**GREENBERG TRAURIG, LLP**
Alan J. Brody, Esq.
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 443-3543 (Telephone)
(973) 295-1333(Facsimile)
*Counsel for Jefferies LLC and Jefferies Group, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| -------------------------------------------------- X | : | |
| *In re*: | : | |
| | : | Chapter 7 |
| RICK ALAN DAVIDSON, | : | Case No. 19-11486 (DSJ) |
| | : | |
| Debtor. | : | |
| | : | |
| -------------------------------------------------- X | : | |
| JEFFERIES, LLC and JEFFERIES | : | |
| GROUP, LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | Case No. 19-01395 (DSJ) |
| RICK ALAN DAVIDSON | : | |
| | : | |
| Defendant. | : | |
| | : | |
| -------------------------------------------------- X | : | |

---

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

*Of Counsel and On the Brief:*
Alan J. Brody
Tracy L. Gerber (admitted *pro hac vice*)
Elizabeth E. Moum (admitted *pro hac vice*)

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS .................................................................... 1

LEGAL ARGUMENT ......................................................................... 1

I.     SUMMARY JUDGMENT STANDARD ........................................... 1

II.    DAVIDSON IS NOT ENTITLED TO JUDGMENT ON JEFFRIES' NON-DISCHARGEABILITY CLAIM UNDER 11 U.S.C. 523(a)(2)(A) (COUNT I) ............................................................................................. 2

A.  The Evidence Establishes That Davidson Obtained The Debt In Question By False Pretenses, A False Representation And Actual Fraud ..................... 2

i.   Davidson's Omissions and False Representations to Jeffries ....... 4

a.  Davidson Falsely Represented He Was Not, And Had Never Been, The Subject of Investigation By Any Employer Or Governmental Or Regulatory Authority ................................ 5

b.  Davidson Falsely Represented The Reason For His Prior Thiry-Day Suspension At Morgan Stanley ............................ 9

ii.  Davidson Knew the Representations Were False at the Time They Were Made ........................................................................ 10

iii. Davidson's Intent to Deceive Jeffries ........................................... 13

iv. Jeffries Justifiably Relied on Davidson's Representations ........... 16

v.  Jeffries' Damages ........................................................................ 23

III.   DEFENDANT IS NOT ENTITLED TO JUDGMENT ON JEFFRIES' NON-DISCHARGEABILITY CLAIMS UNDER 11 U.S.C. 727(a) (COUNTS II-V) ........................................................................................ 24

A.  Legal Standard .................................................................................... 24

i.   Davidson is Not Entitled to Judgment on Jeffries' Section 727(a)(2)(A) Claim ................................................................... 24

i

        a.  Davidson Concealed Equity Interest in the Sag Harbor Property.............................................................................26

        b.  Davidson Intentionally Misrepresented His Gross Income..............................................................................27

        c.  Davidson's Concealment, and Failure to Explain Dissipation, of Assets.............................................................28

           (1) PUB ACCOUNT 4489 ..............................................28

           (2) Bellator LLC's Bank of America Account & Transfers to Sterns ......................................................30

           (3) Davidson's Failure to Disclose Business Interest.......31

    ii.     Davidson is Not Entitled to Judgment on Jeffries' Section 727(a)(3) Claim....................................................32

    iii.    Davidson is Not Entitled to Judgment on Jeffries' Section 727(a)(4)(A) Claim ...............................................34

    iv.    Davidson is Not Entitled to Judgment on Jeffries' Section 727(a)(5) Claim....................................................34

CONCLUSION.............................................................................................35

ACTIVE 697570654v10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Antoniou*,
   527 B.R. 71 (Bankr. E.D.N.Y. 2015) ..............................................................33, 34

*Arfa v. Roni LLC (In re Arfa)*,
   2015 U.S. Dist. LEXIS 127716 (S.D.N.Y. 2015) ...................................................14

*In re Bridge Constr. Servs. Of Fla.*,
   140 F. Supp. 3d 324 (S.D.N.Y. 2015) ......................................................................4

*Brod v. Omya, Inc.*,
   653 F.3d 156 (2d Cir. 2011) ......................................................................................2

*In re Cacioli*,
   463 F.3d at 238 .........................................................................................................35

*In re Cahill*,
   2017 Bankr. LEXIS 501 .........................................................................3, 16, 19, 20

*Carver Fed. Sav. Bank v. Cedillo (In re Cedillo)*,
   573 B.R. 405 (Bankr. E.D.N.Y. 2017) ....................................................................14

*United States v. City of New York*,
   717 F.3d 72 (2d Cir. 2013) ......................................................................................16

*Converse v. State Farm Fire & Cas. Co.*,
   2023 U.S. Dist. LEXIS 119430 (N.D.N.Y. July 12, 2023) ....................................21

*In re Deutsch*,
   575 B.R. ..........................................................................................................2, 13, 32

*DiStiso v. Cook*,
   691 F.3d 226 (2d Cir. 2012) ....................................................................................17

*United States v. Drame*,
   2021 U.S. Dist. LEXIS 64268 (S.D.N.Y. April 1, 2021) .......................................21

*FTC v. Duggan (In re Duggan)*,
   169 B.R. 318 (Bankr. E.D.N.Y. 1994) ....................................................................13

*Fine v. Bellefonte Underwriters Ins.*,
   725 F.2d 179 (2d Cir. 1984) ....................................................................................21

ACTIVE 697570654v10

*In re Flagstaff Foodservice Corp.*,
 25 B.R. 844 (Bankr. S.D.N.Y. 1982) ...................................................................16

*Minsky v. Silverstein*,
 151 B.R. 657 (Bankr. E.D.N.Y. 1993) ............................................................24, 25

*Ng v. Adler*,
 518 B.R. 228 (E.D.N.Y. 2014) ............................................................................32

*Nnebe v. Daus*,
 2013 U.S. Dist. LEXIS 120673 (S.D.N.Y. Aug. 21, 2013) .................................12

*Nof v. Gannon (In re Gannon)*,
 173 B.R. 313 (Bankr. S.D.N.Y.1994) ..................................................................35

*In re Paredes*,
 2017 Bankr. LEXIS 1679 .................................................................................4, 14

*Perillo v. Cassandro (In re Cassandro)*,
 2015 Bankr. LEXIS 3474 (Bankr. E.D.N.Y. Oct. 14, 2015) ...........................16, 23

*In re Postiglione*,
 2019 WL 2590946 (Bankr. E.D.N.Y. June 24, 2019) ..........................................25

*Reddy v. Melnick*,
 592 B.R. 9 (N.D.N.Y. 2018) .................................................................................22

*Rule v. Brine, Inc.*,
 85 F.3d 1002 (2d Cir. 1996) .................................................................................16

*Salomon v. Kaiser (In re Kaiser)*,
 722 F.2d 1574 (2d Cir. 1983) ...............................................................................25

*Schackner v. Breslin Realty Dev. Corp.*,
 2012 WL 32624 (E.D.N.Y. Jan. 5, 2012) ............................................................32

*State Bank of India v. Sethi (In re Sethi)*,
 250 B.R. 831 (Bankr. E.D.N.Y. 2000) .............................................................32, 33

*In re Vanarthos*,
 445 B.R. 257 (Bankr. S.D.N.Y. 2011) ..................................................................13

*Varble v. Chase (In re Chase)*,
 372 B.R. 133 (Bankr. S.D.N.Y. 2007) ...................................................................2, 3

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*,
 373 F.3d 241 (2d Cir. 2004) ...................................................................................2

iv

*Wachtel v. Rich (In re Rich),*
   353 B.R. 796 (Bankr. S.D.N.Y. 2006) .................................................................12

*Weyant v. Okst,*
   101 F.3d 845 (2d Cir. 1996) ..............................................................................12

**Statutes**

11 U.S.C. 523(a)(2)(A) .................................................................................................2

11 U.S.C. 727(a) ........................................................................................................23

11 U.S.C. §522(d)(5) ..................................................................................................26

11 U.S.C. §523(a)(2)(A) ................................................................................... *passim*

11 U.S.C. §727(a) ......................................................................................................24

11 U.S.C. §§727(a)(2)(A) ...........................................................................................24

11 U.S.C. §727(a)(3) ................................................................................24, 32, 33, 35

11 U.S.C. §727(a)(4)(A) .............................................................................................24

11 U.S.C. §727(a)(5) ........................................................................................24, 34, 35

**Other Authorities**

Bankr. R. 7056 .............................................................................................................1

Fed. R. Civ. P. 56 .........................................................................................................1

Fed. R. Civ. P. 56(a) ....................................................................................................1

Restatement (Second) of Torts Section 551 (1977) ...................................................22

Rule 9 ...........................................................................................................................5

ACTIVE 697570654v10

Plaintiffs Jefferies, LLC and Jefferies Group, LLC (collectively, "Jefferies" or "Plaintiffs") respectfully submit this brief in opposition to defendant Rick Alan Davidson's ("Defendant" or "Davidson") motion for summary judgment.

## PRELIMINARY STATEMENT

Davidson is the antithesis of the "the honest but unfortunate debtor." Not only did Davidson procure loan monies from Jefferies through misrepresentations and omissions of material fact, he also repeatedly, and intentionally, concealed his financial assets and misrepresented his financial condition in an attempt to thwart Jefferies' recovery of the money it is rightfully owed. In keeping with his *modus operandi*, Davidson's baseless motion misrepresents and omits evidence which makes clear this case cannot be decided on a motion for summary judgment. Davidson, based on a miscellany of cherry-picked evidence in a vast discovery record, boldly asserts that key issues are undisputed when nothing could be further from the truth. As detailed below, the parties disagree on nearly every question of fact and the evidence submitted by Jefferies in its opposition plainly contradicts all of Davidson's allegedly "undisputed" facts. The parties' factual disagreement requires that Davidson's summary judgment motion be denied in its entirety.

## STATEMENT OF FACTS

Jefferies respectfully refers the Court to its Response to Davidson's Statement of Undisputed Material Facts and Jefferies' Counterstatement of Material Facts ("Jefferies SOMF") submitted herewith for a full and complete recitation of the facts at issue in this lawsuit.

## LEGAL ARGUMENT

### I.     SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56, made applicable to proceedings before a Bankruptcy Court pursuant to Bankr. R. 7056, provides that a court shall grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004). The movant bears the initial burden to offer evidence that satisfies "each material element of his claim or defense, demonstrating that he is entitled to relief." *In re Deutsch*, 575 B.R. at 597. "Once the movant has made this initial showing, the nonmoving party must provide evidence of a genuine issue of fact in order to successfully oppose the motion." *Id.* "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). Davidson has not and cannot even meet his initial burden demonstrating entitlement to summary judgment on any of Jefferies' claims.

## II. DAVIDSON IS NOT ENTITLED TO JUDGMENT ON JEFFERIES' NON-DISCHARGEABILITY CLAIM UNDER 11 U.S.C. 523(a)(2)(A) (COUNT I)

### A. The Evidence Establishes That Davidson Obtained The Debt In Question By False Pretenses, A False Representation And Actual Fraud

Section 523(a)(2)(A) provides that a debtor will not be discharged from any debt for money by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. §523(a)(2)(A). "False pretenses, a false representation, and actual fraud are three distinct concepts each sufficient to deny a debtor a discharge." *Varble v. Chase (In re Chase)*, 372 B.R. 133, 136 (Bankr. S.D.N.Y. 2007).

To object to the discharge of a debt based on false pretenses, a false representation, or actual fraud under section 523(a)(2)(A), a creditor must show "(i) the debtor made a false representation; (ii) at the time the representation was made, the debtor knew it was false; (iii) the debtor made the representation with intent to deceive the creditor; (iv) the creditor justifiably relied on the representation; and (v) the creditor sustained loss or damage as a proximate consequence of the false representation." *Parklex Assocs. v. Deutsch (In re Deutsch)*, 575 B.R. 590, 599 (Bankr.

S.D.N.Y. 2017). For purposes of Section 523(a)(2)(A), a false representation means that "(1) the defendant made a false or misleading statement (2) with intent to deceive (3) in order for the plaintiff to turn over money or property to the defendant." *Id.* (citations omitted). Importantly, "[o]missions of fact can qualify as false representations: '[a] false representation can be shown through either an express statement or through an omission where the circumstances are such that disclosure is necessary to correct what would otherwise be a false impression.'" *Id.* (citations omitted). Similarly, to establish non-dischargeability for false pretenses, plaintiff must show (1) an implied misrepresentation or conduct by the defendant, (2) promoted knowingly and willingly by the defendant, (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff, (4) which wrongfully induced the plaintiff to advance money, property, or credit to the defendant. *In re Chase*, 372 B.R. at 137. "The distinguishing element between a false pretense and a false representation is that of an explicit statement by the Debtor that results in an overt misrepresentation." *In re Cahill*, 2017 Bankr. LEXIS 501, at *23-24.

A debt may also be excepted from discharge under section 523(a)(2)(A) where the creditor establishes actual fraud, which includes "types of fraud beyond frauds based on a misrepresentation." *In re Cahill*, 2017 Bankr. LEXIS 501, at *17-18 (actual fraud is "anything that counts as 'fraud' and is done with wrongful intent.'") (citations omitted).

Although a plaintiff can satisfy a claim under section 523(a)(2)(A) by establishing just one of the three types of fraud, here, Jefferies satisfies the elements for false pretenses, false representations, and actual fraud, and Davidson is not entitled to summary judgment on Jefferies' claim for non-dischargeability under Section 523(a)(2)(A).[1]

---

[1] Jefferies has alleged that Davidson obtained the loan under actual fraud, false pretenses and false representations. Compl. at Section III and Count I. Davidson's moving brief, however, only addresses Jefferies' false representations and contains no argument regarding Jefferies' false pretenses and actual fraud allegations. Accordingly, Davidson is not seeking summary judgment on Jefferies' false pretenses and actual fraud allegations in Count I and has waived

As a preliminary matter, Davidson's suggestion that the analysis on a summary judgment motion "must be narrowly construed as in favor of Davidson" (Brf. at 6) is disingenuous and misleading. It is true that because of the "fresh start policy of the Bankruptcy Code . . . exceptions to the dischargeability of debts should be narrowly construed in favor of a debtor," but "[w]hen the liability that the debtor seeks to discharge was incurred due to the debtor's fraud, the Bankruptcy Code precludes a discharge, 'affording relief only to an honest but unfortunate debtor.'" *In re Paredes*, 2017 Bankr. LEXIS 1679, at *11 (quoting *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998)). This case presents the very situation where the Bankruptcy Code precludes discharge of a debt because it was obtained through fraudulent misrepresentations, false pretenses, and fraud.

i. *Davidson's Omissions and False Representations to Jefferies*

Davidson erroneously and misleadingly contends that the <u>only</u> misrepresentation that Jefferies' designated corporate representative testified Davidson made to it and that Jefferies relied upon in extending its employment offer and Loan to Davidson was that he voluntarily separated from Morgan Stanley, when in reality his separation was not voluntary. That is absolutely false.[2] Rather, Jefferies' decision to hire Davidson and provide him with the Loan[3] was based on several false representations and omissions, only one of which is his misrepresentation that his separation

---

any argument on this point. *See In re Bridge Constr. Servs. Of Fla.*, 140 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) ("Bridge did not advance arguments for summary judgment on those claims in its papers, and neither Tutor Perini nor Hughes had any opportunity to respond to such arguments. Accordingly, those claims are not before the Court on the current motions") (citing *Hammond v. Toy Indus. Ass'n, Inc.*, 8 F. Supp. 3d 484, 499 (S.D.N.Y. 2014) (refusing to consider arguments not raised in motion for summary judgment where opposing party had no opportunity to respond)). In any event, as stated in Legal Argument, Section II.A herein, Davidson would not be entitled to summary judgment on Jefferies' claim for non-dischargeability under Section 523(a)(2)(A) based on false pretenses or actual fraud.

[2] Moreover, contrary to Davidson's argument and as set forth in Legal Argument at Section II.A.i herein, Davidson's representation that his separation from Morgan Stanley was "voluntary" was, in fact, a misrepresentation. *See also* Jefferies SOMF, ¶¶32, 48-52, 58-66. Moreover, Ms. Scoran's deposition testimony was solely in response to the questions that Davidson's counsel chose to ask and does not in any way limit Jefferies' claims or evidence that Jefferies will present at trial. Among other things, Davidson's counsel did not inquire as to all of the misrepresentations that Davidson made to Jefferies.

[3] Capitalized terms not otherwise defined herein have the same meaning as defined in Jefferies SOMF.

from Morgan Stanley was voluntary. The other misrepresentations include but are not limited to (1) Davidson's statement, contained in Jefferies' offer letter, contrary to fact, that he was not and had not been the subject of any investigation, whether by any prior employer, any governmental or regulatory authority, or any self-regulatory organization (Ex. 16 (Offer Letter)), (2) Defendant's false claim that his 30-day suspension from Morgan Stanley was not disciplinary (Jefferies SOMF, ¶¶27-30, 62), (3) Defendant's failure to advise Jefferies of the multiple disciplinary actions Morgan Stanley had taken against Defendant due to his trading misconduct and drug usage, including but not limited to Letters of Reprimand, heightened supervision and a Last Chance Agreement (*id.* ¶¶15, 62-66), (4) Defendant's failure to notify Jefferies about the Cautionary Action Letter he had received from FINRA for exercising unauthorized trading in client accounts (*id.*), and (5) Defendant's failure to advise Jefferies that he had violated Rule 9 of FINRA's rules by engaging in disruptive behavior during a licensing exam (*id.*).

   a. *Davidson Falsely Represented He Was Not, And Had Never Been, The Subject of Investigation By Any Employer Or Governmental Or Regulatory Authority*

At the time Jefferies extended Davidson an offer of employment and the Loan, Jefferies was only aware of <u>three</u> complaints against Davidson alleging unauthorized trading and that Davidson had previously been suspended for thirty days. Jefferies' knowledge was based on the three customer complaints disclosed on Davison's CRD prior to the time of his hire, and Davidson's representations that he had not been subject to any other compliance-related issues at his current or prior employers and that the 30-day suspension imposed by Morgan Stanley was non-disciplinary. Jefferies SOMF ¶20-32.

Specifically, in response to Jefferies' request for an explanation of the three customer complaints set forth on his CRD,[4] by letter dated April 22, 2016, Davidson claimed Morgan Stanley had not asked him to participate in settlement discussions with Sonnenblick or Hunter, Sonnenblick still maintained an account relationship with Davidson, and Morgan Stanley denied the Levy complaint as "frivolous." Ex. 18. Davidson's pre-hire Letter also stated that he was "suspended for 30 days," but that "since [his] return to work in the last four years had no further complaints nor commentary regarding this or anyone else." *Id.* Because Jefferies could not call Morgan Stanley to verify any of the facts or circumstances described by Davidson, as such an inquiry would tip off Morgan Stanley that Davidson was seeking employment elsewhere, Jefferies had to rely solely on Davidson's explanation. Ex. 1 (Scoran Tr. at 105:16-106:21). Contrary to Davidson's representations in his April 22, 2016 Letter, Davidson was also the subject of another customer complaint and substantive compliance-related incidents throughout his tenure at Morgan Stanley – all of which he failed to disclose to Jefferies prior to his hiring and the extension of the significant loan monies by Jefferies. Exs. 2-13, 16, 17 (Morgan Stanley Compliance Issues Documents; Offer Letter; Compliance Questionnaire); Scoran Dec., ¶6-15.

Relying on the information Jefferies was provided at the time (which Jefferies now knows to have been substantially false), on May 17, 2016, Jefferies offered Davidson employment as an at-will Managing Director in the Wealth Management Division in New York City. Exs. 1, 16 (Scoran Tr. at 26:23-27:5, 56:8-15; Offer Letter). In connection with his hiring, Davidson signed, among other documents, an offer letter, which set forth the pertinent terms of Davidson's prospective employment and compensation ("Offer Letter"). Ex. 16. The Offer Letter, which

---

[4] The CRD included three customer complaints made by customers serviced by Davidson while he was employed at Morgan Stanley: Emily Sonnenblick who made a complaint on March 6, 2012, Stephen Levy who made a complaint on September 28, 2011, and Edwin Hunter who made a complaint on January 5, 2012. Ex. 14 (March 22, 2016 CRD).

Davidson admitted was "an important letter" (Ex. 24 (Davidson Tr. at 205:24-206:5)), required that Davidson specifically warrant, "Except as disclosed below, to the best of my current knowledge and belief, I am not, and have not been, the subject of any investigation, whether by any prior employer, any governmental or regulatory authority, or any self-regulatory organization," and it provided a space for Davidson to insert details about prior and ongoing investigations of which Defendant was the subject. Ex. 16. Davidson left the space blank, falsely indicating there was nothing to disclose. *Id.*

The evidence in the record establishes that, prior to his commencing employment with Jefferies, Davidson did not disclose to Jefferies any further compliance-related issues that he experienced at his prior employers. Exs. 14, 16, 18 (March 21, 2016 CRD; April 22, 2016 Letter; Offer Letter). He also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation, or being considered for discipline or termination, by Morgan Stanley. Scoran Dec., ¶9; Ex. 1 (Scoran Tr. at 95:18-97:8).

Jefferies now knows that Davidson's representations were false. During the course of his pre-hire discussions with Jefferies, Davidson purposefully failed to disclose his extensive negative compliance history at Morgan Stanley, including several internal investigations conducted by Morgan Stanley into Davidson's conduct, resulting in the issuance of two disciplinary letters and a Last Chance Agreement; findings of rule violations by FINRA; FINRA's investigation into Davidson's conduct, resulting in its issuance of a Cautionary Action Letter to Davidson; and his Morgan Stanley-imposed business plan and heightened supervision. Jefferies SOMF, ¶¶14-16, 20-36, 58-66. No doubt in an effort to fraudulently induce Jefferies to extend employment to him and offer him a lucrative compensation package which included the Loan, Davidson made it appear as though he were a compliant broker, who had faced limited scrutiny over his business practices in

the past. Jefferies later learned – long after his employment with Jefferies ended – that Davidson had an extensive history of compliance issues. *Ibid.*[5]

Shockingly, contrary to Davidson's statement to Jefferies that he voluntarily resigned from Morgan Stanley with no compliance issues over the last four years and unbeknownst to Jefferies at the time it hired Davidson and extended him the Loan, he was actually under investigation by Morgan Stanley that began on January 6, 2016 and was about to be terminated under the terms of the Last Chance Agreement.[6] *Id.* ¶12. Davidson was aware of the Morgan Stanley investigation at the time he resigned and joined Jefferies, yet he did not disclose that fact to Jefferies, intentionally misrepresented to Jefferies that he had never been under review or investigation by any prior employer or any regulator, and made it appear as though he were a compliant broker who had faced limited scrutiny over his business practices in the past. *Id.* ¶¶12, 15-16.

---

[5] The evidence also shows that, in an effort to prevent Jefferies from learning of his fraudulent misrepresentations, Davidson continued to mislead Jefferies about his compliance history at Morgan Stanley even after his hiring. On May 23, 2016, the Massachusetts State Securities Division sent Jefferies a letter, commencing a regulatory inquiry into Davidson. Among other information, the Massachusetts Securities Division required Davidson to disclose and provide an explanation of other compliance-related matters, regardless of whether the matter would have to be reported on Form U4 or Form U5, including: (a) an inquiry or investigation by any securities regulatory agency or self-regulatory organization; … (c) an internal investigation by Jefferies or any broker-dealer with which the Applicant was formerly associated; and (d) a customer complaint, arbitration proceeding, or securities related litigation. Ex. 26 (May 23, 2016 Letter). When Jefferies forwarded the Massachusetts Securities Division's inquiry to Davidson, Davidson responded, "I read what they asked for and I believe it's all fully disclosed on my U4 ***nothing since then at all has come up or reported by anyone***." Ex. 27 (May 31, 2016 Davidson Email to Lau) (emphasis added).

Shortly after his hiring, Davison was also required to complete a New Hire Compliance Questionnaire 2016 (the "Compliance Questionnaire"). Ex. 17 (Compliance Questionnaire). In his answers to the Compliance Questionnaire, which he certified were true and correct, Davidson made several representations which Jefferies now knows to have been false, including:
- Davidson untruthfully answered that no federal or state financial regulatory organization (which includes FINRA):
  - Notified him "in writing or otherwise that it has made [him] or the organization the subject of a regulatory complaint, proceeding or investigation."
  - Found Davidson to have violated laws, rules or regulations.
  - Disciplined Davidson in any way.
- Davidson untruthfully answered that he was only named in the Three 2021 Customer Complaints during the period of four years prior to the Compliance Questionnaire.
- Davidson untruthfully answered that he had not resigned from Morgan Stanley after allegations were made accusing him of investment related violations.

Ex. 17 (Compliance Questionnaire).

[6] Tellingly, the investigation ended on May 17, 2016 – the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. See Ex. 25 (Morgan Stanley Form U5).

The documentary evidence reaffirms that Davidson had actual knowledge of the 2016 Morgan Stanley investigation and the prior Morgan Stanley investigations–evidenced by his counter-signature on various disciplinary documents (Exs. 4, 6, 8, 13 (June 2011 & February 2012 Letters of Reprimand; 2012 Last Chance Agreement; May 2013 Cautionary Action Letter)) (*see also* Legal Argument at Section II.A.ii below). However, Davidson falsely represented to Jefferies that he was not, nor had he ever been, under review or investigation by any prior employer or regulator. Exs. 16, 18 (April 22, 2016 Letter from Davidson; Offer Letter); Scoran Dec., ¶6-14.

   b. *Davidson Falsely Represented The Reason For His Prior Thirty-Day Suspension At Morgan Stanley*

 After Davidson disclosed to Jefferies (for the first time in the April 22, 2016 Pre-Hire Letter) that Morgan Stanley had suspended him for thirty days,[7] Jefferies immediately followed up for an explanation. Davidson advised Jefferies that he was told to take a month off while Morgan Stanley investigated a customer complaint and that the suspension was not a disciplinary action. Exs. 21, 23 (Lau Tr. at 44:21-22; Lau April 22, 2016 Email). This was an intentional misrepresentation. It was only in connection with Davidson's post-termination FINRA Arbitration that Morgan Stanley suspended Davidson because he had engaged in unauthorized trading. Therefore, and contrary to the explanation that Davidson provided to Jefferies at the time of his hire, the suspension was disciplinary in nature. Ex. 9 (March 5, 2012 Koutsantonis Email); Scoran Dec., ¶8-9, 13. The evidence establishes that Jefferies easily satisfies the first factor. Davidson's motion for summary judgment with respect to Count I must be denied for this reason alone.

_____

[7] Specifically, the pre-hire April 22, 2016 Letter stated that Davidson was "suspended for 30 days," but that "since [his] return to work in the last four years had no further complaints nor commentary regarding this or anyone else." There was no reference to a suspension on Davidson's CRD. Exs. 14, 21, 22 (Lau Tr. at 37:4-17; Arcuri Tr. at 34:11-13; CRD). Additionally, Davidson's representation that he had "no further complaints nor commentary regarding this or anyone else" is also false because Davidson subsequently received a FINRA Cautionary Action Letter for engaging in additional incidents of exercising unauthorized discretion. Ex 13 (FINRA Cautionary Action Letter).

9

### ii. _Davidson Knew the Representations Were False at the Time They Were Made_

Davidson's insistence that, at the time he signed the Jefferies Offer Letter, he was completely unaware that he had _ever_ been the subject of any investigation by any prior employer, governmental or regulatory authority, or self-regulatory organization, is disingenuous and simply not credible. This fact is evidenced by the many written disciplinary documents Davidson received from Morgan Stanley and signed, and by Davidson's own testimony. Further, the following facts cannot be disputed – and in fact, Davidson has _admitted_ that:

- He was the subject of an investigation in 2011 by Morgan Stanley (Answer, ¶22) [Adv. Pro. Doc. No. 6]);

- As a result of the 2011 Morgan Stanley investigation, Davidson received and signed a 2011 Letter of Reprimand for exercising discretion in client accounts and unauthorized trading (_id._; Exs. 6, 24 (2011 Letter of Reprimand; Davidson Tr. at 78:22-25, 88:12-15));[8]

- He was the subject of an investigation in 2012 by Morgan Stanley (Answer, ¶23));

- As a result of the 2012 investigation, Davidson received, and signed, a second Letter of Reprimand for unauthorized trading (_id._; Exs. 8, 24 (Feb. 2012 Letter of Reprimand; Davidson Tr. at 102:1-4));

- Following the 2012 Morgan Stanley investigation, Davidson was suspended for thirty days without pay (Ex. 18 (April 22, 2016 Letter));[9]

- Following the 2012 Morgan Stanley investigation, Davidson also received and signed a Last

---

[8] Davidson's testimony regarding the 2011 investigation and 2011 Letter of Reprimand is a prime example of his disingenuity and lack of credibility. During his deposition, Davidson stated that he had "no idea" if he was the subject of internal investigation by Morgan Stanley in 2011 (Ex. 24 (Davidson Tr. at 72:17-20)); he couldn't remember writing the answer to paragraph 22 of the Complaint "or even giving the answer or even the question being sent to me" (_id._ at 74:17-23); ultimately, however, Davidson finally admitted that he does not believe his answer to paragraph 22 of the Complaint to be untrue (_id._ 78:22-25). Davidson then attempted to deny ever signing the 2011 Letter of Reprimand, but ultimately admitted that "I'm sure it must have been" his signature on the document, and further admitted that he has no reason to believe that Morgan Stanley would sign his name to the letter. _Id._ at 88:12-15, 88:22-89:4.

[9] Davidson's testimony regarding the reason for his 30-day suspension is yet another example of his complete lack of candor. Not only did Davidson, at the time of his hiring, mispresent to Jefferies the complete reason for the 30-day suspension, but after Jefferies filed this adversary proceeding, in an effort to continue hiding the truth, Davidson incredulously testified that he was not suspended; and instead, that he was told to take (paid) time off to study for his Series 65 exam. Ex. 24 (Davidson Tr. 106:6-12, 127:13-128-8). Davidson's testimony is false and contradicted by the documentary evidence.

Chance Agreement which memorialized not only that Davidson had exercised discretion in client accounts but also his violation of Morgan Stanley's substance abuse policies (Answer, ¶24; Exs. 4, 24 (Last Chance Agreement; Davidson Tr. at 114:13-14));

- By signing the Last Chance Agreement, Davidson acknowledged that the Last Chance Agreement gave Davidson a "last chance" at Morgan Stanley and made clear that any violation of Morgan Stanley policy would result in/be grounds for immediate termination (Exs. 4, 24 (Last Chance Agreement; Davidson Tr. at 116:15-18));

- Unauthorized discretion and client account is a very serious matter and could result in the termination of his employment (Ex. 24 (Davidson Tr. at 118:11-14, 120:2-5, 120:16-121:2));

- On March 8, 2012, Davidson received a letter from FINRA finding Davidson had violated FINRA rules and requesting Morgan Stanley outline the steps it has taken to ensure Davidson abides by FINRA rules of conduct in the future (Exs. 10, 24 (March 8, 2012 FINRA Letter; Davidson Tr. at 141:1-17));

- On May 16, 2013, following an investigation by FINRA into Davidson's conduct, FINRA issued a cautionary action letter to Davidson for exercising discretion without written authorization in four customer accounts (Ex. 13; Answer, ¶25);

- He does not recall providing the 2011 or 2012 Letters of Reprimand, the Last Chance Agreement or Addendum to the Last Chance Agreement, the March 13, 2012 Memorandum, or the FINRA cautionary action letters to anybody at Jefferies before or after he was hired, or otherwise discussing any of those documents with anyone at Jefferies at any time before he was hired (Ex. 24 (Davidson Tr. at 105:4-19, 134:15-21, 136:5-7, 155:-17-156:11)).

Further, while Davidson denies having knowledge, Davidson was unquestionably aware of Morgan Stanley's 2016 internal investigation. On March 15, 2016, Darren Wirhouski, Senior Complex Risk Officer for the Midtown Manhattan Complex at Morgan Stanley Wealth Management, emailed Davidson: "Pursuant to ***SIU's ongoing investigation***, please provide your personal cell phone records from January 1, 2015 to March 15, 2016. Please provide these records no later than Tuesday, March 22, 2016."[10] Ex. 2 (emphasis added). Notably, in response to Mr. Wirhouski's request, Davidson did not ask what ongoing investigation Mr. Wirhouski was referring to or inquire what SIU was. Rather, Defendant acknowledged the request and asked for

---

[10] As acknowledged by Davidson, "SIU" stands for Morgan Stanley's Specific Investigation Unit. Ex. 24 (Davidson Tr. at 160:17-25).

ACTIVE 697570654v10

clarification on which accounts records were being sought – clearly indicating he was already aware that an investigation was ongoing. *Id.*

At bottom, the wealth of evidence in the record, including Davidson's own admissions, clearly demonstrates that Davidson knew his representations to Jefferies that he was a compliant broker who had faced limited scrutiny over his business practices in the past were false at the time they were made. Even if there were any doubt as to Davidson's knowledge that his pre-hire statements were false and/or deliberately misleading, denial of summary judgment is still warranted. On a motion for summary judgment, "the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments[.]" *Weyant v. Okst*, 101 F.3d 845, 854-55 (2d Cir. 1996) (citations omitted) ("[a]lthough Okst and Auberger gave evidence to the contrary, the district court was not entitled, on a motion for summary judgment, to credit their version of the facts and enter judgment based on its own view that their version was more likely true. The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury."). Issues concerning Davidson's knowledge of the falsity of his representations go towards his credibility as a witness, matters that are inappropriate on a motion for summary judgment and instead, must be left for the jury to decide. *See also Wachtel v. Rich (In re Rich)*, 353 B.R. 796, 804 (Bankr. S.D.N.Y. 2006) ("Notwithstanding the Debtor's assertions as summarized above, they obviously do not entitle him to summary judgment. While the Debtor may be able to submit evidence on these claims or some of them at a trial, Plaintiff is entitled at a minimum to test the credibility of the Debtor's self-serving and undocumented assertions."); *Nnebe v. Daus*, 2013 U.S. Dist. LEXIS 120673, at *20 (S.D.N.Y. Aug. 21, 2013) (denying motions for summary judgment because "on

12

summary judgment, the Court cannot weigh evidence or make credibility assessments").

Moreover, even if Davidson "had no knowledge or memory that he was the subject of any investigation" when he signed his Jefferies Offer Letter or the first time he learned that he was under internal investigation by Morgan Stanley was "at the same time that Jefferies did – when the Form U5 was filed" (Brf. at 8)[11] – which, as set forth above, is simply not credible – such ignorance and reckless disregard for the truth does not and cannot absolve him from liability. *See FTC v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994) ("Were he nevertheless ignorant, the same conclusion would be mandated: A false representation made under circumstances where a debtor should have known of the falsity is one made with reckless disregard for the truth, and this satisfies the knowledge requirement.").

### iii. *Davidson's Intent to Deceive Jefferies*

Under Section 523(a)(2)(A), a debtor's intent to deceive "need not be express, as 'intent may be inferred when the totality of the circumstances presents a picture of deceptive conduct by the debtor, which indicates that [he] did intend to deceive and cheat the [creditor].'" *In re Deutsch*, 575 B.R. at 600 (quoting *Hong Kong Deposit and Guar. Co. v. Shaheen (In re Shaheen)*, 111 B.R. 48, 53 (S.D.N.Y. 1990)). "Pleading fraud in the context of [] nondischargeability actions may be difficult because 'few men will admit to fraudulent intent.'" *In re Vanarthos*, 445 B.R. 257, 262-263 (Bankr. S.D.N.Y. 2011) (quoting *Mfrs. Hanover Tr. Co. v. Pannell (In re Pannell)*, 27 B.R. 298, 302 (Bankr. E.D.N.Y. 1983)). "Absent such circumstances, the debtor's state of mind is difficult to prove and the inference of fraudulent intent is generally established through the use of circumstantial evidence." *Id.* Intent to deceive can also be satisfied if the debtor "acted with reckless disregard for the truth, with the recklessness of the debtor's behavior determined from the

---

[11] In any event, contrary to Davidson's argument, this is not the only misrepresentation upon which Jefferies' claim for non-dischargeability is based.

totality of the circumstances." *Medina v. Paredes (In re Paredes)*, 2017 Bankr. LEXIS 1679, at *17-18 (Bankr. S.D.N.Y. June 15, 2017) (finding debtor "acted in reckless disregard of the truth of the statements he made when he entered into" agreement with creditor where statements contained in the agreement and documents "were false and misleading because they gave the false impression that [a] corporation that [debtor] knew no longer existed, owned the restaurant and held a liquor license", and debtor "at least recklessly, conveyed shares of a corporation [] that he knew did not have a liquor license"; further noting that the debtor "omitted to state facts necessary to make the statements he did make not misleading. Half truths are likewise actionable in this context."); *Arfa v. Roni LLC (In re Arfa)*, 2015 U.S. Dist. LEXIS 127716, at *9-11 (S.D.N.Y. 2015) (affirming bankruptcy court's finding that appellant, experienced lawyer and former SEC attorney, acted with reckless disregard to the false impression created by her omission when she disclosed a variety of fees to the creditor investors but failed to disclose material evidence about promoter commissions; given appellant's sophisticated background, "it was not clearly erroneous to conclude that the half-truth of disclosing certain fees while withholding information of the Commissions was done with, at a minimum, reckless disregard as to whether it would create a false impression."); *Carver Fed. Sav. Bank v. Cedillo (In re Cedillo)*, 573 B.R. 405, 422 (Bankr. E.D.N.Y. 2017) (Bankruptcy courts have long recognized that a "failure to read the document, in and of itself, constitutes a reckless disregard for its accuracy"; under New York law a person who signs an agreement is conclusively bound by it even if he did not read the agreement or understand its terms; and further noting that courts also consider a debtor's education when determining whether a debtor acted with reckless disregard for the consequences of its actions).

Taking into account the uncontroverted evidence and totality of the circumstances can lead to only one conclusion: Davidson, who admittedly worked as a financial advisor in the financial

14

services industry, "one of the most heavily regulated industries in the world", for over 36 years and as such, is registered with and regulated by the SEC and FINRA (Davidson Statement of Undisputed Material Facts ("SUMF"), ¶¶5-6; Jefferies SOMF, ¶5), clearly knew about his extensive compliance violations at Morgan Stanley. His signatures on the disciplinary documents Morgan Stanley issued to him show that he knew about them. Davidson's extensive financial services industry experience demonstrates that he also clearly knew about the importance of disclosing such information to a potential employer like Jefferies. Davidson purposely hid disclosure of the investigations that Morgan Stanley and FINRA had already undertaken and the discipline he received from them, and then lied about the internal investigation that was ongoing at Morgan Stanley when he sought employment with Jefferies in 2016, all for the purpose of defrauding, and with the intent to defraud, Jefferies. Jefferies SOMF ¶¶14-16, 20-36, 58-66.

Davidson seeks to distract this Court from his fraudulent intent by arguing that he could not possibly have acted with intent to defraud Jefferies because he "had a longstanding relationship with Frank Scheuer who he had known for over thirty years and whom he considered a personal friend" (Brf. at 9). Davidson's argument is not only non-sensical and irrelevant, but it is misleading and untruthful. Davidson's "longstanding relationship" with Mr. Scheuer simply has no bearing at all on Davidson's intent. Davidson seems to suggest that because Mr. Scheuer, who at the time of Davidson's hiring was Chief Operating Officer of Wealth Management at Jefferies, was "advocating for Mr. Davidson's hiring," Davidson could not have intended to deceive Jefferies. However, what Mr. Scheuer did or said is completely inapposite. Mr. Scheuer, who in his role as COO, testified that he did not "hire, recruit or fire advisors" (Ex. 15 (Scheuer Tr. 21:18-20)). In any event, Mr. Scheuer's own conduct does not have any bearing on Davidson's intent to deceive.

While Jefferies maintains that the circumstantial evidence clearly establishes Davidson's

fraudulent intent and acting in reckless disregard for the truth, even if there were any doubt about Davidson's intent to deceive Jefferies, summary judgment is still inappropriate because case law makes clear that "questions of subjective intent can rarely be decided by summary judgment." *United States v. City of New York*, 717 F.3d 72, 82 (2d Cir. 2013) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982)). *See also In re Flagstaff Foodservice Corp.*, 25 B.R. 844, 854 (Bankr. S.D.N.Y. 1982) ("Summary judgment is generally inappropriate when there is a reliance on circumstantial evidence necessary to prove a state of mind"); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are . . . not [matters] for the court on summary judgment.").

iv.    *Jefferies Justifiably Relied on Davidson's Representations*

For purposes of Section 523(a)(2)(A), the justifiable reliance standard applies. Whether a Plaintiff's reliance was justifiable is measured by a subjective standard, not by an objective, reasonable person, standard. *Perillo v. Cassandro (In re Cassandro)*, 2015 Bankr. LEXIS 3474, at *14 (Bankr. E.D.N.Y. Oct. 14, 2015). "Justifiable reliance only requires an investigation if the creditor has some reason to suspect that the debtor is not truthful or that an investigation is necessary." *In re Cahill*, 2017 Bankr. LEXIS 501, at *22-23 (Bankr. E.D.N.Y. Feb. 22, 2017).

Davidson argues that Jefferies cannot satisfy the justifiable reliance factor because (i) "the decision to hire him and to extend him credit[] was based exclusively on his historical performance and ability to move approximately $250 million in new assets to Jefferies," and (ii) after Morgan Stanley filed the Form U5 and Jefferies learned of Morgan Stanley's investigation for the first time, Jefferies treated it "as an immaterial non-event" and therefore the investigation could not have been a "material consideration" for Jefferies. (Brf. at 10-11). Davidson's arguments misconstrue both the facts and the law.

ACTIVE 697570654v10

First, Davidson relies on nothing but his own self-serving declaration to assert that "Jefferies' interest in recruiting and hiring me stemmed from my ability to transfer the $200 to $300 million dollars of assets under management which were contained within accounts held at Morgan Stanley to accounts at Jefferies[.]" Davidson Dec. ¶12. Davidson's baseless and unverified assertion is not admissible evidence because he is not competent to testify as to Jefferies' intent, and therefore it must be disregarded. *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.") (quoting Fed. R. Civ. P. 56(c)(4)).

Significantly, Davidson's self-serving statement is directly contradicted by Jefferies' corporate representative testimony. Ms. Scoran testified she was unaware of what representations Davidson made regarding the approximate value of assets he thought he could transfer to Jefferies, and also testified that the "transferring of assets is driven by clients [who] make the determination on where they want their assets to be or go." Ex. 1 (Scoran Tr. at 69:8-14, 70:4-8). Indeed, Ms. Scoran testified that "the practice of the Compliance Department is we do not generally get involved with the economic deals for wealth management." *Id.* at 75:21-24.

Moreover, Davidson's arguments misrepresent Jefferies' hiring practice and procedure. The documentary evidence and testimony make clear that the decision to hire Davidson and extend him the Loan was not, as Davidson argues, "based exclusively on his historical performance." Rather, Jefferies would <u>not</u> have extended an offer of employment and provided a loan to an individual like Davidson without first obtaining several layers of approval from the Compliance, Legal, and Wealth Management Departments, and in providing their respective approvals for a

prospective hire, each department is responsible for vetting different issues – only one of which is the perceived value of the candidate's book of business. Ex. 1 (Scoran Tr. at 27:22-28:3).

As set forth above, Ms. Scoran testified that the Compliance Department's role in the hiring process was not to vet the candidate's book of business. Not surprisingly, the Compliance Department is responsible for ensuring that the candidate was not statutorily disqualified from serving as a securities broker, reviewing the disclosure information available for that candidate, and asking the candidate about compliance-related issues he might have faced at prior employers, including customer complaints, regulatory investigations, and internal investigations by his prior employers. *Id.* at 42:20-5. As part of that process, the Compliance Department reviews information obtained from the candidate's CRD, and if there are any disclosable items, such disclosures are vetted by both the Legal and Compliance Departments; and the candidate meets and/or speaks with members of Jefferies' business management and Compliance teams. Ex. 1 (Scoran Tr. at 41:10-19, 48:9-17); Scoran Dec., ¶5-6. Both the Legal and Compliance Departments are required to provide their approval for the candidate's hire. Ex. 1 (Scoran Tr. at 48:18-22). Ms. Scoran further confirmed that this is exactly what the Compliance and Legal Departments did in the case of Davidson's hiring: they reviewed the information obtained on Davidson's preregistration check, requested a written explanation from Davidson regarding the three customer complaints on his CRD, and met with and/or asked him about compliance-related issues he might have faced at prior employers. *Id.*; Scoran Dec., ¶¶6-7. Prior to commencing employment with Jefferies, however, Davidson did not disclose to Jefferies any further compliance-related issues that he experienced at his prior employers. *Id.*, ¶¶8-9. He also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley. *Id.*; Ex. 1 (Scoran

Tr. at 95:18-97:8). In reliance on Davidson's representations about his compliance history that Jefferies now knows were false, and based on the limited information contained in his CRD, Jefferies' Compliance Department submitted its approval to hire Davidson. Ex. 1 (Scoran Tr. at 47:19-25, 55:13-56:20, 108:22-109:4); Jefferies SOMF, ¶17.

Second, the case law makes clear that "[j]ustifiable reliance only requires an investigation if the creditor has some reason to suspect that the debtor is not truthful or that an investigation is necessary." *In re Cahill*, 2017 Bankr. LEXIS 501, at *22-23 (Bankr. E.D.N.Y. Feb. 22, 2017). Here, it is undisputed that before he was hired -- and in compliance with securities industry regulatory guidance requiring that firms endeavor to obtain information about a registered person's compliance history so it can make an informed decision about whether it wants to take on the obligation of supervising the registered person and the potential risks of employing that individual (Jefferies SOMF, ¶67) -- Jefferies asked Davidson specific questions related to his compliance history. Davidson's responses to Jefferies' questions were untruthful and he wholly failed to disclose his significant prior compliance issues. Member firms like Jefferies must carefully consider whether to hire brokers with histories of compliance related events and Jefferies was deprived the opportunity to consider the potential regulatory, legal, reputational and compliance implications of Davidson's prior compliance-related issues. Jefferies SOMF, ¶¶67-71, 73. In light of the facts that the three customer complaints (the only customer complaints known to Jefferies at the time) were either settled or dismissed four years prior, Morgan Stanley continued to employ Davidson, and as no other compliance issues appeared on Davidson's CRD or were disclosed by Davidson, Jefferies accepted Davidson's representations that there were no compliance issues, and moved forward with his hiring. *E.g.* Ex. 1 (Scoran Tr. at 106:10-21, 108:22-109:4); Scoran Dec.,

¶¶4-10, 14. Jefferies' reliance on Davidson's statements and assurances was plainly justifiable under these circumstances. *See In re Cahill*, 2017 Bankr. LEXIS 501, at *22-23.

Additionally, by arguing that the Morgan Stanley investigation could not have been a "material consideration" for Jefferies because, as Davidson incorrectly contends, Jefferies took "no responsive action" after learning about the Morgan Stanley investigation, Davidson conflates two distinct concepts: the justifiable reliance factor, and the element of materiality. Davidson contends that "even if Davidson made misrepresentations regarding his compliance and regulatory history at Morgan Stanley [], Jefferies did not 'rely' on any of those representations in deciding to hire him or to make him the loan" (Brf. at 14) because "no action was taken by Jefferies when it learned of Morgan Stanley's purported investigation" (*id.* at 12).

As a preliminary matter, significantly, Davidson's allegation is incorrect. Jefferies did ***not*** learn of Davidson's extensive compliance history until ***after*** Jefferies already terminated Davidson and commenced the FINRA Arbitration. Jefferies SOMF, ¶56-62. The Form U5 disclosed one fact: that Davidson was the subject of an internal investigation at the time of resignation from Morgan Stanley and hiring by Jefferies. Ex. 25. Moreover (and while irrelevant to any of the issues in this adversary proceeding), Davidson's suggestion that Jefferies took no action upon learning of the Morgan Stanley investigation is also false. When Jefferies obtained the Form U5, Jefferies' management confronted Davidson about it. Davidson prevented Jefferies from learning the truth about Morgan Stanley's internal investigation, first claiming he was unaware of the internal review (Ex. 1 (Scoran Tr. at 221:15-23)), and then falsely representing to Jefferies that the Morgan Stanley internal review concerned a loan from a Morgan Stanley employee and that Morgan Stanley had already concluded the investigation with no findings of unauthorized trading. Exs. 28, 29 (June 21, 2016 Davidson Email to Lau; June 23, 2016 Nagy Email to Scoran). Jefferies also contacted

Morgan Stanley to verify Davidson's explanation. However, Morgan Stanley would not provide any further information regarding Davidson. Exs. 1, 30 (Scoran Tr. at 106:7-16, 154:14-155:17; June 22, 2016 Schultz Email to Flessas). Jefferies later learned that these representations by Davidson were also false. Exs. 3, 4 (May 17, 2016 Matthews Email; Last Chance Agreement); Scoran Dec., ¶8-9, 13-19. Davidson's argument that the Morgan Stanley investigation could not have been a "material consideration" for Jefferies is therefore factually false.

Further, case law makes clear that the materiality of a false representation is determined by looking only at the point in time when the false representation was made. "The materiality of false statements [] is not to be judged by what the facts later turn out to have been." *Converse v. State Farm Fire & Cas. Co.*, 2023 U.S. Dist. LEXIS 119430 (N.D.N.Y. July 12, 2023) (quoting *Fine v. Bellefonte Underwriters Ins.*, 725 F.2d 179 (2d Cir. 1984)); *see also Fine*, 725 F.2d at 183 (analyzing whether a false statement is "material only if it relates to a matter or subject which ultimately proves to be decisive or significant in the ultimate disposition of the claim, or is it sufficient that the false statement concerns a subject reasonably relevant to the insurance company's investigation at the time" and concluding "the law is clear that the materiality of false statements during an insurance company investigation is not to be judged by what the facts later turn out to have been . . . the materiality requirement is satisfied if the false statement concerns a subject relevant and germane to the insurer's investigation as it was then proceeding."); *United States v. Drame*, 2021 U.S. Dist. LEXIS 64268 (S.D.N.Y. April 1, 2021) ("Defendant concedes that the misrepresentations were material but argues that there is a chance that the adjudicator may not have viewed this information as very serious, or may have granted him asylum regardless.  However, the Government *need only prove a tendency to influence the decision, not that the decision must actually have been different*. . . . Drame's misrepresentations had the effect

of shutting down a line of questioning relevant to his eligibility. *See Monter*, 430 F.3d at 557. Had the Defendant disclosed his past identity, or that he had been in removal proceedings and his claim for asylum had been denied, *it is reasonable to assume that such information would have influenced a decisionmaker to investigate further into Drame's background and to determine that he was not suitable for admissibility*. It therefore cannot be said that Defendant's past immigration history is immaterial to a decisionmaker deciding admissibility.") (emphasis added).

Davidson's attempts to point to what Jefferies did at a later point in time, *after* it might have learned some half-truths about a small fraction of Davidson's extensive history of compliance issues at Morgan Stanley, to somehow argue that Davidson's false representations and omissions were not material to Jefferies' decision to extend him the Loan, is expressly contrary to the law and the facts. While the Second Circuit has not reviewed the proper standard for materiality under Section 523(a)(2)(A), "[a]s a recurring guidepost for materiality, [] case law often relies on the Restatement (Second) of Torts Section 551 (1977)." *Reddy v. Melnick*, 592 B.R. 9, 23 (N.D.N.Y. 2018) (citations omitted). "In order for a fact to be material, it must have played a substantial part and, thus, have been a substantial factor, in influencing the creditor's decision." *Id.* (citing cases). Davidson's misrepresentations and omissions plainly played a substantial part and were a substantial factor in Jefferies' decision to hire and extend the Loan to Davidson – indeed, it had to, based on securities industry regulatory guidance from FINRA, Jefferies' regulator, which has placed focus on "high-risk" or "recidivist" brokers with histories of compliance issues and indicated their intent for increased regulatory scrutiny of those brokers and the firms that employ them. Jefferies SOMF, ¶¶67-71. In other words, guidance issued by FINRA instructs firms like Jefferies to not only collect this information from recruits, but consider whether they want to take on the risk of employing a broker with a significant compliance history. Ex. 1 (Scoran Tr. at 55:13-

56:15); Scoran Dec. ¶5, 15-16. Significantly, Ms. Scoran confirmed that Davidson's extensive compliance history are serious events and issues that would have caused Jefferies great concern when considering whether to hire him, and that Jefferies' Compliance Department, which Ms. Scoran oversees, would not have granted approval for the hiring of Davidson had Jefferies known of his extensive history of compliance related issues prior to his hire date. *Id.* ¶17. Without approval from the Compliance Department, Jefferies would not have moved forward with the hiring of Mr. Davidson. *Id.* ¶18. And if Mr. Davidson had not been hired, Jefferies would not have extended the Loan to him. *Id.*, ¶19.

　　　v.　　*Jefferies' Damages*

　　　Davidson has not argued and therefore appears to concede that, if Jefferies establishes that Davidson obtained the Loan by false pretenses, false representations or fraud, then Jefferies sustained loss and damages as the proximate consequence of such conduct. As of the Petition Date there was an outstanding principal balance of approximately $5,142,500.00, plus accrued interest of $857,900.54, attorneys' fees and costs of $626,083.30 and estimated arbitration forum fees of $20,587.50, for a total of $6,647,071.34 due from Defendant to Jefferies under the Note. Jeffries' Proof of Claim No. 5-1. On January 12, 2021, this Court entered Judgment in favor of Jefferies against Davidson in the amount of $6,147,071.34. [Adv. Pro. Doc. No. 30.] This amount remains outstanding and unpaid, and the amount of indebtedness continues to increase. Jefferies easily satisfies the final factor. *In re Cassandro*, 2015 Bankr. LEXIS 3474, at *18 ("Defendant's representations to the Plaintiffs were the direct cause of the Plaintiffs' loss. The Plaintiffs would not have given the Defendant the Loan" absent Defendants' false representations).

**III.** **DEFENDANT IS NOT ENTITLED TO JUDGMENT ON JEFFERIES' NON-DISCHARGEABILITY CLAIMS UNDER 11 U.S.C. 727(a) (COUNTS II-V)**

**A.** **LEGAL STANDARD**

11 U.S.C. §727(a) provides that the court shall grant the debtor a discharge, unless:

[. . . ]

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed – (A) property of the debtor, within one year before the date of the filing of the petition; . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, or in connection with the case – (A) made a false oath or account; . . .

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtors liabilities[.]

11 U.S.C. §§727(a)(2)(A), (a)(3), (a)(4)(A), and (a)(5).

> *i.* *Davidson is Not Entitled to Judgment on Jefferies' Section 727(a)(2)(A) Claim*

Davidson correctly acknowledges that to sustain an objection to discharge under Section 727(a)(2), plaintiff must prove: (1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) that the act was that of the Debtor or his duly authorized agent; (4) that the act consisted of transferring, removing, destroying or concealing any of the Debtor's property, or permitting any of these acts to be done. *Minsky v. Silverstein*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993).

ACTIVE 697570654v10

"Ascertaining whether a debtor acted with fraudulent intent is difficult because, ordinarily, the Debtor is the only person able to testify directly regarding his intent and a debtor is unlikely to state that his intent was fraudulent." *Id.* Because fraudulent intent is "rarely susceptible to direct proof," it "may be deduced from the facts and circumstances of a case." *Id.* "To infer actual intent to defraud, the Second Circuit has looked for 'badges of fraud' such as: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect or a pattern or series of transaction or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and (6) the general chronology of the events and transactions under inquiry." *Id.* at 660-661 (citing *Salomon v. Kaiser (In re Kaiser),* 722 F.2d 1574, 1582-83 (2d Cir. 1983)).

The Second Circuit has also identified two other instances which would implicate fraud: "[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud" and "[t]he shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud." *In re Kaiser*, 722 F.2d at 1583. Significantly, "the fact that property has been gratuitously transferred raises a presumption that such transfer was accompanied by the actual fraudulent intent necessary to bar a discharge under 727(a)(2)." *In re Silverstein,* 151 B.R. at 661. *See also In re Postiglione*, 2019 WL 2590946, at *7 (Bankr. E.D.N.Y. June 24, 2019) ("A debtor 'conceals' 'property of the debtor' for purposes of §727(a)(2)(A) by either placing it beyond the reach of their creditors or proffering false or misleading answers regarding such property.").

Here, Davidson concealed substantial equity interest in the Sag Harbor Property. On his Schedules, Davidson identifies real property in Sag Harbor, New York (the "Sag Harbor Property") in which he claims to own a one-half interest. Jefferies SOMF ¶¶90-97; Ex. 35; Schedules, Schedule A/B, Part 1. The other one-half interest in the Sag Harbor Property was alleged to be owned by Davidson's girlfriend, Nancy Stearns, as a joint tenant. Ex. 35; *see also* Ex. 24 (Davidson Tr. at 279:24-280:6). The Schedules reflect a current value of the Sag Harbor Property of $2,900,000 and that it is encumbered by a mortgage from People's United Bank ("PUB") in the amount of $1,977,577.72, and second mortgages from Suffolk Credit Federal Credit Union ("SCFCU") in the amount of $279,199.00. The total of these Mortgages is $2,256,776.72 (the "Mortgages"). Schedules, Schedule A/B, Part 1; Schedule D, Part 1; *see also* Jefferies SOMF ¶92. Additionally, according to the Proof of Claim submitted by Davidson, the Sag Harbor Property was appraised for $3,032,835.00 (the "Appraised Value"). *See* Proof of Claim of Suffolk County Credit Union ("SCFCU") [POC No. 9-1]; *see also* Jefferies SOMF ¶93.

Despite Davidson's own valuation in his Schedules of $2,900,000 and the Appraisal Value of $3,032,835.00 for the Sag Harbor Property – both of which exceed the Mortgages by hundreds of thousands of dollars – Davidson fraudulently listed ___*no equity available*___ for creditors in the Sag Harbor Property. *See* Schedules, Schedule C. In other words, it cannot be disputed that, even accounting for those Mortgages, there is still hundreds of thousands of dollars in equity in the Sag Harbor Property, _regardless_ of which valuation is used:

| Davidson's Value of Sag Harbor | $2,900,000.00 | Appraisal Value of Sag Harbor | $3,032,835.00 |
|---|---|---|---|
| PUB | $1,977,577.72 | PUB | $1,977,577.72 |
| SCFCU | $   279,199.00 | SCFCU | $   279,199.00 |
|  | $2,256,777.52 |  | $2,256,777.52 |
| Total Equity | $643,222.48 | Total Equity | $776,057.48 |

Jefferies SOMF ¶96; Schedules, Schedule A/B, Part 1; Schedule D, Part 1; [POC No. 9-1]. By falsely asserting he had no equity in the Sag Harbor Property, Davidson not only concealed equity available for his creditors, but also listed several assets on his Schedules as exempt pursuant to 11 U.S.C. §522(d)(5) in the aggregate amount of $14,600.00, which exempted amount is in excess of the $1,325.00 statutory allowance. *See* Schedules, Schedule C, Part 1 ¶¶1-2; Jefferies SOMF ¶97.

Moreover, notwithstanding that the Sag Harbor Property – in which Davidson owned an undivided half interest on the Petition Date – was a newly renovated, fully furnished home valued at between $2.9 and $3 million dollars, the Schedules undervalued the material assets, including "[f]urniture, appliances and household items" – valued at $5,000 – and "[t]vs, computer" – valued at $500 (collectively, the "Household Property"). *See* Schedules, Schedule A/B, Part 2; Jefferies SOMF ¶¶98-99. Davidson did not provide any appraisal or other documentation to support the artificially low value ascribed to the Household Property, but still seeks to exempt ***all*** Household Property. *See* Jefferies SOMF ¶¶100-101; Schedules, Schedule C, Part 1.

On top of concealing the equity interest in the Sag Harbor Property and undervaluing his Household Property, Davidson also failed to disclose all of his financial assets, including intentionally undervaluing his gross income in the months leading up to the Petition, concealing bank accounts, and wiring out hundreds of thousands of dollars within months of filing his Petition. Jefferies SOMF ¶¶104-123.

### b. *Davidson Intentionally Misrepresented His Gross Income*

According to his Schedules, Davidson earned $140,000.00 per month and spent in excess of $124,512.00 per month. *Id.* ¶104. Davidson further represented, under the penalty of perjury, that he made a total gross income of $598,011.00 between the start of the year, i.e., January 1, 2019, to the Petition Date, i.e., May 7, 2019. *Id.* ¶105; SOFA, Part 2 ¶4. However, according to Davidson's People's United Bank account ending in 4489 (hereafter "PUB Account 4489"),

between January 1, 2019 and April 26, 2019, he earned **$695,297.68** (approximately $173,824.25 per month). Jefferies SOMF ¶106; Ex. 36. Put another way, between January and May 2019, Davidson failed to disclose **at least $97,286.86** in gross income, and undervalued his monthly income by **$33,000.00**. *Id.* ¶107.

### c. *Davidson's Concealment, and Failure to Explain Dissipation, of Assets*

According to Davidson's Schedules, as of the date of his Petition, he had $100 in cash (Schedule A/B, Part 4 ¶16); $8,009.00 in his Peoples United Bank account (*id.* ¶17); and $100 in his JP Morgan Chase bank account (*id.* ¶16). Jefferies SOMF ¶109. In a further effort to conceal his assets, Davidson did not even identify the existence of the PUB Account 4489 on his Schedules, even though his payroll was being directly deposited into this very same account for over a year. Jefferies SOMF ¶110; Exs. 36-37; *see also* SOFA, Part 8 at ¶20. In fact, between January 10, 2018 and September 26, 2018, Davidson received $1,678,417.77 in payroll that was directly deposited into his PNC Bank Account ending in 4045, for January and February 2018, and then into his PUB Account 4489, starting in March 2018 and through April 2019. *Id*. ¶108; Ex. 37. Although Davidson had received $1,344,477.56 worth of direct deposits into PUB Account 4489 between March and September 2018, this account had a beginning balance of $4,737.66 as of December 18, 2018. *See* Jefferies SOMF ¶111; Ex. 36. In other words, over **1.3 million dollars** had completely **disappeared** from PUB Account 4489 in less than a year that has never been accounted for by Davidson.

### (1) PUB ACCOUNT 4489

Accounting for the $695,297.68 Davidson earned between January and April 2019 (and not the misleading gross income of $598,011.00 identified by Davidson in his SOFA), and assuming Davidson's expenses amounted to $124,512.00 per month for January, February, March, and April (per Schedule A/B), that **would have still left approximately $199,297.68 *in PUB***

ACTIVE 697570654v10

***Account 4489*, after expenses**. *See* Jefferies SOMF ¶112; Schedules, Summary of Assets & Liabilities, Part 3; *see also* Ex. 36. And yet, according to Davidson's Schedules, as of the date of his Petition, he had $100 in cash; $8,009.00 in his Peoples United Bank account[12]; and $100 in his JP Morgan Chase bank account. *See* Jefferies SOMF ¶109; Schedule, Schedule A/B, Part 4. Just like the 1.3 million Davidson received between March 2018 and September 2018, Davidson has not accounted for the missing funds between January 2019 and May 2019. *Id.*

The evidence of Davidson's intentional concealment of assets is irrefutable. Between January and May 2019, Davidson wired out nearly half a million dollars from PUB Account 4489 over the course of the four months preceding his bankruptcy filing:

| PERIOD | AMT. OF WIRE TRANSFERS PER PERIOD |
|---|---|
| 12/18/2018 to 01/18/2019 | $88,000.00 |
| 01/18/2019 to 02/19/2019 | $58,000.00 |
| 02/19/2019 to 03/18/2019 | $94,000.00 |
| 03/18/2019 to 04/18/2019 | $76,000.00 |
| 04/18/2019 to 05/20/2019 | $178,000.00 |
| TOTAL: | **$494,000.00** |

*See* Jefferies SOMF ¶113; Ex. 36. In fact, fact, no more than a few days after receiving his direct deposit, Davidson wired out large sums of money from the PUB Account 4489, for example:

| | |
|---|---|
| 01/15/2019 | $ 42,281.54 (direct deposit) |
| 01/15-16/2019 | $ -15,000.00 (wired out) |
| 01/31/ 2019 | $58,944.13 (direct deposit) |
| 02/01/2019 | $ -44,000.00 (wired out) |
| 02/28/2019 | $ 104,765.56 (direct deposit) |
| 02/28/2019 | $ -88,000.00 (wired out) |
| 03/15/2019 | $ 61,867.39 (direct deposit) |
| 03/18/2019 | $ -41,000.00 (wired out) |
| 04/26/2019 | $ 180,000.00 (direct deposit) |
| 04/26/2019 | $ -150,000.00 (wired out) |

---

[12] Although Davidson had multiple People's United accounts, he did not identify *which* account contained the referenced $8,009.00, despite the Schedule's clear instructions to list each account with the same institution. *See* Schedule A/B, Part 4.

Jefferies SOMF ¶116; Ex. 36. Davidson did not disclose the $494,000.00 wired out of PUB Account 4489 and has not otherwise accounted for the $494,000.00. *Id.* ¶114; SOFA, Part 8 ¶20. Nor did Davidson disclose that he wrote $26,500 worth of checks from PUB Account 4489, payable to Nancy Sterns, an insider, between November 2018 and February 2019 (*Id.* ¶115) or that he withdrew $2,400.00 in cash from PUB Account 4489 between May 1, 2019 and May 7, 2019. Id.; Exs. 36,39. Indeed, according to the Schedules, Davidson only had $100 in cash as of the Petition Date. *See* Schedule, Schedule A/B, Part 4.

Not only has Davidson failed to explain why he wired out nearly half a million dollars over the course of four months, where that money was sent to, or why he closed the PUB Account 4489 merely days after filing his Petition, he also failed to disclose any of those large transfers on his Schedules and SOFA, presumably in an attempt to hide his assets and misrepresent his financial condition. Indeed, as of May 7, 2019 – i.e., the Petition Date – PUB Account 4489 had a balance of $12,789. *See* Jefferies SOMF ¶117. And as of May 10, 2019, PUB Account 4489 had a balance of $0.00 and was closed by Davidson. *Id.* ¶118.

### (2) Bellator LLC's Bank of America Account & Transfers to Sterns

Besides PUB Account 4489, Davidson also falsely represented on his SOFA that the last balance in his "passthrough entity" Bellator, LLC ("Bellator") Bank of America ("BoA") account was $0.00, when the last balance of the Bellator BoA account – before Davidson transferred all of the money out of said account less than a month prior to the Petition date – was $55,340.40. *See* Jefferies SOMF ¶119; Ex. 38; SOFA Part 8, ¶20.

Davidson also did not disclose that, between April 1, 2019 and April 9, 2019, he withdrew a total of $40,631.68 from the Bellator BoA account by way of writing a check payable to himself for $10,000.00, wiring out approximately $27,000.00 to other accounts or entities, and withdrawing over $2,000.00 from various ATM machines before closing the account altogether.

*See* Jefferies SOMF ¶120; Ex. 38. Additionally, Davidson has yet to account for (and certainly did not disclose) the $61,000.00 transferred out of the Bellator BoA account to an unidentified checking account ending in "0974" between January 2019 and April 2019. *See* Jefferies SOMF ¶121; Ex. 38. Besides the Bellator BoA account and PUB Account 4489, Davidson also concealed that he wrote approximately $50,000.00 worth of checks, payable to Nancy Sterns, an insider, between May 30, 2019 and November 2019 through another PUB account ending 8022. *See* Jefferies SOMF ¶¶122-123; Ex. 40.

### (3) Davidson's Failure to Disclose Business Interest

SOFA Part 11 requires Davidson to disclose his interests in any business or company within four years of filing his Petition. *See* SOFA, Part 11. The only business interest identified in Davidson's SOFA was his interest in Bellator. *See* SOFA, Part 11. Davidson did not identify his interest in DLJ First Esc LP and DLJ Fund Investment Partners II, LP despite Davidson identifying his interest in those entities in his 2016 federal tax return. Jefferies SOMF ¶126; Ex. 41. Nor did the Schedules identify that he received dividends from "Pershing LLC" despite Davidson listing the dividends received from Pershing LLC in his 2016 and 2017 federal tax returns. Jefferies SOMF ¶127; Schedules, Schedule A/B at §§6-7; Exs. 41-42.

\*\*\*

In sum, the record establishes Davidson intentional concealment of significant equity in the Sag Harbor Property; nearly half a million dollars in wire transfers from an undisclosed bank account; $1.3 million in payroll that mysteriously disappeared out his bank account; transfer of funds in Bellator's BoA account to himself, insiders, and an unknown checking account; and writing over $50,000 worth of undisclosed checks made payable to Sterns, an insider. This evidence, at the very least, establishes a dispute of material fact that requires the denial of Davidson's motion for summary judgment on Jefferies' Section 727(a)(2)(A) cause of action.

ii. *Davidson is Not Entitled to Judgment on Jefferies' Section 727(a)(3) Claim*

Under §727(a)(3), the discharge will be denied if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. §727(a)(3). Unlike §727(a)(2)(A), §727(a)(3) lacks an intent requirement. "The fundamental policy underlying §727(a)(3) is to ensure that the trustee and the creditors receive sufficient information to enable them to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions." *State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 837-38 (Bankr. E.D.N.Y. 2000). Courts have established a two-step, burden-shifting approach under §727(a)(3). *See Ng v. Adler*, 518 B.R. 228, 233 (E.D.N.Y. 2014) (citing *In re Jacobowitz*, 309 B.R. 429, 436 (S.D.N.Y. 2004)).

To satisfy its burden, the creditor must show by a preponderance of the evidence either (1) the provided records' inadequacy in accordance or (2) the impossibility of ascertaining "the debtor's present financial condition and the nature of any business transaction that occurred within a reasonable period prior to filing." *Schackner v. Breslin Realty Dev. Corp.*, 2012 WL 32624, at *4-5 (E.D.N.Y. Jan. 5, 2012). Assuming the plaintiff satisfies this burden, the burden shifts to the debtor to show that the failure to keep adequate records is justified. *Adler*, 518 B.R. at 241-42.

Although it is ultimately Jefferies' burden to prove its §727(a)(3) claim at trial, as the proponent of the motion for summary judgment, Davidson carries the burden of tendering sufficient admissible evidence to demonstrate the absence of a material issue of fact. *In re Deutsch*, 575 B.R. at 597. Davidson does not come close to meeting his burden on summary judgment.

Davidson argues that because he has produced "every imaginable financial record related to his affairs" (Brf. at 20; SUMF ¶¶158-159), Jefferies cannot possibly maintain its §727(a)(3)

32

claim. The evidence that Davidson relies on to support this supposedly undisputed fact is his own self-serving declaration and the scattered "bank statements and credit card statements . . . and tax returns" that were produced. SUMF ¶¶158-160; Davidson Decl. ¶¶42-45.

However, Davidson conveniently ignores the nearly half a million dollars he transferred out of PUB Account 4489 over the course of several months; the $1.3 million in payroll that disappeared between March 2018 and September 2018; the $61,000 transferred from the Bellator BoA account to a still undisclosed checking account; and $50,000 worth of undisclosed checks made payable to Sterns, an insider. *See generally supra* III(2)(i)-(iii). To date, Davidson has failed to explain the whereabouts of these funds.

Moreover, the scattered financial records cited by Davidson certainly do not provide "sufficient information to enable [Jefferies] to trace the debtor's financial condition" as evidenced by the fact that the Chapter 7 Trustee launched six (6) adversary proceedings against, among others, Davidson, Davidson's family members and Stearns to try to recover the fraudulent transfers concealed by Davidson in the first place. *See* Case No. 19-bk-11486, Doc. Nos. 131-136. *See In re Sethi*, 250 B.R. at 838 ("In reviewing an objection to a discharge based on the debtor's failure to keep books or records from which the debtor's financial condition may be ascertained, the court must be mindful of the *debtor's obligation in a bankruptcy case to reveal, rather than conceal, the complete financial picture*.") (Emphasis added). Although Davidson's bank statements show thousands of dollars in transfers between accounts or to insiders, it is difficult, if not impossible at times, to determine from these statements the source of the funds, the recipient of the funds, or use of the funds being transferred. *See In re Antoniou*, 527 B.R. 71, 79 (Bankr. E.D.N.Y. 2015) (finding debtor's bank statements and tax filings insufficient for overcoming §727(a)(3) objection, explaining "the bank statements only show the Debtor's account summary and activity for the

relevant time period The Debtor has provided no corresponding information about the source or use of the funds in the account.").

Davidson's hidden bank accounts, wire transfers, and overall concealment of records make it possible for Jefferies to ascertain his true financial condition both Pre-Petition and Post-Petition.

### iii. Davidson is Not Entitled to Judgment on Jefferies' Section 727(a)(4)(A) Claim

Section 727(a)(4)(A) provides: "The court shall grant the debtor a discharge, unless (4) the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account." "Under this section, the party objecting to discharge must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *In re Antoniou*, 527 B.R. at 82.

The information contained in Davidson's Schedules and SOFA contained materially false statements and omissions that constitute a false oath or account in connection with the Bankruptcy Case. Indeed, as detailed *supra* III(2)(i)-(iii), Davidson made numerous false statements and omissions including: (a) concealing the equity interest in the Sag Harbor Property and undervaluing his Household Property; (b) not disclosing bank accounts (i.e., PUB Account 4489) or misrepresenting the balance of bank accounts (i.e., Bellator BoA); (c) not disclosing the large cash transfers made to insiders, unknown checking accounts, or otherwise wired to destinations unknown; and (d) intentionally concealing his business interests in other companies. At the very least, the record evidence establishes factual disputes requiring the denial of Davidson's motion and a trial on the issues.

### iv. Davidson is Not Entitled to Judgment on Jefferies' Section 727(a)(5) Claim

Section 727(a)(5) provides the basis to deny a discharge if "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets

or deficiency of assets to meet the debtor's liabilities." 11 U.S.C. §727(a)(5). This section aims to deter and punish debtors from "abus[ing] the bankruptcy process by obfuscating the true nature of their affairs, and then refusing to provide a credible explanation." *Nof v. Gannon (In re Gannon)*, 173 B.R. 313, 317 (Bankr. S.D.N.Y.1994). Like §727(a)(3), this section contains no intent requirement and creates a two-part burden-shifting analysis. *In re Cacioli*, 463 F.3d at 238.

Here, Davidson has not, and cannot, satisfactorily explain how, as of the Petition Date, he only had $100 in cash despite earning a gross income of over $2.2 million per year for at least the two years prior to the Petition Date and earning a gross income of $695,297.68 from January 1, 2019 to the Petition Date. *See* Jefferies SOMF ¶112; *See* SOFA, Part 2 ¶4.

However, Davidson conveniently ignores the nearly half a million dollars he transferred out of PUB Account 4489 over the course of several months; the $1.3 million in payroll that disappeared between March 2018 and September 2018; the $61,000 transferred from the Bellator BoA account to a still undisclosed checking account; and $50,000 worth of undisclosed checks made payable to Sterns, an insider. *See generally* supra III(2)(i)-(iii). To date, Davidson has failed to explain the whereabouts of these funds.

Contrary to his self-serving arguments, Davidson has refused explain satisfactorily the loss or deficiency of significant assets over the past several years. Davidson's obfuscations and feigned ignorance over the state of his financial affairs is exactly the type of conduct that Section 727(a)(5) seeks to prevent and punish. Davidson's motion for summary judgment on Davidson's non-dischargeability claim under Section 727(a)(5) must be denied.

## **CONCLUSION**

For the foregoing reasons, Jefferies respectfully requests that Defendant's motion for summary judgment be denied in its entirety.

Dated:  May 15, 2024
Florham Park, New Jersey

**GREENBERG TRAURIG, LLP**

By: _/s/ Alan J. Brody_
Alan J. Brody, Esq.
500 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 443-3543
Email:  _brodya@gtlaw.com_

Tracy L. Gerber, Esq. (admitted _pro hac vice_)
Elizabeth E. Moum, Esq. (admitted _pro hac vice_)
777 S. Flagler Drive
West Palm Beach, Florida 33401
Telephone: (561) 650-7900
Email:  _gerbert@gtlaw.com_
        _Moume@gtlaw.com_
_Counsel for Jefferies LLC and Jefferies Group LLC_

36