**GREENBERG TRAURIG, LLP**
Alan J. Brody, Esq.
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 443-3543 (Telephone)
(973) 295-1333(Facsimile)

-and-

**GREENBERG TRAURIG, LLP**
Tracy L. Gerber, Esq. (admitted *pro hac vice*)
Elizbeth E. Moum, Esq. (admitted *pro hac vice*)
777 S. Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
(561) 650-7900 (Telephone)
(516) 655-6222 (Facsimile)

Counsel to Jefferies LLC and Jefferies Group LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------- X | | |
| In re: | : | |
| | : | Chapter 7 |
| RICK ALAN DAVIDSON, | : | Case No. 19-11486 (DSJ) |
| | : | |
| Debtor. | : | |
| -------------------------------------------------- X | | |
| JEFFERIES, LLC and JEFFERIES GROUP, LLC, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | Case No. 19-01395 (DSJ) |
| RICK ALAN DAVIDSON | : | |
| | : | |
| Defendant. | : | |
| -------------------------------------------------- X | | |

ACTIVE 697896374v5

## PLAINTIFFS' RESPONSE TO DEFENDANT'S
## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Plaintiffs Jefferies, LLC and Jefferies Group, LLC (collectively, "Jefferies" or "Plaintiffs") respond to defendant Rick Alan Davidson's ("Defendant") Statement of Material Facts, as follows:

## GENERAL OBJECTIONS

Defendant's submission does not comply with Rule 7056-1 of the Southern District of New York Local Bankruptcy Rules, which requires the moving party to submit "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The vast majority of the asserted statements in Plaintiff's submission are either: not material to the instant summary judgment motion, include improper legal argument, and/or improperly contain more than one asserted fact per paragraph. Defendants' submission is redundant, unduly burdensome, and a waste of judicial resources. Notwithstanding the foregoing general objections, Plaintiffs hereby respond to Defendant's specific assertions as follows.

1.        Defendant Rick Alan Davidson ("Davidson" or "Defendant"), by and through his undersigned attorneys, The Law Offices of Neal Brickman, P.C., respectfully submits the following Statement of Undisputed Material Facts pursuant to Fed. R. Civ. P. 56 and Local Civ. Rule 56.1 (a) in support of Defendant's motion for summary judgment dismissing Jefferies' adversary Complaint in its entirety.

**RESPONSE**:  **Deny that the statement contained in this paragraph is a material fact.  This paragraph contains a statement of Defendant's characterization of its motion for summary judgment and Plaintiff otherwise denies any inferences contained therein.**

*Rick Davidson and the FINRA Rules that Apply to Him as a Financial Advisor*

1.        Rick Davidson (hereinafter "Davidson") began working in the securities industry in 1983 as an intern at Donaldson, Lufkin & Jenrette ("DLJ") and continued working at that firm and then at its successor firm, Credit Suisse, from 1984 through 2009.  (Declaration of Neal Brickman (hereinafter "Brickman Decl.") ¶5 and Exhibit C attached to the Brickman Decl., Transcript of the Deposition of Rick Davidson (hereinafter "Davidson Dep.") pp. 51:23-52:19).

**RESPONSE:** **Deny that the statement contained in this paragraph are material facts.  Admit only that Davidson testified he "started to work for Donaldson, Lufkin & Jenrette [DLJ] as an intern" while he was in college, obtained a full-time job at DLJ after graduating, and worked at "DLJ Credit Suisse from 1984 to 2009, I think it was."  Ex. 24[2] (Davidson Dep. Tr. at 52:10-24, 56:19-20).**

---

[1] Capitalized terms not otherwise defined herein have the same meaning as defined in Jefferies' Statement of Material Facts ("Jefferies SOMF"), submitted herewith.
[2] References to "Ex. __" are to the Exhibits attached to the Declaration of Alan Brody, submitted herewith.

2. From approximately 2009 through 2016 Davidson was employed as a financial advisor/registered representative at Morgan Stanley, where he was recognized as one of the top financial advisors in the nation's largest complex. (Davidson Dep. pp. 56:21-57:7).

**RESPONSE**: **Deny that the statement contained in this paragraph are material facts. Admit only that Davidson testified he was employed as a financial advisor at Morgan Stanley from approximately 2009 or 2010 through 2016 but deny the remainder of the statement in this paragraph. The cited purported evidence does not support the remainder of the statement contained in this paragraph as required by Local Rule 7056-1.**

**Further add that Davidson was the subject of several disciplinary actions and regulatory scrutiny while at Morgan Stanley.** *See* **Exs. 2-13 (March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Last Chance Agreement; Addendum to Last Chance Agreement; June 2011 Letter of Reprimand; January 2012 Business Plan Requirements Memorandum; February 2012 Letter of Reprimand; March 2012 Koutsantonis Email; March 8, 2012 FINRA Letter to Morgan Stanley; March 2013 Memorandum; May 2012 Memorandum; May 2013 FINRA Cautionary Action Letter (collectively, the "Morgan Stanley Compliance Issues Documents"). Moreover, after being placed under investigation in 2016 for improperly exercising discretion in client accounts, with the substantial possibility of being terminated by Morgan Stanley under the terms of a Last Chance Agreement imposed on Davidson by Morgan Stanley in 2012, Davidson resigned from Morgan Stanley in 2016. Exs. 2-4 (March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Last Chance Agreement).**

3. While at Morgan Stanley Davidson achieved placement in the Barons Top 100 Financial Advisors, an esteemed annual ranking of financial advisors, repeatedly between 2008 and 2016 and held membership in Morgan Stanley's Chairman's Club from 2011 to 2015. (Declaration of Rick Davidson (hereinafter "Davidson Decl.") ¶¶ 3-7, Exhibits A-D to the Davidson Decl., and Davidson Dep. pp. 57:25 – 58:12).

**RESPONSE**: **Deny that the statements contained in this paragraph are material facts. Deny on the basis that this statement mischaracterizes the cited testimony and deny that the cited purported evidence supports the statements contained in this paragraph, as required by Local Rule 7056-1.**

**Further add that Davidson was the subject of several disciplinary actions and regulatory scrutiny while at Morgan Stanley.** *See* **Exs. 2-13 (Morgan Stanley Compliance Issues Documents). Moreover, after being placed under investigation for improperly exercising discretion in client accounts, with the substantial possibility of being terminated by Morgan Stanley under the terms of a Last Chance Agreement imposed on Davidson by Morgan Stanley in 2012, Davidson resigned from Morgan Stanley in 2016. Exs. 2-4 (March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Last Chance Agreement).**

4. As of January 2016, Davidson served as financial advisor to clients and managed their accounts which collectively held between $250,000,000 and $300,000,000 in assets. As a result of Davidson managing those assets, Davidson routinely generated revenue for his employer

in excess of $200,000.00 per month. (Brickman Decl. ¶10, Exhibit H to the Brickman Decl. and Davidson Dep. p. 61:6-16).

**RESPONSE**: **Deny that the statements contained in this paragraph are material facts. Deny on the basis that this statement mischaracterizes the cited testimony and deny that the cited purported evidence supports the statements contained in this paragraph, as required by Local Rule 7056-1.**

5.      Davidson has worked as a financial advisor in the Financial Services industry for over 36 years. (Davidson Dep. pp. 53:25-54:6).

**RESPONSE**: **Admit that Davidson testified that he was a financial advisor for 36 years.**

6.      The Financial Services industry is one of the most heavily regulated industries in the world with Broker-Dealers or other securities and derivative market intermediaries being regulated by an organization known as Financial Industry Regulatory Authority (FINRA) under the authority of the Securities and Exchange Commission (SEC), as well as by the State securities regulators, and other federal regulatory arms. (Davidson Decl. ¶8).

**RESPONSE**: **Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion. Further add that, given the highly regulated nature of the securities industry and the risks of employing a financial advisor with a history of customer complaints, disciplinary actions, regulatory scrutiny and other compliance-related issues, Jefferies endeavors to learn about a financial advisor's compliance history prior to his or her hiring. Declaration of Lauri Scoran ("Scoran Dec."), ¶5; *see also* Jefferies SOMF, ¶67-71.**

7.      FINRA has a comprehensive set of rules, referred to as the FINRA Rules, which according to FINRA Rule 0140 entitled Applicability, "shall apply to all members and persons associated with a member. Persons associated with a member shall have the same duties and obligations as a member under the Rules." (Davidson Decl. ¶9).

**RESPONSE**: **Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion and that this paragraph contains an accurate excerpt from the referenced FINRA Rule 0140, which rule speaks for itself.**

8.      Each of Davidson's prior employers: DLJ, Credit Suisse and Morgan Stanley are FINRA member organizations subject to the FINRA Rules. (Davidson Decl. ¶9).

**RESPONSE**: **The statement in this paragraph mischaracterizes the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, and therefore deny that the cited purported evidence supports the statements contained in this paragraph, as required by Local Rule 7056-1. Admit that DLJ, Credit Suisse and Morgan Stanley are FINRA member organizations, and that FINRA member organizations are subject to FINRA Rules.**

9. Jefferies, LLC (hereinafter "Jefferies") is a FINRA member organization subject to the FINRA Rules. (Davidson Decl. ¶9).

**RESPONSE: The statement in this paragraph mischaracterizes the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, and therefore deny that the cited purported evidence supports the statements contained in this paragraph, as required by Local Rule 7056-1. Admit that Jefferies, LLC is a FINRA member organizations and that FINRA member organizations are subject to FINRA Rules.**

10. FINRA Rule 3110 entitled Supervision provides in part that pursuant to 3110(a): "each member shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules. Final responsibility for proper supervision shall rest with the member." (Brickman Decl. ¶11 and Exhibit I to the Brickman Decl.).

**RESPONSE: Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(a), which rule speaks for itself.**

11. FINRA Rule 3110 (b)(4) <u>Review of Correspondence and Internal Communication</u> provides that "the supervisory procedures required by this paragraph (b) shall include procedures for the review of incoming and outgoing written (including electronic) correspondence and internal communications relating to the member's investment banking or securities business. The supervisory procedures must be appropriate for the member's business, size, structure, and customers. The supervisory procedures must require the member's review of: (A) incoming and outgoing written (including electronic) correspondence to properly identify and handle in accordance with firm procedures, customer complaints, instructions, funds and securities, and communications that are of a subject matter that require review under FINRA rules and federal securities laws. (B) internal communications to properly identify those communications that are of a subject matter that require review under FINRA rules and federal securities laws." (Brickman Decl. ¶11 and Exhibit I to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(b)(4), which rule speaks for itself.**

12. FINRA Rule 3110(b)(5) <u>Review of Customer Complaints</u> provides in part that "the supervisory procedures required by this paragraph (b) shall include procedures to capture, acknowledge, and respond to all written (including electronic) customer complaints. (Brickman Decl. ¶11 and Exhibit I to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(b)(5), which rule speaks for itself.**

ACTIVE 697896374v5

13.     FINRA Rule 3110(d) <u>Transaction Review and Investigation</u> provides in part that "each member shall include in its supervisory procedures a process for the review of securities transactions that are reasonably designed to identify trades that may violate the provisions of the Exchange Act, the rules thereunder, or FINRA rules prohibiting insider trading and manipulative and deceptive device that are effected for the (A) accounts of the member; (B) accounts introduced or carried by the member in which a person associated with the member has a beneficial interest or the authority to make investment decisions; (C) accounts of a person associated with the member that are disclosed to the member pursuant to NASD Rule 3050 or NYSE Rule 407, as applicable; and (D) covered accounts.  (2) Each member must conduct promptly an internal investigation into any such trade to determine whether a violation of those laws or rules has occurred."  (Brickman Decl. ¶11 and Exhibit Ito the Brickman Decl.).

**<u>RESPONSE</u>: Deny that the statements contained in this paragraph are material facts. Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(d), which rule speaks for itself.**

14.     FINRA Rule 3110(d)(3) further specifies that "a member engaging in investment banking services must file with FINRA, written reports, signed by a senior officer of the member, at such times and, without limitation, including such content, as follows:  (A) within ten business days of the end of each calendar quarter, a written report describing each internal investigation initiated in the previous calendar quarter pursuant to paragraph (d)(2), including the identity of the member, the date each internal investigation commenced, the status of each open internal investigation, the resolution of any internal investigation reached during the previous calendar quarter, and, with respect to each internal investigation, the identity of the security, trades, accounts, associated persons of the member, or associated person of the member's family members holding a covered account, under review, and that includes a copy of the member's policies and procedures required by paragraph (d)(1).  (Brickman Decl. ¶11 and Exhibit I to the Brickman Decl.).

**<u>RESPONSE</u>: Deny that the statements contained in this paragraph are material facts. Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(d)(3), which rule speaks for itself.**

15.     FINRA Rule 3110(d)(3)(B) further specifies that:

"within five business days of completion of an internal investigation pursuant to paragraph (d)(2) in which it was determined that a violation of the provisions of the Exchange Act, the rules thereunder, or FINRA rules prohibiting insider trading and manipulative and deceptive devices had occurred, a written report detailing the completion of the investigation, including the results of the investigation, any internal disciplinary action taken, and any referral of the matter to FINRA, another self-regulatory organization, the SEC, or any other federal, state, or international regulatory authority.  (Brickman Decl. ¶11 and Exhibit Ito the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 3110(b)(5), which rule speaks for itself.**

16.     FINRA Rule 4530 entitled Reporting Requirements provides that:

(a) Each member shall promptly report to FINRA, but in any event not later than 30 calendar days, after the member knows or should have known of the existence of any of the following:

(1) the member or an associated person of the member:

(A) has been found to have violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body, self-regulatory organization or business or professional organization;

(B) is the subject of any written customer complaint involving allegations of theft or misappropriation of funds or securities or of forgery;

(C) is named as a defendant or respondent in any proceeding brought by a domestic or foreign regulatory body or self-regulatory organization alleging the violation of any provision of the Exchange Act, or of any other federal, state or foreign securities, insurance or commodities statute, or of any rule or regulation thereunder, or of any provision of the by-laws, rules or similar governing instruments of any securities, insurance or commodities domestic or foreign regulatory body or self-regulatory organization;

(D) is denied registration or is expelled, enjoined, directed to cease and desist, suspended or otherwise disciplined by any securities, insurance or commodities industry domestic or foreign regulatory body or self-regulatory organization or is denied membership or continued membership in any such self-regulatory organization; or is barred from becoming associated with any member of any such self-regulatory organization;

(E) is indicted, or convicted of, or pleads guilty to, or pleads no contest to, any felony; or any misdemeanor that involves the purchase or sale of any security, the taking of a false oath, the making of a false report, bribery, perjury, burglary, larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion, or misappropriation of funds, or securities, or a conspiracy to commit any of these offenses, or substantially equivalent activity in a domestic, military or foreign court;

(F) is a director, controlling stockholder, partner, officer or sole proprietor of, or an associated person with, a broker, dealer, investment company, investment advisor, underwriter or insurance company that was suspended, expelled or had its registration denied or revoked by any domestic or foreign regulatory body,

jurisdiction or organization or is associated in such a capacity with a bank, trust company or other financial institution that was convicted of or pleaded no contest to, any felony or misdemeanor in a domestic or foreign court;

(G) is a defendant or respondent in any securities- or commodities-related civil litigation or arbitration, is a defendant or respondent in any financial-related insurance civil litigation or arbitration, or is the subject of any claim for damages by a customer, broker or dealer that relates to the provision of financial services or relates to a financial transaction, and such civil litigation, arbitration or claim for damages has been disposed of by judgment, award or settlement for an amount exceeding $15,000. However, when the member is the defendant or respondent or is the subject of any claim for damages by a customer, broker or dealer, then the reporting to FINRA shall be required only when such judgment, award or settlement is for an amount exceeding $25,000; or

(H) (i) is subject to a "statutory disqualification" as that term is defined in the Exchange Act; or (ii) is involved in the sale of any financial instrument, the provision of any investment advice or the financing of any such activities with any person that is subject to a "statutory disqualification" as that term is defined in the Exchange Act, provided, however, that this requirement shall not apply to activities with a member or an associated person that has been approved (or is otherwise permitted pursuant to FINRA rules and the federal securities laws) to be a member or to be associated with a member. The report shall include the name of the person subject to the statutory disqualification and details concerning the disqualification; or

(2) an associated person of the member is the subject of any disciplinary action taken by the member involving suspension, termination, the withholding of compensation or of any other remuneration in excess of $2,500, the imposition of fines in excess of $2,500 or is otherwise disciplined in any manner that would have a significant limitation on the individual's activities on a temporary or permanent basis.

(b) **Each member shall promptly report to FINRA, but in any event not later than 30 calendar days, after the member has concluded or reasonably should have concluded that an associated person of the member or the member itself has violated any securities-, insurance-, commodities-, financial- or investment-related laws, rules, regulations or standards of conduct of any domestic or foreign regulatory body or self-regulatory organization.** (emphasis added).

(c) Each person associated with a member shall promptly report to the member the existence of any of the events set forth in paragraph (a)(1) of this Rule.

(d) Each member shall report to FINRA statistical and summary information regarding written customer complaints in such detail as FINRA shall

8

specify by the 15th day of the month following the calendar quarter in which customer complaints are received by the member.

(e) Nothing contained in this Rule shall eliminate, reduce or otherwise abrogate the responsibilities of a member or person associated with a member to promptly disclose required information on the Forms BD, U4 or U5, as applicable, to make any other required filings or to respond to FINRA with respect to any customer complaint, examination or inquiry.  In addition, members are required to comply with the reporting obligations under paragraphs (a), (b) and (d) of this Rule, regardless of whether the information is reported or disclosed pursuant to any other rule or requirement, including the requirements of the Form BD.  However, a member need not report:  (1) an event otherwise required to be reported under paragraph (a)(1) of this Rule if the member discloses the event on the Form U4, consistent with the requirements of that form, and indicates, in such manner and format that FINRA may require, that such disclosure satisfies the requirements of paragraph (a)(1) of this Rule, as applicable; or (2) an event otherwise required to be reported under paragraphs (a) or (b) of this Rule if the member discloses the event on the Form U5, consistent with the requirements of that form.

(f) Each member shall promptly file with FINRA copies of:

(1) any indictment, information or other criminal complaint or plea agreement for conduct reportable under paragraph (a)(1)(E) of this Rule;

(2) any complaint in which a member is named as a defendant or respondent in any securities- or commodities-related private civil litigation, or is named as a defendant or respondent in any financial-related insurance private civil litigation;

(3) any securities- or commodities-related arbitration claim, or financial-related insurance arbitration claim, filed against a member in any forum other than the FINRA Dispute Resolution forum;

(4) any indictment, information or other criminal complaint, any plea agreement, or any private civil complaint or arbitration claim against a person associated with a member that is reportable under question 14 on Form U4, irrespective of any dollar thresholds Form U4 imposes for notification, unless, in the case of an arbitration claim, the claim has been filed in the FINRA Dispute Resolution forum.

(g) Members may file electronically, in such manner and format as specified by FINRA, the documents required by paragraph (f); provided, however, that the filings shall be accompanied by summary information regarding the documents in such detail as specified by FINRA.

(h) Members shall not be required to comply separately with paragraph (f) in the event that any of the documents required by paragraph (f) have been the subject of a request by FINRA's Credentialing, Registration, Education and Disclosure staff, provided that the member produces those requested documents to

9

the Credentialing, Registration, Education and Disclosure staff not later than 30 days after receipt of such request. This paragraph does not supersede any FINRA rule or policy that requires production of documents specified in paragraph (f) sooner than 30 days after receipt of a request by the Credentialing, Registration, Education and Disclosure staff. (Brickman Decl. ¶12 and Exhibit J to the Brickman Decl.).

**RESPONSE: Admit that the statement in this paragraph contains an accurate excerpt from the referenced FINRA Rule 4530, which rule speaks for itself.**

17.    The excerpts of the FINRA Rules contained above are a small sampling of the FINRA Rules which are hereby incorporated by reference. The FINRA rules represent only a portion of the regulatory requirements which members, such as Jefferies, and associated persons, such as Davidson, are subjected to working in the financial services industry. (Davidson Decl. ¶ 10).

**RESPONSE: Admit only that member organizations and associated persons working in the financial services industry are subjected to certain regulatory requirements, including abiding with the FINRA rules, which rules speak for themselves.**

18.    Pursuant to FINRA Rules members routinely file registrations for registered representatives (financial advisors) using what is referred to as a Form U-4, to make required disclosures to the investing public (e.g. customer complaints and regulatory infractions), and Form U-5 is used to disclose information when a registered representative's employment is terminated for any reason. (Davidson Decl. ¶ 10).

**RESPONSE: Deny that statements contained in this paragraph are material facts. Deny as the word "routinely" is undefined and therefore the statement in this paragraph vague and ambiguous. Deny as unsupported by a citation to admissible evidence, as required by Local Rule 7056-1.**

**A FINRA Form U-4 is filed subsequent to certain events and are limited in the context that is disclosed. Not all aspects of a registered person's compliance history is reportable on the Central Registration Depository ("CRD"), Form U4 or Form U5. Under FINRA's Rules, only certain information must be reported to regulators for inclusion in the CRD, U4 or U5. As a few examples, only written customer complaints where the damages alleged by the customer exceed a specific value must be reported for inclusion on the CRD; written discipline by an employer does not need to be reported on the CRD, unless it meets certain conditions; and regulator discipline is not always reportable on the CRD.**

19.    To ensure that member organizations are fulsome with the disclosures contained on a Form U-5, the New York Court of Appeals held in *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359, 368, 866 N.E.2d 439, 444 (2007) that "Form U-5's compulsory nature...lead us to conclude that statements made by an employer on the form should be subject to an absolute privilege" and enjoy absolute immunity from claims of defamation. (Brickman Decl. ¶13 and Exhibit K to the Brickman Decl.).

**RESPONSE:** Deny that the statements contained in this paragraph are material facts. Admit the existence of the decision issued by the New York Court of Appeals styled *Rosenberg v. MetLife, Inc.*, 8 N.Y.3d 359 (2007), which decision speaks for itself.

*Jefferies and its Efforts to Recruit Davidson*

20.     As a FINRA member organization Jefferies is required to comply with the FINRA Rules and has access to Central Registration Depository ("CRD") where FINRA members file and can view, among other things, filed Forms U-4 and U-5.  (Davidson Decl. ¶11).

**RESPONSE:** Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, that Jefferies is a FINRA member organization and is required to comply with the FINRA Rules, and that Jefferies has access to the CRD.  Further add that FINRA Form U4s are filed subsequent to certain events and are limited in the context that is disclosed.  Not all compliance related incidents are disclosed on a financial advisor's Form U4.  *See generally*, FINRA Rules, which rules speak for themselves; *see also* Response to Paragraph 18 above which Jefferies incorporates herein by reference.

21.     As of February 2016, the following individuals were employed in respective top executive and/or managerial roles at Jefferies:  Brian Friedman ("Friedman"), President and Global Head; Lauri Scoran ("Scoran"), Chief Compliance Officer; Michael Armstrong ("Armstrong"), Managing Director and Global Head of Wealth Management; Frank Scheuer ("Scheuer"), Chief Operating Officer of Wealth Management; and Ron Filipowitz ("Filipowitz,") Senior Vice President of Business Management.  (Brickman Decl. ¶14 and Exhibit L of the Brickman Decl.)

**RESPONSE:** Deny that the cited purported evidence supports all of the statements contained in this paragraph.  Admit only that as of February 2016, the following individuals were employed at Jefferies with the following respective titles: Lauri Scoran ("Scoran"), Chief Compliance Officer; Michael Armstrong ("Armstrong"), Managing Director and Global Head of Wealth Management; Frank Scheuer ("Scheuer"), Chief Operating Officer of Wealth Management; and Ron Filipowitz ("Filipowitz,") Senior Vice President of Business Management.

22.     As of September 2016, Peter Forlenza ("Forlenza") assumed the role of Global Head of Equities, replacing Armstrong, and Robert Peyreigne ("Peyreigne") assumed the role of Senior Vice President of Business Management replacing Filipowitz.  (Brickman Decl. ¶14 and Exhibit L of the Brickman Decl.)

**RESPONSE:** Deny that the statements contained in this paragraph are material facts or that the cited purported evidence supports all of the statements contained in this paragraph.  Admit only that in September 2016, Peter Forlenza ("Forlenza") was Global Head of Equities, and Robert Peyreigne ("Peyreigne") joined Jefferies as Managing Director, Head of Wealth Management, replacing Scheuer.

23.     In addition, at all relevant times, Sandy Bernardo ("Bernardo"), served as Jefferies' Human Resources Representative for business coverage of Wealth Management, Mike Sharpe

("Sharpe") served as Jefferies' General Counsel, Eileen Arcuri ("Arcuri") served as a Senior Vice President in the Compliance Department and Jeff Lau ("Lau") served as the Compliance Officer for Wealth Management, with both Arcuri and Lau reporting directly to Chief Compliance Officer Scoran. (Exhibit "D" to Brickman Decl., Transcript of the Deposition of Lauri Scoran (hereinafter "Scoran Dep.") pp. 7:21-8:11, 45:8-15, 49:13-15, 86:2-6).

**RESPONSE: Deny on the basis that the statements contained in this paragraph are vague and ambiguous, as the phrase "at all relevant times" is undefined. Admit that during the period Jefferies recruited Davidson and up to his termination from Jefferies, Sandy Bernardo ("Bernardo") served as Jefferies' Human Resources Representative for business coverage of Wealth Management, Mike Sharp ("Sharp") served as Jefferies' General Counsel, Eileen Arcuri ("Arcuri") served as a Senior Vice President in the Compliance Department and Jeff Lau ("Lau") served as the Compliance Officer for Wealth Management, and that Arcuri and Lau reported to Chief Compliance Officer Scoran.**

24.     Before serving as Jefferies Compliance Officer for Wealth Management, in 2001 Lau worked in Compliance at DLJ.  Lau first met Davidson in the early 2000's when they were both employed at DLJ.  (Exhibit "E" to Brickman Decl., Transcript of the Deposition Jeff Lau (hereinafter "Lau Dep." p. 16:20-23).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact.  Admit that Lau testified that he knew Davidson from his time at Donaldson, Lufkin & Jenrette, where he started in 2001 or 2002.  Ex. 21 (Lau Dep. Tr. at 16:18-17:3).**

25.     Before serving as Jefferies Chief Operating Officer, Scheuer worked at several other firms, including working at DLJ for about 18 years and continuing at its successor firm Credit Suisse for about 6 years.  (Exhibit "F" to Brickman Decl., Transcript of the Deposition of Frank Scheuer (hereinafter "Scheuer Dep.") p. 4:10 - 5:6).

**RESPONSE: Deny that the statements contained in this paragraph are material facts.  Admit that Scheuer testified that he worked for Paine Weber "for about two years.  I worked for Pershing for about another two years. And then I worked for Donaldson, Lufkin & Jenrette for probably eighteen years, until it was taken over by Credit Suisse.  And I worked at Credit Suisse for about six years, as it became – as it was taken over – as it took over DLJ."  Ex. 15 (Scheuer Dep. Tr. at 4:10-5:3).**

26.     Scheuer first met Davidson in the 1980's when both employed at DLJ.  (Scheuer Dep. p. 14:22 – 15:6).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact.  Admit that Scheuer testified that he met Davidson "at Donaldson, Lufkin & Jenrette" "back in the 80s".  Ex. 15 (Scheuer Dep. Tr. at 14:22-15:6).**

27.     Davidson and Scheuer were friends and over the years would socialize outside of work.  (Scheuer Dep. p. 17:3-18:6).

**RESPONSE:** Deny that the statement contained in this paragraph is a material fact. Admit that Scheuer testified that he became friendly with Davidson and would socialize with him outside of the office. *Id.* at 17:3-18:6.

28. Davidson and Scheuer continued to stay connected after Davidson left for Morgan Stanley. (Scheuer Dep. p. 19:23-25).

**RESPONSE:** Deny that the statement contained in this paragraph is a material fact. Denied as mischaracterizes the cited testimony. Scheuer testified that he kept in touch with Davidson after Davidson went to Morgan Stanley. *Id.* at 19:23-25.

29. Scheuer joined Jefferies as a Chief Operating Officer in 2011. (Scheuer Dep. pp. 11:17-12:3).

**RESPONSE:** Deny that the statement contained in this paragraph is a material fact. Admit that Scheuer testified that he started at Jefferies in 2011 and was hired into "the same kind of COO CFO kind of a role." *Id.* at 11:17-12:3.

30. Armstrong joined Jefferies as the head of Jefferies' wealth management business in 2015, coming from Morgan Stanley. (Scheuer Dep. p. 21:2-24).

**RESPONSE:** Deny that the statement contained in this paragraph is a material fact. Admit that Scheuer testified that Michael Armstrong joined Jefferies as head of the wealth management business in 2015, and that Scheuer testified he believes Armstrong joined Jefferies from Morgan Stanley. *Id.* at 21:2-22:3.

31. Upon Armstrong's joining Jefferies, Scheuer recommended to Armstrong that Jefferies hire Davidson. (Scheuer Dep. p. 20:21-25).

**RESPONSE:** Deny that the statement contained in this paragraph is a material fact. Admit that Scheuer testified that he recommended Davidson to Armstrong, but further add that Scheuer did not have hiring power and did not "hire, recruit or fire advisors." *Id.* at 21:18-20.

32. Davidson was Armstrong's first big recruit, and he was viewed as filling a significant need at Jefferies, who was an investment bank, but had no real retail wealth management presence. (Davidson Dep. pp. 182:16-183:11).

**RESPONSE:** Deny as the statements contained in this paragraph consist of self-serving testimony unsupported by admissible evidence, as required by Local Rule 7056-1.

33. Jefferies' interest in recruiting and hiring Davidson stemmed from Davidson's ability to transfer his $250,000,000 to $300,000,000 in assets under management which were contained within accounts held at Morgan Stanley to accounts at Jefferies, which would serve to significantly bolster Jefferies' struggling retail wealth management group. (Davidson Decl. ¶ 12).

**RESPONSE**: Deny as the statements contained in this paragraph consist of self-serving assertions contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, which does not constitute admissible evidence, and therefore the statements in this paragraph are unsupported by a citation to admissible evidence, as required by Local Rule 7056-1.

Further add that Jefferies' decision to recruit and hire Davidson was based on false information Davidson provided to Jefferies about his compliance history and the limited information available to Jefferies contained in Davidson's CRD. Ex. 1 (Scoran Dep. Tr. at 56:8-15). Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *Id.*; Exs. 2-13 (Morgan Stanley Compliance Issues Documents). Prior to his commencement of employment with Jefferies, aside from disclosing the three customer complaints (which were on Davidson's CRD) and advising that he was placed on a non-disciplinary, 30-day suspension while Morgan Stanley reviewed a complaint made by customer Emily Sonnenblick, Davidson did not disclose to Jefferies any further compliance-related issues that he experienced at his prior employers. He also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley. Scoran Dec., ¶¶8-9. In the course of the FINRA Arbitration, Jefferies subpoenaed Mr. Davidson's prior employer, Morgan Stanley, by way of an Order of Production issued by the Chairperson of the arbitration panel in the FINRA arbitration. *Id.*, ¶12. In response to the Order of Production, Morgan Stanley produced evidence of the substantial and extensive compliance-related issues involving Mr. Davidson. *Id.*, ¶13; *see also* Exs. 2-13 (Morgan Stanley Compliance Issues Documents). Prior to Mr. Davidson's employment start date, he never apprised Jefferies of the compliance-related issues or his history of drug abuse, identified in the Morgan Stanley Compliance Issues Documents. These are serious events and issues that would have caused Jefferies great concern when considering whether to hire Mr. Davidson. They evidence that employing Mr. Davidson could present risk of future compliance violations, customer complaints and litigations, and regulatory scrutiny. Scoran Dec., ¶¶14-15. In addition, under applicable rules, regulations and written guidance issued by securities industry regulators, including FINRA and the Securities and Exchange Commission ("SEC"), Jefferies would have had to carefully consider whether and how it could appropriately supervise Mr. Davidson given his compliance history. *Id.*, ¶16. Under these circumstances, Jefferies' Compliance Department would not have granted approval for the hiring of Mr. Davidson, had Jefferies known of Mr. Davidson's extensive history of compliance-related issues prior to his hire date. *Id.*, ¶17. Without approval from the Compliance Department, Jefferies would not have moved forward with the hiring of Mr. Davidson. *Id.*, ¶18. If Mr. Davidson had not been hired, Jefferies would not have extended the Loan to him. *Id.*, ¶19. This is a genuine issue to be tried.

34.     Davidson was known for his stellar reputation with customers and his status as one of the best financial advisors in the industry due to his accolades which could help build a retail presence at Jefferies. (Davidson Dep. pp. 182:16-183:11).

**RESPONSE: Deny as the statements contained in this paragraph consist of self-serving testimony unsupported by admissible evidence, as required by Local Rule 7056-1. Further add that Jefferies only learned of Davidson's history of compliance related issues after he fraudulently procured the Loan and after his employment with Jefferies was terminated.** *See* **Exs. 2-13 (Morgan Stanley Compliance Issues Documents);** *see also* **Response to Paragraph 33 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

*Jefferies Due Diligence on Davidson Focuses on Davidson's Regulatory Filings, Production Numbers and the Termination Reasons from Prior Firms*

35.     Jefferies pre-hire review protocol consists of reviewing a prospective employee's CRD record and checking with the National Futures Association ("NFA") to see if they had futures registration. (Exhibit "G" to Brickman Decl., Transcript of the Deposition of Eileen Arcuri (hereinafter "Arcuri Dep.") pp. 14:23 – 15:9.

**RESPONSE: Admit that, when asked "from the compliance side, what was the protocol or the process; what would be part of the pre-hire review?", Eileen Arcuri testified that "we would review their record on Web CRD, the Central Registration Depository," and when asked "beyond reviewing the results from the CRD searches, what if anything else would compliance do on their side in a pre-hire review?", Arcuri testified "We would check with the NFA if they've had futures registration." Ex. 22 (Arcuri Dep. Tr. at 14:23-15:7). Further add that among other things, Jefferies pre-hire and hire protocols also included interviews with Davidson, requesting information about the information disclosed on Davidson's CRD, inquiring about prior investigations that Davidson was the subject of by prior employers, governmental or regulatory authorities, or self-regulatory organizations, and the requirement that Davidson complete a Compliance Questionnaire shortly after hiring.** *See* **Exs. 2-13, 14, 16-18 (April 22, 2016 Letter; March 21, 2016 CRD; Offer Letter;; Compliance Questionnaire;).** *See also* **Response to Paragraph 33 above which Jefferies incorporates herein by reference. Davidson failed to provide relevant and requested information about his history of compliance issues during Jefferies' pre-hire and hire protocols.** *Id.***;** *see also* **Morgan Stanley Compliance Issues Documents**

36.     As part of Jefferies' hiring process, Davidson was required to authorize Jefferies to search regulatory filings relating to him as maintained in the CRD system. Davidson did so and Jefferies obtained the CRD system report concerning Davidson on March 21, 2016. (Brickman Decl. ¶¶ 15-17 and Exhibits M, N and O to the Brickman Decl.)

**RESPONSE: Deny that the statements contained in this paragraph are supported by the cited evidence as required by Local Rule 7056-1. Admit only that on or about March 21, 2016, Jefferies obtained a CRD system report for Davidson which contained only limited information about three customer complaints against Davidson.** *See* **Ex. 14 (March 21, 2016 CRD). Further add that subsequent to Davidson's termination by Jefferies, Jefferies learned that Davidson had a history of compliance issues which were not reported on Davidson's CRD at the time of his hiring, and Davidson failed to disclose and provided false information**

in response to Jefferies' questions concerning the only three customer complaints reflected on his CRD. *See* Scoran Dec., ¶¶6-15; Jefferies SOMF, ¶¶ 14-16, 20-32.

37.     As it relates to Jefferies' U.S. Equity and Fixed Income business lines, Jefferies, and more specifically Jefferies' Compliance Department, had a process which was applied before any targeted candidates would be extended an offer.  That process included requiring all candidates to sign a preregistration form permitting Jefferies to scan the employee and view all CRD filings related to that employee.  (Scoran Dep. p. 34:9-22).

**RESPONSE:** Deny as stated.  Admit that, when asked to describe "the process by which Rick Davidson was first identified as a candidate for hire, vetted, interviewed, and then hired," Scoran testified:

> So the various business groups identify candidates that are seeking employment. Wealth management is part of our global equities business. I am not intimately familiar with their sort of business mix or model or from a sales perspective about what individuals they, per se, target.
> I can speak to the firm's business is generally a U.S. equity business or – and fixed income are the products we generally offer.
> In targeting a candidate, I can speak to the processes before any offer is made. An employee has to sign a preregistration form, in which we scan an employee to look at to see if they're registered, if they're statutorily disqualified, to see – it's a preliminary registration scan.
> HR has requirements for interviewing and the number of references that they check and the types of questions that are asked. We have various programs that have evolved over the years and manuals on sort of interviewing a candidate.
> And then all offers are contingent on a satisfactory background check, which was done by a third-party service.
> And then we run a criminal background check via fingerprints once an employee signs off on that.

**Ex. 1 (Scoran Dep. Tr. at 33:9-34:22).**

38.     The purpose of the review of the disclosures contained in these systems was to determine if a candidate, in this case, Davidson, was statutorily disqualified from continuing to do business as a registered representative.  (Scoran Dep. p. 34:9-22).

**RESPONSE:** Deny as stated.  Admit that, when asked to describe "the process by which Rick Davidson was first identified as a candidate for hire, vetted, interviewed, and then hired," Scoran testified:

> So the various business groups identify candidates that are seeking employment. Wealth management is part of our global equities business. I am not intimately familiar with their sort of business mix or model or from a sales perspective about what individuals they, per se, target.

I can speak to the firm's business is generally a U.S. equity business or – and fixed income are the products we generally offer.

In targeting a candidate, I can speak to the processes before any offer is made. An employee has to sign a preregistration form, in which we scan an employee to look at to see if they're registered, if they're statutorily disqualified, to see – it's a preliminary registration scan.

HR has requirements for interviewing and the number of references that they check and the types of questions that are asked. We have various programs that have evolved over the years and manuals on sort of interviewing a candidate.

And then all offers are contingent on a satisfactory background check, which was done by a third-party service.

And then we run a criminal background check via fingerprints once an employee signs off on that.

*Id.* at 33:9-34:22.

Further add that during the pre-hire process, Jefferies reviewed the limited disclosures in Davidson's CRD, as well as obtained information from Davidson about the three customer complaints and a suspension by Morgan Stanley which he disclosed.. *Id.* at 56:8-15; Scoran Dec., ¶¶13-14. Jefferies also inquired if Davidson was the subject of any prior investigations by prior employers, governmental or regulatory authorities, or self-regulatory organizations. Ex. 16 (Offer Letter). Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Scoran Dec., ¶¶6-15; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.

39.     On March 22, 2016, Arcuri sent email correspondence to her Jefferies colleagues Lau, Timothy Smith, and David Nagy instructing them that Jefferies needed to demonstrate, in the event of a subsequent FINRA audit, that it reviewed Davidson's CRD report. (Brickman Decl. ¶¶15-17 and Exhibits M, N and O to the Brickman Decl.).

**RESPONSE**: Deny that the statements contained in this paragraph are material facts. Deny as the statement in this paragraph mischaracterizes the cited evidence and deny that the cited purported evidence supports the statements contained in this paragraph as required by Local Rule 7056-1.

40.     On March 22, 2016, Jefferies employee Marsha Rockcliffe ("Rockcliffe") sent email correspondence to, among others, Armstrong, Bernardo, Lau, Arcuri and Scheuer stating that "COMPLIANCE/LEGAL APPROVAL WILL BE REQUIRED BEFORE AN OFFER OF EMPLOYMENT IS MADE." In that email Rockcliffe asked for a written explanation from Davidson regarding the customer complaints disclosed on his Form U4. (Brickman Decl. ¶15 and Exhibits M, N and O to the Brickman Decl.).

17

**RESPONSE: Admit. Further add that Davidson's CRD at the time of his hiring did not disclose the full extent of his compliance history, and Davidson provided false information in response to Jefferies' questions concerning his compliance history at Morgan Stanley. Scoran Dec., ¶¶6-15; Jefferies SOMF, ¶¶ 14-16, 20-32, 58-66. This is a genuine issue to be tried.**

41.     Davidson's CRD Report showed that Davidson had received three historical customer complaints, two of which had been settled and one of which had been denied. (Brickman Decl. ¶17 and Exhibit O to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are supported by the cited evidence as required by Local Rule 7056-1. Admit that Davidson's CRD Report as of March 20, 2016 listed three customer complaints, and that two were listed as settled and one was listed as denied. Ex. 14 (CRD).**

42.     As part of Jefferies' hiring due diligence process, Lau alongside Scoran, Arcuri and the Jefferies Wealth Management Team reviewed and discussed the disclosures on Davidson's CRD report. (Lau Dep. p. 15:16-21).

**RESPONSE: Deny. The statements in this paragraph mischaracterize the cited testimony. Further add that Davidson provided false information in response to Jefferies' questions concerning the three customer complaints reflected on his CRD and his compliance history at Morgan Stanley. Scoran Dec., ¶¶6-15. *See also* Response to Paragraph 33 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

43.     In addition, Jefferies' Human Resources ("HR") had a protocol for interviewing and checking references along with certain types of questions that are asked, and all offers were contingent upon a satisfactory background check and drug test done by a third-party service and a criminal background check via fingerprints. (Scoran Dep. p. 34:9-22 and Arcuri Dep. p. 15:15-23).

**RESPONSE: Deny as stated. Admit that Scoran testified as follows:**

> **HR has requirements for interviewing and the number of references that they check and the types of questions that are asked. We have various programs that have evolved over the years and manuals on sort of interviewing a candidate.**
> **And then all offers are contingent on a satisfactory background check, which was done by a third-party service.**
> **And then we run a criminal background check via fingerprints once an employee signs off on that.**

**Scoran Tr. at 34:9-22. Further admit that Arcuri testified as follows:**

> **Q: Are you aware of what the HR functions were as part of the pre-hire review process?**
> **A: Yes.**

**Q: Can you describe that to me, please?**
**A: They would do – they would have a vendor do a background check. They would have the potential employee or prospective employee complete an employment application. And they would – that's it, actually, that I'm aware of.**
**Q: Do you know if drug testing was part of the protocol for HR or for compliance purposes?**
**A: Yes, it was.**

**Arcuri Tr. at 15:11-25.**

44.　On March 23, 2016, Jefferies hosted Davidson for an in-person meeting and interview with Scheuer, Filipowicz, Maryellen Dragotta and Lau to discuss *inter alia*, Davidson's recruitment and hiring. (Brickman Decl. ¶18, Exhibit P to the Brickman Decl. and Lau Dep. p. 23:24-24:2).

**RESPONSE: Deny that the statements contained in this paragraph are supported by the cited evidence as required by Local Rule 7056-1.**

45.　On April 19, 2016, as part of Jefferies hiring process, Jefferies' employee Joyce Chan circulated email correspondence to Scheuer, copying Armstrong, Norm Dannen and Jean Dedick stating that she left two copies of "Rick's New Hire Request" on Frank's desk for his review. (Brickman Decl. ¶ 19 and Exhibits Q to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. Deny that the statements in this paragraph are supported by the cited document as required by Local Rule 7056-1. Further add that in his role as COO, Scheuer didn't "hire, recruit or fire advisors." Ex. 15 (Scheuer Tr. 21:18-20).**

46.　The April 19, 2016, New Hiring Request focused on Davidson's stellar revenue production, strong reputation, and his infectious high energy level stating as follows:

We would like to hire Rick Davidson as a Wealth Management advisor. Rick is currently a Wealth Management advisor at Morgan Stanley, where he has been employed for the past eight years. His production is consistently $4.5-5 million focused on high net worth retail accounts.

Prior to Morgan Stanley, Rick was employed by DLJ/Credit Suisse where he was a perennial Chairman Club producer, which represents the top producers in the firm. He maintains extremely close relationships with his account base and they are entirely domestic/US based. Rick's business mix is predominately 70% Fixed Income and the rest is Equities and Mutual Funds. His depth of experience in Fixed Income product knowledge makes him a natural fit for Jefferies. **Rick has an extremely high energy level and we are certain this will translate into an increase in revenue for him and these existing producers in Wealth Management.** (emphasis added).

(Brickman Decl. ¶19 and Exhibit Q to the Brickman Decl.).

**RESPONSE**: **Deny. The statements in this paragraph mischaracterize the cited document and contains counsel's improper characterization of the cited document. Further add that Jefferies' decision to hire Davidson was materially based on the misinformation provided by Davidson and the limited information about Davidson's prior history of compliance issues that was available to Jefferies through Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15. *See also* Jefferies SOMF, ¶¶ 14-17, 20-36, 58-66. Subsequent to Davidson's termination from Jefferies and Davidson's fraudulent procurement of the Loan, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *Ibid.*; Response to Paragraph 33 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

47.    In that same April 19, 2016, hiring request under a category entitled "Prior Firm Information" information concerning Davidson's prior employment was indicated as follows:

| Employer Name | Dates of Employment | Term Reason (voluntary or involuntary) | Comments |
|---|---|---|---|
| Morgan Stanley | Dec 2008 – Present | Voluntary | |
| Credit Suisse | Nov 2000 – Dec 2008 | Voluntary | |

(Brickman Decl. ¶19 and Exhibit Q to the Brickman Decl.).

**RESPONSE**: **Deny as stated, but admit that this paragraph contains an accurate excerpt from the cited document. Further add that Jefferies' decision to hire Davidson was materially based on the misinformation provided by Davidson about his history of compliance issues and the limited information available to Jefferies through Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15. *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. Subsequent to Davidson's termination from Jefferies and Davidson's fraudulent procurement of the Loan, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *Ibid.*; Response to Paragraph 33 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

48.    On April 21, 2016, Jefferies HR Representative Bernardo sent an email to Forlenza (Head of Wealth Management), copying Armstrong and Scheuer, and asking Forlenza to confirm his approval of hiring Davidson, stating that Armstrong has approved and advising that the approval from the Global Head at Jefferies, Brian Friedman, would also be required. (Brickman Decl. ¶20 and Exhibit R to the Brickman Decl.).

**RESPONSE**: **Deny. The statements in this paragraph are not supported by the cited document, as required by Local Rule 7056-1. Further add that Jefferies' decision to hire**

Davidson was materially based on the misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15. *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. Subsequent to Davidson's termination from Jefferies and Davidson's fraudulent procurement of the Loan, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *Ibid.*; Response to Paragraph 33 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.

49. On April 22, 2016, Bernardo sent an email to Arcuri, Rockcliffe and others to ask if Davidson had received compliance/legal approval stating that Wealth was looking to extend an offer to Davidson. (Brickman Decl. ¶21 and Exhibit S to the Brickman Decl.).

**RESPONSE: Deny. The statements in this paragraph are not supported by the cited document, as required by Local Rule 7056-1.**

50. As requested by Jefferies, on April 22, 2016, Davidson provided a written explanation of the events on his CRD report describing and detailing the infractions he was aware of on his Form U4, which Davidson duly supplied to Scheuer once it was requested. (Davidson Dep. pp. 111:11-18 and 178:12-179:24 and Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Deny. The statements in this paragraph are not supported by the cited document or is otherwise supported only by citation to self-serving testimony which does not constitute admissible evidence, and therefore this statement does not contain a citation to admissible evidence as required by Local Rule 7056-1. Further add that, subsequent to Davidson's termination by Jefferies, Jefferies learned that Davidson provided false information in the April 22, 2016 Letter. *See* Exs. 2-13, 18 (April 22, 2016 Letter, Morgan Stanley Compliance Issues Documents). See also response to Paragraph 41 above which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

51. To the best of Davidson's knowledge and belief, Davidson provided Jefferies, specifically Scheuer and Armstrong, with comprehensive details regarding his prior employer including the only "investigation" he perceived himself to be under during his tenure at Morgan Stanley which entailed Davidson being questioned concerning baseless allegations premised on inaccurate information where Davidson was incorrectly identified as residing on Park Avenue South, possessing a firearm, being a parent to a young child, and undergoing a divorce. None of this was true. (Davidson Dep. 167:9-24).

**RESPONSE: Deny. Further add that Davidson knew he was under investigation while at Morgan Stanley no less than three times, for violations of Morgan Stanley's compliance policies, and that Davidson know the statements he provided in the April 22, 2016 letter were false. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents). *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

52.    In addition, Davidson supplied Jefferies' compliance department with an explanation for a 30-day suspension that Morgan Stanley had imposed on him in 2012 as a result of a customer complaint which alleged that Davidson had engaged in unauthorized trading. (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Deny. The statements in this paragraph are not supported by the cited document as required by Local Rule 7056-1.**

53.    On April 22, 2016, Lau and Scheuer exchanged multiple emails wherein Scheuer provided Lau with the written explanation received from Davidson concerning customer complaints and the 30-day suspension.  (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Deny. The statements in this paragraph are not supported by the cited document as required by Local Rule 7056-1.**

54.    In that same April 22, 2016, email exchange Scheuer wrote to Lau urging him to expedite the process of hiring Davidson telling Lau, "I need you all over this[,] this is a 5 million dollar guy.  You met with him and Ron.  Lets slam dunk this.  Than[k]s."  (Brickman Decl. ¶22 and Exhibit S to the Brickman Decl.).

**RESPONSE: Deny as the statement in this paragraph mischaracterizes the cited document and contains argument and is otherwise supported by the cited purported evidence as required by Local Rule 7056-1.  Further add that Scheuer, who in his role as COO, didn't "hire, recruit or fire advisors", in turn, passed along Davidson's name to Michael Armstrong, the then head of Jefferies' Wealth Management group.  Ex. 15 (Scheuer Tr. at 20:18-20, 21:2-4, 22:21-23:4).  This is a genuine issue to be tried.**

55.    It was Lau's understanding that Scheuer's remarks "to be all over" the hiring of Davidson was meant to speed up the process of approving the hiring of Davidson and that Scheuer's remark that he should "slam dunk" the hiring of Davidson was intended to impose an added urgency on Lau to get the hiring of Davidson done quickly.  (Lau Dep. pp. 62:21-25 and 63:20-25).

**RESPONSE: Deny as mischaracterizing the cited testimony.  Further add that Scheuer, who in his role as COO, didn't "hire, recruit or fire advisors", in turn, passed along Davidson's name to Michael Armstrong, the then head of Jefferies' Wealth Management group.  Ex. 15 (Scheuer Tr. at 20:18-20, 21:2-4, 22:21-23:4). This is a genuine issue to be tried.**

56.    Lau explained Scheuer's role in recruiting and hiring Davidson as "the driving force to bring [Davidson] on" and that Scheuer was "spearheading" bringing Davidson on board.  (Lau Dep. pp. 64:10-15).

**RESPONSE: Deny as mischaracterizing the cited testimony.  Further add that Scheuer, who in his role as COO, didn't "hire, recruit or fire advisors", in turn, passed along Davidson's name to Michael Armstrong, the then head of Jefferies' Wealth Management group.  Ex. 15 (Scheuer Tr. at 20:18-20, 21:2-4, 22:21-23:4). This is a genuine issue to be tried.**

57. Lau explained that Scheuer was the Chief Operating Officer ("COO") of the business and that he was pushing for Davidson's hiring. Scheuer brought Davidson forward as a candidate, having gotten the information about Davidson and having gotten Davidson's authorization to do a preliminary pre-hire review. (Lau Dep. pp. 64:16-65:2).

**RESPONSE: Deny as mischaracterizing the cited testimony. Further add that Scheuer, who in his role as COO, didn't "hire, recruit or fire advisors", in turn, passed along Davidson's name to Michael Armstrong, the then head of Jefferies' Wealth Management group. Ex. 15 (Scheuer Tr. at 20:18-20, 21:2-4, 22:21-23:4). This is a genuine issue to be tried.**

58. In the email exchange between Lau and Scheuer occurring on April 22, 2016, Lau confirmed to Scheuer that he had just spoken with Davidson, obtained the explanation regarding Davidson's 2012 suspension at Morgan Stanley, and that he was satisfied with the explanation, but that it needed to be approved by Arcuri and Scoran. (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Deny. The statements in this paragraph are not supported by the cited document as required by Local Rule 7056-1. Further add that subsequent to Davidson's termination, Jefferies learned that Davidson's explanation to Lau was false and that Davidson's suspension was actually disciplinary in nature. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents).**

59. On April 22, 2016, Lau and Arcuri also exchanged multiple emails in anticipation of legal and compliance approving Davidson's hiring. In those emails Arcuri wrote to Lau stating, "Lauri asked for his trailing 24 – do you have this?" (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Admit that this contains an accurate excerpt from the cited document. Further add that Scoran's request to review Davidson's production did not provide any indication that Davidson's production, rather than any other factor, was a material factor in the decision to approve Davidson's hiring. This is a triable issue of fact. Moreover, Jefferies' decision to hire Davidson was materially based on the misinformation provided by Davidson and the limited information available to Jefferies through Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See ibid.;* Morgan Stanley Compliance Issues Documents. *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

60. On April 22, 2016, Lau responded back to Arcuri stating that when he spoke to Scheuer, Scheuer stated that Davidson was between a $4.5 and $5 million-dollar guy. (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

ACTIVE 697896374v5

**RESPONSE**: **Admit that on April 22, 2016, Lau responded to Arcuri, "Spoke to Frank he did not have exact but said between 4.5 and 5 million a year." Further add that Jefferies' decision to hire Davidson was materially based on the misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See ibid.;* Morgan Stanley Compliance Issues Documents. *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

61. On April 22, 2016, Lau and Arcuri exchanged additional email messages where Lau detailed that he understood the reasons for Davidson's suspension being related to the customer complaints filed against him. Lau then further clarified that he spoke to Davidson and "he said he was suspended due to the Sonnenblick complaint. Before any investigation was done at the time the complaint was received, he was told there was a complaint filed, and to take a month off" (Brickman Decl. ¶24 and Exhibit V to the Brickman Decl.).

**RESPONSE**: **Deny. The statements in this paragraph are not supported by the cited document as required by Local Rule 7056-1. Davidson never advised Jefferies that his suspension was related to customer complaints against him. Further add that subsequent to Davidson's termination from Jefferies, Jefferies learned that his representations about his suspension by Morgan Stanley during the recruitment process were false and Davidson's suspension was actually disciplinary in nature. Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above which Jefferies incorporates herein by reference.**

62. On April 25, 2016, Arcuri sent correspondence to Lau stating that Scheuer "just came by" and asked what the holdup was in hiring Davidson. Arcuri indicated again that they were waiting for Davidson's "trailing 24." Arcuri went on to state to Lau that Scheuer "is in there with Lauri." Arcuri added, "we have to make sure Armstrong knows this guy was suspended not that long ago." (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE**: **Admit that on April 25, 2016, Arcuri sent an email to Lau stating that "Frank just came by – asked what the hold up was. I said we were waiting for trailing 24 he is in there with Lauri – he said you said you are ok with it. We have to make sure Armstrong knows this guy was suspended not that long ago." Further add that subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See* Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66; Scoran Dec., ¶¶ 6-15; Response to Paragraph 33 above, which Jefferies incorporates herein by reference.**

63. On April 25, 2016, Lau writes back to Arcuri responding that "**Mike is aware of [Davidson's] history.**" (emphasis added). (Brickman Decl. ¶22 and Exhibit T to the Brickman Decl.).

**RESPONSE: Admit that the statement in this paragraph accurately quotes the cited document. Further add that subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time.** *See* **Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66; Scoran Dec., ¶¶ 6-15.** *See also* **Response to Paragraph 33 above, which Jefferies incorporates herein by reference.**

64.     On April 25, 2016, at 2:37 PM Arcuri writes back to Lau, "**Yes just confirmed with Mike that he know[s] about both situations. He is going to stop by and talk to Lauri.**" (Brickman Decl. ¶23 and Exhibit U to the Brickman Decl.).

**RESPONSE: Deny that the cited document contains the emphasis included in the statement contained in this paragraph. Further add that Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time.** *See* **Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66; Scoran Dec., ¶¶ 6-15.** *See also* **Response to Paragraph 33 above, which Jefferies incorporates herein by reference.**

65.     On April 25, 2016 at 4:51 pm Arcuri wrote to Bernardo and Rockcliffe, copying several others including Lau and General Counsel Barbara Flessas stating, "**Compliance/Legal review complete ok to move forward with this hire.**" (Brickman Decl. ¶20 and Exhibit R to the Brickman Decl.).

**RESPONSE: Deny that the cited document contains the emphasis included in the statement contained in this paragraph but admit that this statement contains an accurate excerpt from the cited document. Further add that Jefferies' decision to hire Davidson was based on the misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15).** *See also* **Scoran Dec., ¶¶ 6-15; Response to Paragraph 33 above, which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time.** *See ibid.;* **Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

66.     Both Arcuri and Scheuer affirmed that, in adherence with Jefferies' hiring protocols and due diligence practices, Jefferies' Compliance and Legal Departments were comfortable, with and voted in favor of, hiring Davidson. (Arcuri Dep. p. 52:23 – 53:7 and Scheuer Dep. p. 99:23-25).

**RESPONSE: Deny as mischaracterizing the cited testimony. Further add that Jefferies' decision to hire Davidson was based on the misinformation provided by Davidson and the limited information available to Jefferies through Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15). Scoran Dec., ¶¶ 6-15.** *See also* **Response to Paragraph 33 above which Jefferies**

incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *Ibid.*; *see also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.

<u>Final Approvals and Davidson's Hiring</u>

67.     On May 3, 2016 Armstrong, Jefferies' Global Head of Wealth Management wrote to Forlenza, Jefferies' Global Head of Equities, copying Scheuer, and stating "I took another look at the deal structure." Armstrong said "it is very favorable for Jefferies." Armstrong went on to describe Davidson's trailing 12 month production stating, "He generated $4,675,000 despite a tough fixed income environment." (Brickman Decl. ¶24 and Exhibit V to the Brickman Decl.).

**RESPONSE: Admit that this paragraph contains accurate excerpts from the cited document and further refer to the cited document for its full and complete content. Further add that Jefferies' decision to hire Davidson was based on the misinformation provided by Davidson and the limited information available to Jefferies through Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15). Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above, which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process, included materially false information, all of which was known to Davidson at the time. *Ibid.*; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

68.     On May 12, 2016, Forlenza, Jefferies' Global Head of Equities sent an email to Friedman, Jefferies' Global Head, stating "Brian, this is the wealth hire we discussed earlier." Contained within the body of the email from Florenza to Friedman was the same information circulated on April 19, 2016 which highlighted Davidson's stellar production, strong reputation and which recounted Davidson's financial performance at Morgan Stanley, ($4.5-5 million production from high net worth retail accounts, his consistent status as a top producer in the Chairman's Club, his business mix, proposed compensation terms), and indicating the Termination Reason from each of Davidson's prior employers as being **Voluntary**. (emphasis added). (Brickman Decl. ¶25 and Exhibit W to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited document and otherwise contains counsel's improper characterization of the cited document. Further add that Davidson was the subject of several disciplinary actions while at Morgan Stanley and, recognizing that he was under investigation for again improperly exercising discretion in client accounts, and about to be terminated by Morgan Stanley under the terms of the Last Chance Agreement, Davidson sought out employment with Jefferies. *See* Exs. 2-44, 15 (Last Chance Agreement; March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Scheuer Dep. Tr. at 14:22-15:6, 19:23-25); Jefferies SOMF, ¶ 12.**

69.     Prior to Davidson's hiring no one from the compliance team spoke with Friedman and no other information other than what was originally included in the May 12, 2016 email, was

provided to Friedman prior to Davidson's hiring. (Scoran Dep. p. 134:9-25, Brickman Decl. ¶25 and Exhibit W to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited testimony and otherwise unsupported by the cited testimony or other admissible evidence, as required by Local Rule 7056-1. Further add that subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process, included materially false information, all of which was known to Davidson at the time. Scoran Dec., ¶¶ 6-15; Response to Paragraph 33 above; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

70.     Within that May 12, 2016, email to Friedman, there was no information concerning Davidson's past regulatory filings, customer complaints, suspensions or representations made concerning investigations upon which Friedman could have relied upon. Friedman's decision to endorse Davidson's hiring was based solely on Davidson's past financial performance and his "extremely high energy level" that would "translate into an increase in revenue for him and these existing producers in Wealth Management." (Brickman Decl. ¶25 and Exhibit W to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited document and otherwise unsupported by any admissible evidence, as required by Local Rule 7056-1. Further add that Jefferies' decision to hire Davidson was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above, which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process, included materially false information, all of which was known to Davidson at the time. *Id.*; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

71.     Friedman wrote back in approval of the request to hire Davidson, simply stating "ok." (Brickman Decl. ¶25 and Exhibit W to the Brickman Decl.).

**RESPONSE: Admit. Further add that Jefferies' decision to hire Davidson was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above, which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process, included materially false information, all of which was known to Davidson at the time. *Id.*; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. This is a genuine issue to be tried.**

72.     On May 13, 2016, Rockcliffe sent a follow up email to Lau asking him if he received any communication concerning Davidson's Customer Complaints on his Form U4. Lau replied stating that he provided Arcuri with Davidson's comments, that Scoran was involved in this hire and that on April 25, 2016, Lau had received a notice that the Compliance/Legal review

was complete and that it was okay to move forward with the hiring of Davidson. (Brickman Decl. ¶26 and Exhibit X to the Brickman Decl.).

**RESPONSE: Admit that on May 13, 2016, Rockcliffe sent an email to Lau stating "Rick Davidson is scheduled to start with the firm on Tuesday, May 17, did you receive any communication regarding the below disclosures?" and that on the same day, Lau responded, "I provided Eileen with Ricks comments, Lauri has been involved in this hire, and on 4/25/16, I received a notice that Compliance/Legal review complete ok to move forward with this hire." Further add that subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See* Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. *See also* Response to Paragraph 33 above, which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

73.     On or about May 13, 2016 Jefferies extended Davidson an offer of at-will employment with a commencement date of May 17, 2016. Davidson executed the written offer letter presented to him on May 17, 2016, the same date his employment commenced. (Brickman Decl. ¶27 and Exhibit Y to the Brickman Decl.).

**RESPONSE: Admit. Further add that Jefferies' decision to hire Davidson was materially based on the misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶ 6-15. *See also* Response to Paragraph 33 above, which Jefferies incorporates herein by reference. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See ibid.;* Morgan Stanley Compliance Issues Documents; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

74.     On May 17, 2016, Davidson in connection with executing his employment offer letter signed a Representations, Warranties, and Disclosure form attached to the offer letter in which he represented that "Except as disclosed below, to the best of my current knowledge and belief, I am not, and have not been, the subject of any investigation, whether by any prior employer, any governmental or regulatory, or self-regulatory organization. (Brickman Decl. ¶27 and Exhibit Y to the Brickman Decl.).

**RESPONSE: Admit.**

75.     At the time of his hiring, Jefferies was aware that a number of customers had complained that Davidson had engaged in unauthorized trading and that Davidson had been suspended as result of those complaints, that, pursuant to FINRA rules, Morgan Stanley had concluded a mandatory investigation of those complaints, and that it had made all required disclosures. (Scoran Dep. 99:6-23, Davidson Decl. ¶ 13, Brickman Decl. ¶23 and Exhibit U to the Brickman Decl.).

**RESPONSE**: Deny. Full disclosure of Davidson's history of compliance issues and drug related concerns had not been disclosed to Jefferies at the time of Davidson's hiring. Scoran Dec., ¶¶6-15; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.

76. On May 17, 2016 Davidson voluntarily resigned his employment with Morgan Stanley in order to accept the opportunity to work at Jefferies. (Davidson Dep. 182:16-183:17 and Brickman Decl. ¶29 and Exhibit AA to the Brickman Decl.).

**RESPONSE**: Admit that Davidson resigned from Morgan Stanley and joined Jefferies, but further add that recognizing that he was under investigation for again improperly exercising discretion in client accounts, and about to be terminated by Morgan Stanley under the terms of the Last Chance Agreement, Davidson resigned from Morgan Stanley in 2016 to join Jefferies. Jefferies SOMF, ¶ 12.

77. To the best of Rick Davidson's knowledge and belief, the only investigation that he was subjected to while at Morgan Stanley occurred when he was compelled to attend a meeting in a conference room accompanied by an attorney and two compliance personnel. During this meeting, he was confronted with an array of false and grave accusations surrounding possession of a firearm, undergoing a divorce, residing in Park Avenue South, and being subjected to arrest. It became evident that the pertinent department within Morgan Stanley had committed a grave error of mistaken identity. (Davidson Dep. 161:12-162:10).

**RESPONSE**: Deny. Davidson knew he was under investigation while at Morgan Stanley no less than three times, for violations of Morgan Stanley's compliance policies, and that Davidson know the statements he provided in the April 22, 2016 letter were false. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents). *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. Davidson expressly acknowledged these compliance issues and reprimand while at Morgan Stanley by counter-signing the documents. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents).

78. Davidson's hiring at Jefferies was celebrated in the industry as a win for Jefferies when on May 18, 2016, a trade publication article from Advisorhub.com characterized Davidson as an experienced individual in the New York City retail brokerage sphere, expected to generate a multi-million-dollar value to Jefferies. (Brickman Decl. ¶28 and Exhibit Z to the Brickman Decl.).

**RESPONSE**: Deny as mischaracterizing the cited document, which was not written by Jefferies. Davidson's hiring at Jefferies was not celebrated in the industry as a win.

*Jefferies Loan to Davidson – How it was Calculated and its Terms*

79. In connection with Davidson's hiring, Jefferies, based on an analysis of the revenue that Davidson was anticipated to originate based upon his ability to transfer assets, extended Davidson a loan, which is the debt which is now the subject of this Adversary Proceeding. The principal amount of the loan was $5,142,500. (Davidson Decl. ¶ 16, Brickman Decl. ¶¶ 19-20, 25, 29 and Exhibits to the Brickman Decl. Q-R, W, AA).

**RESPONSE**: Deny, except admit only that Jefferies extended Davidson a loan which is the subject of this Adversary Proceeding, and that the principal amount of the loan was $5,142,500.00. Further add that Jefferies' decision to hire Davidson and provide him with the Loan was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15; Response to Paragraph 33 above, which Jefferies incorporates herein by reference; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See ibid.;* Morgan Stanley Compliance Issues Documents.

80.     The decision to extend Davidson a loan was based on the same things as the decision to hire Davidson, his historical and anticipated production, and his ability to transfer assets to Jefferies. (Davidson Decl. ¶ 16, Brickman Decl. ¶¶ 19-20 and 25 and Exhibits to the Brickman Decl. Q-R and W).

**RESPONSE**: Deny. Jefferies' decision to hire Davidson and provide him with the Loan was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD. Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15; Response to Paragraph 33 above, which Jefferies incorporates herein by reference; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See ibid.;* Morgan Stanley Compliance Issues Documents.

81.     On the same date which Davidson commenced employment with Jefferies, he executed the Full-Recourse Promissory Note (hereinafter "Promissory Note") memorializing the terms of the loan extended to Davidson by Jefferies. (Davidson Decl. ¶ 16, Brickman Decl. ¶ 29 and Exhibit to the Brickman Decl. AA).

**RESPONSE**: Admit.

82.     The calculations relied upon in determining the amount of the Promissory Note anticipated that Davidson would reach a Production Target of $3,506,250 at the end of Year 1. The calculations further assumed Production Targets of $4,675,000 for Year 2, $5,375,250 for Year 3 and $6,077,500 for Year 4. The calculations also assumed for each year Davidson would receive a Bonus Payment of $1,168,750 reflecting 25% of T-12 (Davidson's trailing 12). (Brickman Decl. ¶¶ 19-20 and 25 and Exhibits to the Brickman Decl. Q-R and W).

**RESPONSE**: Deny as the statements in this paragraph are not material facts. Deny that all of the cited documents support the statements contained in this paragraph, as required by Local Rule 7056-1 and the statements contained in this paragraph otherwise mischaracterize the cited documents.

83.     The Promissory Note contained a schedule which contemplated Davidson making equal principal payments of $571,389 across nine years with accruing interest at a rate of 1.43% for a total repayment of $5,539,604.  (Davidson Decl. ¶ 16, Brickman Decl. ¶¶ 29 and Exhibit to the Brickman Decl. AA).

**RESPONSE: Admit that Exhibit A to the Promissory Note set forth a Payment Schedule and further refer to that document for its full and complete contents.  Further add that the Note also provided for acceleration of repayment of the Loan in certain instances, including the termination of Davidson's employment for cause. Ex. 19 (Note).  Upon the occurrence of an acceleration event, including termination, the Note provides that interest would begin to accrue at the rate of 8% per annum.  *Id.***

84.     The Promissory Note contained 21 paragraphs each setting forth the various terms and conditions of the loan.  Paragraph 13 of the Promissory Note entitled Conflicting Agreements specifically states as follows:

> "This Note contains the entire agreement and understanding of the parties with respect to the subject matter contained herein and **supersedes all prior communications, representations** and negotiations with respect thereto."  (emphasis added).

(Davidson Decl. ¶ 16, Brickman Decl. ¶¶ 29 and Exhibit to the Brickman Decl. AA).

**RESPONSE: Admit that the Promissory Note contains 21 paragraphs as well as an Exhibit A, and that this paragraph contains an accurate recitation of Paragraph 13 of the Promissory Note.  Further add that Jefferies' decision to hire Davidson and provide him with the Loan was based on the misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD.  Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15; Response to Paragraph 33 above.  *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

**The Note also provided for acceleration of repayment of the Loan in certain instances, including the termination of Davidson's employment for cause. Ex. 19 (Note).  Upon the occurrence of an acceleration event, including termination, the Note provides that interest would begin to accrue at the rate of 8% per annum.  *Id.***

85.     The Promissory Note does not contain any term, condition, or requirement wherein Davidson warrants or represents any information concerning:  1) his prior employment, 2) his regulatory compliance history, 3) customer complaints and/or 4) Davidson's knowledge of any investigations or internal reviews concerning himself.  (Davidson Decl. ¶ 16, Brickman Decl. ¶¶ 29 and Exhibit AA to the Brickman Decl.).

**RESPONSE: Deny.  Jefferies' decision to hire Davidson and provide him with the Loan was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD.  Ex. 1 (Scoran Tr. at 56:8-15); Scoran Dec., ¶¶6-15; Response to Paragraph 33 above, which Jefferies incorporates herein by reference; Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.  Further add that, in Section III.B of his Offer Letter, Davidson expressly "acknowledge[d] and agree[d] that the representations, warranties, and**

disclosures set forth on Exhibit A are truthful and accurate to the best of your knowledge." **Ex. 16 (Offer Letter).** Exhibit A of the Offer Letter required that Davidson specifically warrant that "Except as disclosed below, to the best of my current knowledge and belief, I am not, and have not been, the subject of any investigation, whether by any prior employer, any governmental or regulatory authority, or any self-regulatory organization," and it provided a space for Davidson to insert details about prior and ongoing investigations of which Defendant was the subject. *Id.* Davidson left the space blank, indicating there was nothing to disclose. *Id.* Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the time. *See id.;* **Morgan Stanley Compliance Issues Documents.** *See also* Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.

*Morgan Stanley Files a Form U-5 after Davidson's Resignation & Jefferies' Reaction*

86. On June 15, 2016, Jefferies received Davidson's initial Form U-5 from Morgan Stanley. (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE: Admit only that the U-5 from Morgan Stanley is dated June 15, 2016.**

87. The Form U-5 filed by Morgan Stanley indicated that Davidson's reason for termination was **Voluntary**. (emphasis added). (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE: Admit that Morgan Stanley's Form U-5 indicates the reason for Davidson's termination was voluntary but also disclosed that Davidson had resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016). The Form U5 disclosed that Morgan Stanley's internal review related to Davidson's exercise of discretion in clients' accounts, as well as Davidson's receipt of a loan from another Morgan Stanley employee. *Id.* No doubt recognizing that he was under investigation for again improperly exercising discretion in client accounts, and about to be terminated by Morgan Stanley under the terms of the Last Chance Agreement, Davidson sought out employment with Jefferies. *See* Exs. 2-44, 15 (Last Chance Agreement; March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Scheuer Dep. Tr. at 14:22-15:6, 19:23-25). Prior to his commencement of employment with Jefferies, Davidson also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley. Scoran Dec., ¶6-15; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8). This is a genuine issue to be tried.**

88. The Form U-5 also disclosed that Davidson had allegedly been under **internal review** at the time of his resignation, arising out of allegations of unauthorized trading (i.e. the customer complaints) and that he had accepted a loan from a co-worker in contravention of Morgan Stanly policies. (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE**: **Admit that Morgan Stanley's Form U-5 indicates the reason for Davidson's termination was voluntary but also disclosed that Davidson had resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016).** ***See also*** **Response to Paragraph 87 above, which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

89.     According to the Disclosure Question section of the U-5 Form filed by Morgan Stanley, on the date of his termination Davidson was **not** the subject of any "investigation(s)." (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE**: **Admit that Morgan Stanley's Form U-5 indicates the reason for Davidson's termination was voluntary but also disclosed that Davidson had resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016).** ***See also*** **Response to Paragraph 87 above, which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

90.     According to the Disclosure Question section of the U-5 Form filed by Morgan Stanley, on the date of his termination Davidson was the subject of internal review, initiated January 6, 2016 and "relating to registered representative's exercise of discretion in clients' accounts as well as receipt of a loan from a Morgan Stanley employee." The internal review was no longer pending on the date of the U-5 filing and was concluded upon Davidson's resignation. The internal review stemmed from allegations relating to Davidson exercising discretion in clients' accounts.  (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE**: **Admit that Morgan Stanley's Form U-5 indicates the reason for Davidson's termination was voluntary but also disclosed that Davidson had resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016).** ***See also*** **Response to Paragraph 87 above, which Jefferies incorporates herein by reference. This is a genuine issue to be tried.**

91.     To the best of Davidson's understanding and belief, the Form U-5 disclosures reported by Morgan Stanley regarding his borrowing money from another employee were unfounded as Davidson had obtained explicit permission from his then-manager, Ben Firestein, to obtain the short-term loan to be utilized for purchasing an engagement ring.  (Davidson Dep. 187:5-14).

**RESPONSE**: **Deny.  The statement contained in this paragraph is inconsistent with the evidence produced by Morgan Stanley confirming that Davidson resigned from Morgan Stanley "while under SIU investigation for Unauthorized Trading allegations and**

unapproved loans between employees" and that "his imminent termination was the next step." Ex. 3 (Matthews Email).

92.     Scheuer had also been made fully aware that this short-term loan arrangement had occurred prior to the issuance of the Morgan Stanley Form U-5.  (Davidson Dep. 187:5-14).

**RESPONSE: Deny. When asked "do you recall whether it indicated that although his termination was voluntary, they said at the time of his termination there was an internal review regarding allegations relating to registered representatives, exercise discretion and client accounts as well as receipt of a loan from a Morgan Stanley employee?", Scheuer testified, "I don't recall any of that." Ex. 15 (Scheuer Tr. at 81:23-82:9).**

93.     At Davidson's deposition, he testified that to the best of his knowledge and belief, he was not aware of any ongoing SIU investigation occurring during his tenure at Morgan Stanley and that he did not furnish any phone records to anybody at Morgan Stanley, nor did he recall anyone at Morgan Stanley requesting his personal phone records in connection with any investigation at Morgan Stanley.  (Davidson Dep. pp. 164-166).

**RESPONSE: Deny. Davidson's testimony was false, contradicted by the documentary evidence, and remains a triable issue of fact. In early 2016, Davidson knew he was the subject of an internal investigation by the SIU of his then employer, Morgan Stanley. *See* Exs. 2, 3 (March 15, 2016 Email from Wirhouski to Davidson; May 17, 2016 Email from Matthews). *See also* Jefferies SUMF, ¶¶ 6-7, 62(j), 63-64.**

94.     On June 16, 2016, Arcuri sent a correspondence attaching Davidson's Form U-5 to Scoran, Bruce Spiegler and David Nagy, copying Jefferies in-house counsel Barbara Flessas on that correspondence.  (Brickman Decl. ¶31 and Exhibit CC to the Brickman Decl.).

**RESPONSE: Admit.**

95.     Following Arcuri's June 16, 2016 email extensive email correspondence was exchanged concerning an internal review performed by Jefferies related to Davidson's alleged exercise of discretion in client's accounts as well as receipt of a loan from a Morgan Stanly employee.  The exact details of the communications exchanged by and between Jefferies employees are unknown because Jefferies has asserted privilege with respect to these communications due to Barbara Flessas being copied or participating in a number of the communications.  (Brickman Decl. ¶32 and Exhibit DD to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts.  The statements contained in this paragraph constitute legal argument.  Deny as inaccurate.  After Jefferies received the Form U5 filed by Morgan Stanley, Jefferies' management confronted Davidson, who first claimed he was unaware of the internal review (Ex. 1 (Scoran Tr. at 221:15-23)), and then falsely represented to Jefferies that the Morgan Stanley internal review concerned a loan from a Morgan Stanley employee and that Morgan Stanley had already concluded the investigation with no findings of unauthorized trading.  Exs. 28, 29 (June 21,**

**2016 Davidson Email to Lau; June 23, 2016 Nagy Email to Scoran).** **Jefferies also contacted Morgan Stanley to verify Davidson's explanation. However, Morgan Stanley would not provide any further information regarding Davidson. Exs. 1, 30 (Scoran Tr. at 154:14-155:17; June 22, 2016 Schultz Email to Flessas). Jefferies later learned that these representations by Davidson were also false. Exs. 3-4 (May 17, 2016 Matthews Email; Last Chance Agreement); Scoran Dec., ¶¶6-15. Further add that communications between Jefferies employees and its counsel (Barbara Flessas) are protected under the attorney-client privileged.**

96.     On or about July 15, 2016, a meeting was held between Scoran, Arcuri, Lau, Tim Smith and in-house counsel Barbara Flessas to discuss Davidson's customer complaints and the U-5 filed by Morgan Stanley. (Brickman Decl. ¶33 and Exhibit EE to the Brickman Decl.)

**RESPONSE: Deny that the statements contained in this paragraph are material facts. The referenced meeting was held subsequent to Davidson's hiring by Jefferies and is therefore not a material fact to this adversary proceeding. Admit only that the referenced document is an email from Lau to Arcuri and Timothy Smith with Lau's notes from a meeting on July 15, 2016 attended by Lauri Scoran, Tim Smith, Eileen Arcuri, Jeff Lau, and Barbara Flessas, and that in the email, Lau further states the purpose of the meeting was "to discuss Rick Davidson's customer complaints and U5 from Morgan Stanley."**

97.     The meeting minutes from the July 15, 2016 meeting reflect as follows:

"Prior to joining the firm Rick had three customer complaints on his U4. A review of these complaints revealed two were settled by Morgan Stanley and one was dismissed. Both of the settled complaints indicate unauthorized transactions. Discussions with Rick prior to joining indicated he did not trade without authorization and that the firm settled without him contributing in the restitution.

On June 15th Rick's U5 was filed in which by Morgan Stanley, on Rick's U5 it was indicated that he was under an internal review at the time of termination for exercising discretion in client's accounts as well as receiving a loan from another Morgan Stanley employee.

Due to these allegations as well as the customer complaints, a discussion regarding the need for heightened supervision was held. **It was determined that at this time heightened supervision was not necessary** but on a monthly basis Jeff Lau will sit with Ron Filipowicz (WM Supervisor) to review Rick's monthly business. In addition, on a quarterly basis those in attendance today will meet to review Rick's business to determine if heightened supervision is needed. (emphasis added).

(Brickman Decl. ¶33 and Exhibit EE to the Brickman Decl.)

**RESPONSE: Deny that the statements contained in this paragraph are material facts. The referenced meeting was held subsequent to Davidson's hiring by Jefferies and is therefore not a material fact to this adversary proceeding. Deny that the cited document contains any**

**bold text. Admit only that this paragraph contains an accurate excerpt from the referenced document.**

98.     Davidson's employment with Jefferies was at-will, meaning Jefferies had the right to terminate Davidson at any time, with or without cause. If Jefferies had any bona fide concern arising from the Form U-5 filed by Morgan Stanley or any of the four amended U-5s, Jefferies could have immediately terminated Davidson's employment. (Scoran Dep. p. 35:10-23).

**RESPONSE: Admit only that Davidson's employment with Jefferies was at-will. Ex. 16 (Offer Letter). Deny the remainder of the statements in this paragraph as it is not supported by the cited testimony, is argument and makes a legal conclusion, and does not contain a citation to admissible evidence, as required by Local Rule 7056-1.**

*Documented Issues Occurring During Davidson's Tenure of Employment at Jefferies*

99.     On August 4, 2016, Rockcliffe circulated an email to Lau, Filipowicz, Scheuer, Arcuri and others which contained an amended version of the Form U-5 as filed by Morgan Stanley on or about August 3, 2016 along with a Customer Complaint disclosure letter from FINRA. (Brickman Decl. ¶ 34 and Exhibit FF to the Brickman Decl.).

**RESPONSE: Admit. Further add that information received after Davidson's hiring and payment of Davidson's receipt of the Loan funds is not material to this adversary proceeding.**

100.     The reason for termination indicated on the Amended Form U-5 filed by Morgan Stanley on August 3, 2016 continues to reflect Davidson's termination reason as being "Voluntary." (Brickman Decl. ¶ 34 and Exhibit FF to the Brickman Decl.).

**RESPONSE: Deny as argumentative. *See also* Response to Paragraph 87 above, which Jefferies incorporates herein by reference.**

101.     On August 29, 2016, Davidson received a Letter of Warning from Forlenza and Scheuer. The letter of warning was issued because of Davidson's alleged unprofessional and aggressive behavior towards his sales assistant, Patrick McDevitt ("McDevitt"), which was deemed as bullying and resulted in McDevitt terminating his employment at Jefferies. The letter emphasized that Davidson's conduct violated Jefferies' Respect in the Workplace Policy. Additionally, it warned Davidson that any future instances of unprofessional behavior or policy violations could result in further disciplinary action, potentially including termination. (Brickman Decl. ¶ 35 and Exhibit GG to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statements contained in this paragraph are not relevant to this adversary proceeding. Deny as the statements in this paragraph are argumentative. Admit only that on August 29, 2016, Davidson received a Letter of Warning, and refer to that document for its full and complete contents, the contents of which speak for itself.**

102.     The August 29, 2016 warning letter was not required to be, and never was, disclosed on Davidson's U-4 registration. (Davidson Decl. ¶ 14).

**RESPONSE:** **Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Deny as the statement contained in this paragraph consists of a self-serving assertion contained in Davidson's post-deposition declaration submitted in support of his motion for summary judgment, and is therefore unsupported by admissible evidence, as required by Local Rule 7056-1. Deny that discipline of this nature is required to be disclosed on the Form U4.**

103.    On September 15, 2016, Davidson received another letter of warning from Forlenza and Filipowicz regarding a transaction involving the sale and purchase of structured notes. This transaction was found to be in violation of Jefferies' policies regarding client dealings based on Jefferies Compliance Department's review of the trade. The letter specified that Davidson's use of his personal mobile phone to contact the client violated Jefferies' policies on internet, electronic communications, and social media. Despite being instructed during a meeting with the Compliance department on August 29, 2016 not to discuss the trade with his sales assistants, Davidson approached them on multiple occasions regarding the matter. The letter cautioned Davidson that any further breaches of Jefferies' policies or standards of conduct may lead to additional disciplinary measures, potentially including termination. (Brickman Decl. ¶ 36 and Exhibit HH to the Brickman Decl.).

**RESPONSE:** **Deny that the statement contained in this paragraph is a material fact. The statements contained in this paragraph are not relevant to this adversary proceeding. Deny as the statements contained in this paragraph are argumentative. Admit only that on September 15, 2016, Davidson received a Letter of Warning, and refer to that document for its full and complete contents, the contents of which speak for itself.**

104.    The September 15, 2016 warning letter was not required to be, and never was, disclosed on Davidson's U-4 registration. (Davidson Decl. ¶ 15).

**RESPONSE:** **Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Deny as the statement contained in this paragraph consists of a self-serving assertion contained in Davidson's post-deposition declaration submitted in support of his motion for summary judgment, and is therefore unsupported by admissible evidence, as required by Local Rule 7056-1. Deny that discipline of this nature is required to be disclosed on the Form U4.**

105.    On October 11, 2016, Tim Smith, Arcuri, Lau, and in house counsel Barbara Flessas convened a meeting to discuss the supervision of Davidson. The meeting minutes outlined a review conducted to assess the necessity of placing Davidson under heightened supervision following the receipt of a CRD notice on October 3, 2016. Contact was made with Morgan Stanley, Davidson's former employer, to inquire about an internal review they may have conducted on Davidson. Jefferies questioned Davidson about the matter to which he responded that he was unaware of the internal review. After gathering all relevant information, the Jefferies Compliance department concluded that placing Davidson on heightened supervision was unnecessary. (Brickman Decl. ¶ 37 and Exhibit II to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. The statements contained in this paragraph are not relevant to this adversary proceeding. Deny as mischaracterizing the cited document. Admit only that the cited document is titled "Meeting Minutes-Rick Davidson" and reflects a meeting on October 11, 2016, attended by Tim Smith, Eileen Arcuri, Jeff Lau, and Barbara Flessas, and further refer to the cited document for its full and complete contents, which speaks for itself.**

106.    On May 9, 2017, Bernardo sent email correspondence to Peyreigne, with Barbara Flessas copied, outlining new allegations that had surfaced warranting an investigation into Davidson's conduct in the office.  (Brickman Decl. ¶ 38 and Exhibit JJ the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. The statements contained in this paragraph are not relevant to this adversary proceeding. Admit only that the cited document is an email from Bernardo to Robert Peygreigne and Barbara Flessas dated May 9, 2017, and further refer to the cited document for its full and complete contents, which speaks for itself.**

107.    On May 16, 2017, talking points were prepared for a discussion with Davidson. The points outlined that both HR and legal had conducted a review of Rick's behavior in the office, and based on his workplace conduct, he was found to be in violation of Jefferies' Respect in the Workplace Policy.  It was noted that Davidson's aggressive and unprofessional conduct was no longer sustainable, leading to the decision to part ways.  Additionally, it was stated that due to Davidson not being in good standing and being subject to an internal review, he would not receive the incentive bonus.  No compliance issues were noted.  (Brickman Decl. ¶ 39 and Exhibit KK to the Brickman Decl.).

**RESPONSE: Deny that the statements contained in this paragraph are material facts. The statements contained in this paragraph are not relevant to this adversary proceeding. Admit only that by email dated May 16, 2017, Barbara Flessas circulated a document titled "Talking Points for Discussion with Rick Davidson", and further refer to the cited document for its full and complete contents, which speaks for itself.**

108.    On June 16, 2017, Davidson's submitted a letter of resignation resigning his position as Jefferies.  (Brickman Decl. ¶ 40 and Exhibit LL to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Deny as unsupported by the cited document. Further add that Davidson submitted a resignation letter after Jefferies had already terminated his employment and provided him with notice that his last day of employment at Jefferies would be June 15, 2017. Jefferies SOMF, ¶ 53.**

*Davidson's Termination from Jefferies by Mutual Agreement*

109.    On July 10, 2017, Jefferies filed a Form U-5 related to Davidson's termination from Jefferies.  (Brickman Decl. ¶ 41 and Exhibit MM the Brickman Decl.).

ACTIVE 697896374v5

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Admit that Jefferies filed a Form U-5 on July 10, 2017 for Davidson.**

110.    The Form U-5 filed by Jefferies indicated that Davidson's reason for termination was "**Mutual Agreement. Loss of confidence related to violation of Respect in the Workplace Policy. Not customer or compliance related.** (emphasis added). (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Admit that the statements contained in this paragraph contain an accurate excerpt from the referenced document. Further add that Davidson submitted a resignation letter after Jefferies had already terminated his employment and provided him with notice that his last day of employment at Jefferies would be June 15, 2017. Jefferies SOMF, ¶ 53.**

111.    Under the Termination Disclosure section of the Form U-5 filed by Jefferies, Jefferies specifically indicated that Davidson was not discharged and did not resign "after allegations were made that accused the individual of fraud." (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Deny as mischaracterizing the cited document. Further add that Davidson submitted a resignation letter after Jefferies had already terminated his employment and provided him with notice that his last day of employment at Jefferies would be June 15, 2017. Jefferies SOMF, ¶ 53.**

112.    The Form U-5 filed by Jefferies also indicated that Davidson had not been under internal review or investigation at the time of his termination. (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. The statement contained in this paragraph is not relevant to this adversary proceeding. Admit that, for the question whether Davidson "currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment-related* statutes, regulations, rules or industry standards of conduct?", the response is "no." Further add that Davidson submitted a resignation letter after Jefferies had already terminated his employment and provided him with notice that his last day of employment at Jefferies would be June 15, 2017. Jefferies SOMF, ¶ 53.**

113.    The Form U-5 filed by Jefferies concerning Davidson's termination of employment did not contain any reference to Davidson having procured employment with Jefferies by fraud. (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited document. Davidson's gross misrepresentation concerning his Morgan Stanley compliance history during the**

recruitment process, which included materially false information that known to Davidson at the time, was not known to Jefferies at the time it filed its Form U-5 and was only learned later in the subsequent arbitration proceeding filed by Jefferies against Davidson. Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.

114.     The Form U-5 filed by Jefferies concerning Davidson's termination of employment did not contain any reference to Davidson having made misrepresentations to Jefferies in connection with his hiring. (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited document. Davidson's gross misrepresentation concerning his Morgan Stanley compliance history during the recruitment process, which contained substantial and materially false information, known to Davidson at the time, was not known to Jefferies at the time it filed its Form U-5. Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

115.     The Form U-5 filed by Jefferies concerning Davidson's termination of employment did not contain any reference to Davidson's failure to disclose his regulatory and disciplinary record from his tenure of employment while at Morgan Stanley. (Brickman Decl. ¶41 and Exhibit MM to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing the cited document. Davidson's gross misrepresentation concerning his Morgan Stanley compliance history during the recruitment process, which contained substantial and materially false information, known to Davidson at the time, was not known to Jefferies at the time it filed its Form U-5. Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

*Jefferies' After-the-Fact Factually Flawed Allegations of Misrepresentations*

116.     Jefferies alleges that during Jefferies' recruitment of Davidson, Davidson was asked about ongoing and prior compliance issues or investigations at Morgan Stanley. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶13).

**RESPONSE: Admit.**

117.     Jefferies alleges that the offer letter extending Davidson an offer of employment required that Davidson specifically warrant that "Except as disclosed below, to the best of my current knowledge and belief, I am not, and have not been, the subject of any investigation, whether by any prior employer, any governmental or regulatory, or self-regulatory organization" and that Davidson did not disclose to Jefferies that he was the subject of any current or prior investigation. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶13)

**RESPONSE: Admit.**

118.     Jefferies admits that Davidson spoke to Jefferies' management about his compliance history in advance of his hiring by Jefferies and that Davidson provided explanations

for three customer complaints between 2011 and 2012 that were disclosed on his CRD report in response to Jefferies' inquiries. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶13)

**RESPONSE: Deny as unsupported by the cited document. Admit that as part of the pre-hiring process, Jefferies obtained a copy of Davidson's publicly available CRD report. Exs. 1, 14 (Scoran Dep. Tr. at 40:17-21; March 21, 2016 CRD). Jefferies reviewed the limited information contained therein, which listed three customer complaints made by customers serviced by Davidson while he was employed at Morgan Stanley. No other customer complaints or other compliance related issues were disclosed on Davison's CRD prior to his hiring by Jefferies.** *Id.; see also* **Ex. 21 (Lau Dep. Tr. at 22:9-20). In response to Jefferies' request for an explanation of the three complaints set forth on his CRD, by letter dated April 22, 2016, Davidson claimed Morgan Stanley had not asked Davidson to participate in settlement discussions with Sonnenblick or Hunter, Sonnenblick still maintained an account relationship with Davidson, and Morgan Stanley denied the Levy complaint as "frivolous." Ex. 18 (April 22, 2016 Letter). Because Jefferies could not call Morgan Stanley, Davidson's current employer, to verify any of the facts or circumstances described by Davidson, or else that would tip off Morgan Stanley that Davidson was seeking employment elsewhere, Jefferies had to rely solely on Davidson's explanation. Ex. 1 (Scoran Tr. at 105:16-106:21). Moreover, Davidson expressly represented to Jefferies, in writing, that he had no other customer complaints or compliance violations.** *See* **Exs. 16-18 (April 22, 2016 Letter; Compliance Questionnaire; Offer Letter); Scoran Dec., ¶6-15.** *See also* **Jefferies SOMF, ¶¶ 20-32.**

119.    Jefferies alleges that Davidson knowingly failed to disclose that he was the subject of internal investigations for perceived misconduct as his prior firm, Morgan Stanley. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶18)

**RESPONSE: Admit.**

120.    Jefferies alleges that Morgan Stanley's filed a Form U-5 disclosing that Davidson's resignation came amidst an internal review commenced on January 6, 2016 and ending upon Davidson's May 17, 2016 resignation and that the internal review related to Davidson's exercise of discretion in client accounts as well as Davidson's receiving a loan from another Morgan Stanley employee. Jefferies alleges that when confronted by Jefferies's management about Morgan Stanley's U-5 disclosure that Davidson represented to Jefferies that he was not aware of Morgan Stanley's internal review. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶¶ 19-20).

**RESPONSE: Admit.**

121.    Jefferies alleges that Davidson's denial of knowledge concerning the Morgan Stanley internal review and about his compliance history during the recruitment process was false. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶ 21).

**RESPONSE: Admit.**

122.     Jefferies further alleges that Davidson knew about internal investigations at Morgan Stanley which occurred in 2011, failed to disclose the severity of his compliance misconduct in 2011 and 2012 or the employer and regulatory imposed discipline he received for such conduct; and lied about an internal investigation ongoing at Morgan Stanley when he joined Jefferies. (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶ 28).

**RESPONSE: Admit.**

123.     Jefferies conclusory asserts that Davidson's alleged misrepresentations are material and that Davidson's "material misrepresentations" to Jefferies made prior to and during Davidson's employment, were relied upon by Jefferies in loaning Davidson money, hiring him and continuing his employment.  (Brickman Decl. ¶3 and Exhibit A to the Brickman Decl. at ¶¶ 29-31).

**RESPONSE: Deny that the statements in this paragraph are material facts, and rather constitute argument. Deny that Jefferies' assertions are conclusory. Davidson's misrepresentations are material and Davidson's "material misrepresentations" to Jefferies prior to Davidson's employment were relied upon by Jefferies in hiring him and loaning Davidson money.  Ex. 1 (Scoran Tr. at 56:8-15); Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.Jefferies further denies that its allegations about representations made after Jefferies extended the loan to Davidson are "meritless" or "irrelevant to the Plaintiff's Claim alleged under §523 in this Adversary Proceeding," but admits that the Loan to Davidson was procured by fraud.  This is a genuine issue to be tried.**

124.     The allegations of fraud set forth within Jefferies Adversary Complaint are without merit and are not supported by the evidentiary testimony offered by Jefferies corporate representative Lauri Scoran.  (Davidson Decl. ¶ 17).

**RESPONSE: Deny that the statements in this paragraph are material facts, and rather constitute argument. Deny as the statements contained in this paragraph consist of self-serving assertions contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, which does not constitute admissible evidence, and therefore the statements in this paragraph are unsupported by a citation to admissible evidence, as required by Local Rule 7056-1.  Deny that the allegations of fraud set forth in Jefferies' Adversary Complaint are "without merit."  This is a genuine issue to be tried.**

125.     Pursuant to FRCP Rule 30(b)(6) Defendant served a subpoena seeking to take the deposition of a corporate representative on behalf of Jefferies.  (Brickman Decl. ¶42 and Exhibit NN to the Brickman Decl.)

**RESPONSE: Deny that the statement contained in this paragraph is a material fact.  Admit that Defendant served a subpoena pursuant to Fed. R. Civ. P. 30(b)(6).**

126.     In response to Defendant's FRCP Rule 30(b)(6) subpoena, Jefferies designated Scoran as Jefferies' corporate representative to appear and testify on behalf of Jefferies.  (Scoran Dep. 12:3-16, Brickman Decl. ¶42 and Exhibit NN to the Brickman Decl.).

**RESPONSE: Deny that the statement contained in this paragraph is a material fact. Admit that Defendant served a subpoena pursuant to Fed. R. Civ. P. 30(b)(6), and that Jefferies designated Scoran as Jefferies' corporate representative to appear and testify on behalf of Jefferies only as to certain deposition topics and subject to the objections asserted by Jefferies in response to the deposition notice.**

127.    Scoran identified a series of deposition topics noticed in advance which she was designated by the Plaintiffs to be competent to testify to.  Among those topics were: 1) the information relied upon by Jefferies in deciding to make Davidson an employment offer to join Jefferies and in deciding to extend Davidson a loan and 2) the representations relied upon by Jefferies in extending Davidson an offer of employment and 3) the facts upon which plaintiff based the allegations contained within the Complaint dated November 11th, 2019.  (Scoran Dep. pp. 18:8-21:20, 23:3-14, Brickman Decl. ¶42 and Exhibit NN to the Brickman Decl.)

**RESPONSE: Admit.**

128.    Scoran, in her capacity as a corporate representative for Jefferies testified that Davidson misrepresented to Jefferies that the reason he was leaving Morgan Stanley was voluntarily.  The exact testimony was as follows:

> Q:  Is it Jefferies's contention that Mr. Davidson misrepresented that the reason for his termination from Morgan Stanley was voluntary?
>
> A:  Yes.

(Scoran Dep. p. 95:18-22)

**RESPONSE: Admit that this paragraph contains an accurate excerpt from Scoran's deposition, but deny Davidson's characterization of Scoran's testimony.  Scoran did not testify that this was the only misrepresentation that Davidson made to Jefferies. Jefferies' decision to hire Davidson and provide him with the Loan was based on several false representations and omissions, only one of which was his misrepresentation that his separation of employment from Morgan Stanley was voluntary, but also includes the misinformation provided by Davidson to Jefferies regarding his extensive prior history of compliance issues.** *See* **Exs. 1, 2-13, 16-17 (Scoran Tr. at 56:8-15; Compliance Questionnaire; Offer Letter; Morgan Stanley Compliance Issues Documents).** *See also* **Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

129.    Scoran, in her capacity as a corporate representative for Jefferies testified that Davidson misrepresented to Jefferies that Morgan Stanley's Form U-5 filing would reflect Davidson's termination as being voluntary.  The exact testimony was as follows:

> Q:  There's a spot in the U5 for a reason for termination.
>
> A:  Yes.

Q: And the answer to that is either voluntary, involuntary, or other, correct?

A: Yes.

Q: And Mr. Davidson represented that in connection with that explanation for his termination it would -- it was voluntary, correct?

A: That is my recollection. He represented it would be voluntary.

Q: And that it would indicate on his U5 that the reason for the termination was voluntary, correct?

A: My recollection is Mr. Davidson represented he was leaving Morgan Stanley on his own accord and it would be voluntary.

(Scoran Dep. pp. 96:13- 97:8).

**RESPONSE: Admit that this paragraph contains an accurate excerpt from Scoran's deposition, but deny Davidson's characterization of Scoran's testimony. Scoran did not testify that this was the only misrepresentation that Davidson made to Jefferies. Jefferies' decision to hire Davidson and provide him with the Loan was based on several false representations and omissions, only one of which was his misrepresentation that his separation of employment from Morgan Stanley was voluntary, but also includes the misinformation provided by Davidson to Jefferies regarding his extensive prior history of compliance issues. _See_ Exs. 1, 2-13, 16-17 (Scoran Tr. at 56:8-15; Compliance Questionnaire; Offer Letter; Morgan Stanley Compliance Issues Documents). _See also_ Jefferies SOMF, ¶¶ 14-16, 20-36, 58-66.**

130.     Scoran, in her capacity as a corporate representative for Jefferies testified that the reason for termination as listed on the Form U-5 filed by Morgan Stanley concerning Davidson changed, at some point, from voluntary to something other than voluntary following the multiple amendments to the U-5 filed by Morgan Stanley. (Scoran Dep. p. 94:6-15).

**RESPONSE: Deny as mischaracterizing Scoran's testimony. Scoran testified as follows:**

> **Q: And I am asking you very specifically. Do you recall anything, any change for reason for termination being indicated as voluntary?**
> **A: I would need a document to refresh my recollection.**
> **Q: As we sit here today, you have no reason to believe that the reason for termination being indicated as voluntary has ever changed?**
> **Mr. Brody: Objection to form. That's not what she answered.**
> **A: My memory could be wrong, but I believe it did change, but my memory could be wrong. It was seven-and-a-half years ago.**

**Ex. 1 (Scoran Dep. Tr. at 93:24-94:15). Moreover, prior to his commencement of employment with Jefferies, Davidson also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by**

Morgan Stanley or being considered for discipline or termination by Morgan Stanley. Scoran Dec., ¶9; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8).

131     Scoran's testimony as corporate representative for Jefferies' as to the reason for termination listed on Davidson's Form U-5 filed by Morgan Stanley is factually incorrect given that the initial filing made on June 15, 2016, indicates the reason for Davidson's termination as **Voluntary**.  (Brickman Decl. ¶30 and Exhibit BB to the Brickman Decl.).

**RESPONSE**: Deny as mischaracterizing Scoran's testimony.  Scoran testified as follows:

> **Q: And I am asking you very specifically. Do you recall anything, any change for reason for termination being indicated as voluntary?**
> **A: I would need a document to refresh my recollection.**
> **Q: As we sit here today, you have no reason to believe that the reason for termination being indicated as voluntary has ever changed?**
> **Mr. Brody: Objection to form. That's not what she answered.**
> **A: My memory could be wrong, but I believe it did change, but my memory could be wrong. It was seven-and-a-half years ago.**

*Id.* **at 93:24-94:15. Moreover, prior to his commencement of employment with Jefferies, Davidson also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley.  Scoran Dec., ¶9; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8).**

132.     Morgan Stanley proceeded to file four subsequent amendments to the Form U-5 providing updated information to the Form U-5 related to customer complaints and developments concerning the disposition of those customer complaints.  (Brickman Decl. ¶¶ 33, 43 and Exhibits EE and OO to the Brickman Decl.).

**RESPONSE**: Admit that Morgan Stanley filed four amendments to the Form U-5; and further refer to the referenced documents, the contents of which speak for themselves.

133.     The reason for Davidson's termination never changed and remained listed as **Voluntary** on each and every version of the Form U-5's filed by Morgan Stanley.  (Brickman Decl. ¶¶ 33, 43 and Exhibits EE and OO to the Brickman Decl.).

**RESPONSE**: Admit that each of the Form U-5s filed by Morgan Stanley provided: "Reason for Termination: Voluntary" but further add that the Form U5 also disclosed that Davidson resigned while under investigation by Morgan Stanley.  Ex. 33.

134.     Scoran attempted to cure her factually inaccurate testimony by offering that "her review" of documents received in response to a subpoena served upon Morgan Stanley showed that Morgan Stanley was concerned about Davidson's behavior and handling of client accounts and that Morgan Stanley was "clearly in the process of, you know, significant discipline or termination." (Scoran Dep. pp. 95:23-96:9).

**RESPONSE:** Deny as mischaracterizing Scoran's testimony. Deny as the statement in this paragraph is not a material fact, but constitutes improper argument. Deny as Scoran's testimony was not factually inaccurate. Scoran testified as follows:

> Q: And I am asking you very specifically. Do you recall anything, any change for reason for termination being indicated as voluntary?
> A: I would need a document to refresh my recollection.
> Q: As we sit here today, you have no reason to believe that the reason for termination being indicated as voluntary has ever changed?
> Mr. Brody: Objection to form. That's not what she answered.
> A: My memory could be wrong, but I believe it did change, but my memory could be wrong. It was seven-and-a-half years ago.

Ex. 1 (Scoran Dep. Tr. at 93:24-94:15). Scoran further testified:

> Q: Is it Jefferies's contention that Mr. Davidson misrepresented that the reason for his termination from Morgan Stanley was voluntary?
> A: Yes.
> Q: What do you claim was misrepresented about that statement?
> A: In reviewing documents that were produced by Morgan Stanley, based on my review, it's clear they were concerned about his behavior and handling of client accounts, and that Mr. – what I see from Morgan Stanley, which we didn't have access to [at the time Jefferies extended an offer of employment to Davidson and provided the Loan], he was clearly in the process of, you know, significant discipline or termination.
> Q: Perhaps my question wasn't clear.
> A: Okay.
> Q: There's a spot in the U5 for a reason for termination.
> A: Yes.
> Q: And the answer to that is either voluntary, involuntary, or other, correct?
> A: Yes.
> Q: And Mr. Davidson represented that in connection with that explanation for his termination it would – it was voluntary, correct?
> A: That is my recollection. He represented it would be voluntary.
> Q: And that it would indicate on his U5 that the reason for the termination was voluntary, correct?
> A: My recollection is Mr. Davidson represented he was leaving Morgan Stanley on his own accord and it would be voluntary.

*Id.* at 95:18-97:8.

135. Scoran's after-the-fact self-serving perception of Morgan Stanley's undisclosed intentions to discipline Davidson is at odds with the U-5 filings made by Morgan Stanley, which filings are afforded absolute immunity under New York State law to the U-5 filer who is obligated

under FINRA rules to provide full and complete disclosures. (Brickman Decl. ¶¶ 11, 12, 13 and Exhibits I, J and K to the Brickman Decl.).

**RESPONSE: Deny as mischaracterizing Scoran's testimony. Deny as the statement in this paragraph is not a material fact, but constitutes improper argument. Further add that the Morgan Stanley Form U5 reported that Davidson had resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies. Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016). The Form U5 disclosed that Morgan Stanley's internal review related to Davidson's exercise of discretion in clients' accounts, as well as Davidson's receipt of a loan from another Morgan Stanley employee. *Id.* Prior to his commencement of employment with Jefferies, Davidson informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley. Scoran Dec., ¶9; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8).**


136. Jefferies knew Davidson's history before an offer of employment had been made to Davidson by Jefferies, including Davidson's history of customer complaints and that Davidson had been suspended for 30 days related to customer complaints. Jefferies requested, received and accepted a written explanation concerning the customer complaints and suspension and that in accordance with its practices placed that explanation in a registration file to accompany the preregistration check. (Scoran Dep. pp. 99:6-100:25, (Brickman Decl. ¶23-24 and Exhibits U and T to the Brickman Decl.).

**RESPONSE: Deny. As part of the pre-hiring process, Jefferies reviewed the limited information reflected on Davidson's CRD, which listed three customer complaints filed by Davison's customers while he was employed by Morgan Stanley: Emily Sonnenblick on March 6, 20212, Stephen Levy on September 28, 2011 and Edwin Hunter on January 5, 2012. No other customer complaints were disclosed on Davison's CRD (or by Davidson in any other manner) prior to the time of his hiring by Jefferies. Ex. 21 (Lau Tr. at 22:9-20; CRD); Scoran Dec., ¶¶6-9. Moreover, Davidson expressly represented to Jefferies, in writing, that he had no other customer complaints or compliance violations. Exs. 16-18 (April 22, 2016 Letter; Compliance Questionnaire; Offer Letter). During the course of his pre-hire discussions with Jefferies, Davidson purposefully failed to disclose his extensive history of compliance issues at Morgan Stanley, including Morgan Stanley's internal investigations resulting in the issuance of two disciplinary letters by Morgan Stanley to Davidson, findings of rule violations by FINRA and a FINRA investigation that resulted in the issuance of a Cautionary Action Letter by FINRA to Davidson, and his Morgan Stanley-imposed business plan and heightened supervision. *See* Exs. 1, 16, 17 (Scoran Tr. at 95:25-96:9; Offer Letter; Compliance Questionnaire). *See also* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Scoran Dec., ¶6-15.**
**In response to Jefferies' request for an explanation of the three complaints set forth on his CRD, by letter dated April 22, 2016, Davidson claimed Morgan Stanley had not asked Davidson to participate in settlement discussions with Sonnenblick or Hunter, Sonnenblick still maintained an account relationship with Davidson, and Morgan Stanley denied the Levy**

complaint as "frivolous." Ex. 18 (April 22, 2016 Letter). Because Jefferies could not call Morgan Stanley, Davidson's current employer, to verify any of the facts or circumstances described by Davidson, or else that would tip off Morgan Stanley that Davidson was seeking employment elsewhere, Jefferies had to rely solely on Davidson's explanation. Ex. 1 (Scoran Tr. at 105:16-106:21). Because the Three 2012 Complaints (the only customer complaints known to Jefferies at the time) were either settled or dismissed, Morgan Stanley continued to employ Davidson, and no other compliance issues appeared on Davidson's CRD or were disclosed by Davidson, Jefferies accepted Davidson's explanation and moved forward with his hiring. Ex. 1 (Scoran Tr. at 108:22-109:4). Davidson's pre-hire April 22, 2016 Letter also stated that he was "suspended for 30 days," but that "since [his] return to work in the last four years had no further complaints nor commentary regarding this or anyone else." There was no reference to a suspension on Davidson's CRD. Exs. 14, 21, 22 (Lau Tr. at 37:4-17; Arcuri Tr. at 34:3-13; March 21, 2016 CRD). As a follow-up to Davidson's April 22, 2016 Letter, Lau, a compliance officer of Jefferies, spoke to Davidson, requesting an explanation for the thirty-day suspension. Ex. 21, 23 (April 22, 2016 Lau Email to Arcuri; Lau Tr. at 47:7-48:18). Davidson advised Lau that he was told to take a month off while the Sonnenblick complaint was being investigated by Morgan Stanley. *Id.*; Ex. 23 (April 22, 2016 Lau Email to Arcuri). However, completely unbeknownst to Jefferies, Davidson's suspension was actually disciplinary in nature. Ex. 9 (March 5, 2012 Email from Koutsantonis to Firestein). Moreover, contrary to Davidson's representations in his April 22, 2016 Letter, Davidson was also the subject of another customer complaint and substantive compliance-related incidents throughout his tenure at Morgan Stanley – all of which he failed to disclose to Jefferies prior to his hiring and the extension of the significant loan monies by Jefferies. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); *See also* Exs. 16, 17 (Offer Letter; Compliance Questionnaire); Scoran Dec., ¶6-15. Moreover, prior to his commencement of employment with Jefferies, Davidson also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley. Scoran Dec., ¶9; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8).

137.    Jefferies followed its protocols and practices fulfilling its preregistration obligations of ensuring that Davidson was not statutorily disqualified and, as Arcuri's March 22, 2016 email stated, "showed that we reviewed" the CRD Report. This, along with Davidson's financial production, was the only material information upon which Jefferies relied upon in hiring Davidson and extending him the $5.1 million loan. (Scoran Dep. pp. 33:9-34:22, Brickman Decl. ¶15 and Exhibit M to the Brickman Decl.).

**RESPONSE: Deny, except admit only that during Davidson's pre-hire process, Jefferies followed its protocols and practices. Jefferies inquired about and Davidson was required to disclose his history of compliance related issues at Morgan Stanley, which compliance history was material to Jefferies' decision to hire advisors like Davidson. Davidson purposely and knowingly failed to provide accurate responses to Jefferies' inquiries. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Jefferies SOMF, ¶¶ 14-18, 20-36, 58-66, 72-77. Subsequent to Davidson's termination from Jefferies, Jefferies learned that Davidson's representations about his Morgan Stanley compliance history during the recruitment process included materially false information, all of which was known to Davidson at the**

time. *Ibid.* **Jefferies' decision to hire Davidson and provide him with the Loan was based on the gross misinformation provided by Davidson and the limited information available to Jefferies by Davidson's CRD.** *Ibid.***;** *see also* **Ex. 1 (Scoran Tr. at 56:8-15).**

*Undisputed Facts Relevant to Jefferies' Meritless Claims Alleged Under §727*

138. In filing for bankruptcy, Davidson relied upon the assistance and advice of counsel to aid him in the preparation of all filings including all bankruptcy schedules related to his bankruptcy. (Davidson Decl. ¶ 18).

**RESPONSE: Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment, but deny the truth or accuracy of Davidson's statement. These issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.**

139. To the best of Davidson's knowledge and abilities he provided his counsel with true and accurate information for use in preparing and filing all bankruptcy schedules related to this bankruptcy proceeding. (Davidson Decl. ¶ 19).

**RESPONSE: Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment, but deny that Davidson provided his counsel with true and accurate information. Further add that Davidson knew he provided his counsel with untrue and inaccurate information for use in preparing and filing all bankruptcy schedules related to this bankruptcy proceeding.** *See* **Response to Paragraph 143 below, which Jefferies herein incorporates by reference.**

140. Davidson originally filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code by the filing of a Chapter 11 Voluntary Petition and Statement of Financial Affairs on May 7, 2019. Also on May 7, 2019, Davidson submitted a Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2 which explained in detail his background and the series of occurrences which led to Davidson filing for bankruptcy, including among other things the disposition of the loan proceeds received from Jefferies. (Davidson Decl. ¶¶ 20-21 and Exhibits E and F to the Davidson Decl.).

**RESPONSE: Admit that the statement in this paragraph accurately reflects the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment motion, but deny that Debtor's Declaration Pursuant to Local Bankruptcy Rule 1007-2 submitted and executed by Davidson under penalty of perjury accurately described the full series of occurrences which led to Davidson filing for bankruptcy.** *See generally* **Jefferies SOMF. Further add that whether Davidson intentionally concealed or misrepresented the statements in his 1007-2 Declaration go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.**

141.    Following Davidson's Chapter 11 bankruptcy filing Davidson worked with his attorneys to prepare and submit Monthly Operating Reports.  On June 17, 2019, July 24, 2019, August 14, 2019, September 13, 2019, October 15, 2019 and November 15, 2019 Monthly Operating Reports were filed with the Court.  Those Monthly Operating Reports were also provided to the office of the United States Trustees and were never objected to.  (Davidson Decl. ¶ 22 and Exhibit G to the Davidson Decl.).

**RESPONSE: Admit only the existence of the referenced Monthly Operating Reports ("MORs") but deny that Davidson accurately described his financial condition in his financial MORs, Schedules, or SOFA. *See generally* Jefferies SOMF.  Further add that whether Davidson intentionally concealed or misrepresented his financial condition in the Chapter 11 bankruptcy filings is heavily disputed and is for the trier of fact to determine whether or not a witness is credible and truthful.**

142.    In the course of the bankruptcy proceedings, Davidson was also caused to file an Amended Bankruptcy Schedule and an Amended Statement of Financial Affairs both on October 11, 2019.  Thereafter, on November 5, 2019, a motion was made to convert Davidson's bankruptcy case to bankruptcy under Chapter 7 of the Bankruptcy Code.  That motion was granted, and the bankruptcy was converted on December 3, 2019.  (Davidson Decl. ¶¶ 23-24 and Exhibit H to the Davidson Decl.).

**RESPONSE: Deny as stated. On November 5, 2019, Defendant sought by application to convert his Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (the "Conversion Application").  Bankruptcy Case, Doc. No. 65.  By order entered on November 6, 2019, the Court denied the Conversion Application as a result of Defendant's failure to file a motion to convert in accordance with Bankruptcy Rule 1017(f)(2).  Bankruptcy Case Doc. No. 66.  On November 8, 2019, Defendant filed a *Motion for the Entry of an Order Converting Debtor's Case to a Chapter 7 Case* (the "Conversion Motion").  Bankruptcy Case Doc. No. 66. The Court entered the order converting Davidson's case to a case under Chapter 7 on December 4, 2019. Bankruptcy Case Doc. No. 74.**

143.    At all times Davidson worked diligently with his counsel to prepare true and accurate bankruptcy schedules and Davidson never knowingly and fraudulently made false oaths or accounts as it relates to his bankruptcy filings.  (Davidson Decl. ¶ 25-26).

**RESPONSE: Deny. These issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.  Davidson's bankruptcy schedules contained false and inaccurate information known to Davidson, for which he made false oaths. Davidson knew he provided his counsel with untrue and inaccurate information for use in preparing and filing all bankruptcy schedules related to this bankruptcy proceeding including:**

**(a).    Not disclosing his People's United Wealth Advantage Checking Account (# 4489) despite his salary being directly deposited into this account as early as March 2018**

and as late as May 2019. *See* Schedules, Schedule A/B at § 17; *see also* Exs. 36-37; **Jefferies SOMF ¶¶ 102-118.**

(b). **Not disclosing the large sums of money transferred out of People's United Wealth Advantage account #4489 including, but not limited to, the following total wire transfers sent between December 2019 and May 2019:**

| PERIOD | AMT. OF WIRE TRANSFERS PER PERIOD |
|---|---|
| 12/18/2018 to 01/18/2019 | $88,000.00 |
| 01/18/2019 to 02/19/2019 | $58,000.00 |
| 02/19/2019 to 03/18/2019 | $94,000.00 |
| 03/18/2019 to 04/18/2019 | $76,000.00 |
| 04/18/2019 to 05/20/2019[3] | $178,000.00 |
| TOTAL: | **$494,000.00** |

*See* Ex. 38; *see also*

**Jefferies SOMF ¶¶ 113-114.**

(c). **Not disclosing that he wrote 26,500 worth of checks from PUB Account 4489, payable to Nancy Sterns, an insider, between November 2018 and February 2019 (*see* Ex. 39) or that he withdrew $2,400.00 in cash from PUB Account 4489 between May 1, 2019 and May 7, 2019. *See* Ex. 36; see also Jefferies SOMF ¶ 115.**

(d). **Not disclosing that he over $50,000 worth of checks, payable to Nancy Sterns, an insider, between May 30, 2019 and November 2019 through another PUB account ending 8022. *See* Ex. 40; s*ee also* Jefferies SOMF ¶ 122.**

(e). **Falsify representing on his SOFA that the last balance in the Bellator Bank of America ("BoA") account was $0.00 (*see* SOFA Part 8, § 20), when the last balance of the Bellator BoA account – before Davidson transferred all of the money out of said account less than a month prior to the Petition date – was actually $55,340.40. *See* Ex. 38. Davidson also did not disclose that, between April 1, 2019 and April 9, 2019, he withdrew a total of $40,631.68 from the Bellator BoA account by way of writing a check payable to himself for $10,000.00, wiring out approximately $27,000.00 to other accounts or entities, and withdrawing over $2,000.00 from various ATM machines. *Id. See also* Jefferies SOMF ¶¶ 119-121.**

(f). **Fraudulently claiming that there was no equity available for creditors in the Sag Harbor Property in a fraudulent attempt to exempt all of the Household Property (*see* Schedules, Schedule C at § 2), notwithstanding Davidson's own valuation in his Schedules of $2,900,000 or an appraisal of the Sag Harbor Property, which reflected a value of $3,032,835.00 (*see* Proof of Claim of Suffolk County Federal Credit Union ("SCFCU") [POC No. 9-1]) both exceeding the Mortgages by hundreds of thousands of dollars. *See also* Jefferies SOMF ¶¶ 90-97.**

144.     One of the meritless allegations made by Jefferies in this Adversary proceeding is that Davidson's bankruptcy schedules misstate the value of the real property located at 39 Tyndall Rd., Sag Harbor, NY 11963 (the "Sag Harbor property,") which, at the time of Davidson's bankruptcy filing, he was a 50% owner of along with his domestic partner Nancy Stearns. (Davidson Decl. ¶ 27).

**RESPONSE: Deny as argumentative.  Deny that Jefferies' allegations concerning the Sag Harbor property are "meritless."  At the time of the Petition, Davidson owned an undivided half interest in the Sag Harbor Property.  The Schedules reflect a current value of the Sag Harbor Property of $2,900,000 and that it is encumbered by first and second mortgages totaling approximately $ 2,256,777.52 (the "Mortgages"). (See Schedule, Schedule D). Accounting for those Mortgages, there is still hundreds of thousands of dollars in equity in the Sag Harbor Property that was fraudulent concealed by Davidson:**

| Davidson's Value of Sag Harbor | $2,900,000.00 | Appraisal Value of Sag Harbor | $3,032,835.00 |
|---|---|---|---|
| PUB | $1,977,577.72 | PUB | $1,977,577.72 |
| SCFCU | $   279,199.00 | SCFCU | $   279,199.00 |
| | $2,256,777.52 | | $2,256,777.52 |
| Total Equity | $643,222.48 | Total Equity | $776,057.48 |

*See also* **Jefferies SOMF  ¶¶ 90-97.**

145.     The Sag Harbor property was originally purchased in June of 2014 for $2,350,000 and at all times prior to the commencement of the bankruptcy proceeding was owned jointly by Davidson and Nancy Stearns each as 50% owners.  (Davidson Decl. ¶ 29).

**RESPONSE: Denied.  At the time of the Petition, Davidson owned an undivided half interest in the Sag Harbor Property.** *See* **Ex. 35.**

146.     Both bankruptcy schedules filed reflect the Sag Harbor property having a value of $2,900,000 with Davidson's 50% interest in the property amounting to $1,450,000.  (Davidson Decl. ¶¶ 20, 23 and Exhibits E and H to the Davidson Decl.).

**RESPONSE: Admit that the bankruptcy schedules provide that the Sag Harbor Property has a value of $2,900,000 and that the value of Davidson's portion based on his valuation is $1,450,000, but deny that the referenced bankruptcy schedules are truthful or accurate.  At the time of the Petition, Davidson owned an undivided half interest in the Sag Harbor Property.** *Id.* **Accounting for those Mortgages, there is still hundreds of thousands of dollars in equity in the Sag Harbor Property that was fraudulent concealed by Davidson.** *See* **Response to Paragraph 144 above, which Jefferies incorporates herein by reference.** *See also* **Jefferies SOMF  ¶¶ 90-97.**

147.     To Davidson's knowledge, the last and only appraisal conducted of the Sag Harbor property was conducted on June 29, 2020, by Sharon Treanor of Appraisal Source.  At that time,

Ms. Treanor, a licensed Real Estate Appraiser, valued the property at $2,500,000. (Davidson Decl. ¶30 and Exhibit I to the Davidson Decl.).

**RESPONSE: Deny. Davidson's own valuation of the Sag Harbor Property in his Schedules is $2,900,000 (*see* Schedules, Schedule A/B), and the appraisal of the Sag Harbor Property, reflects a value of $3,032,835.00. (*See* Proof of Claim by SCFCU [POC No. 9-1]). *See also* Jefferies SOMF ¶¶ 90-97.**

148. At the time of the bankruptcy filing the Sag Harbor property was more than five years old. The Sag Harbor property was not "newly renovated" as Jefferies has alleged and there were a number of issues with the property including that the floors in the living room and upstairs bedrooms were warped from water damage, the lower level was not finished and did not have an egress, the pool was in need of repairs and most of the appliances were old and/or failing. Aside from the condition of the property, there was an ongoing local zoning ordinance violation on the Sag Harbor property as in September of 2017, the Village of North Haven issued a violation notice indicating that vegetation has been removed and a hedge has been planted on village property without necessary village approvals. (Davidson Decl. 31 and Exhibit J to the Davidson Decl.).

**RESPONSE: Deny. Davidson has provided no admissible evidence of any issues or local zoning ordinance violations that affect the value of the Sag Harbor Property. The document attached as Exhibit J to Davidson's declaration is not bates stamped, and therefore was not produced in discovery and is not admissible.**

149. Davidson and Stearns were advised that before being able to sell the Property, they would need to cure the violation to obtain an updated Certificate of Occupancy. To cure the violation, the hedges would need to be removed and replanting new hedges of a similar size would cost at a minimum $80,000.00. (Davidson Decl. 32).

**RESPONSE: Deny. The statements contained in this paragraph consist of self-serving assertions contained in Davidson's post-deposition declaration submitted in support of his motion for summary judgment. Davidson has provided no admissible evidence of any issues or local zoning ordinance violations that affect the value of the Sag Harbor Property.**

150. During the course of the bankruptcy proceedings, the Chapter 7 Trustee commenced six adversary proceedings against, among others, Davidson and Stearns. (Case No. 19-bk-11486, ECF. Nos. 131-136). Over Jefferies' objections, the Court approved a settlement of $450,000 paid in full and final satisfaction of the claims asserted by the Trustee against Rick Davidson, Hannah Davidson, Max Davidson, Nancy Stearns, and Bellator LLC and in exchange the transfer of all of the Debtor's right, title and interest in the Sag Harbor Property to Nancy Stearns. (Davidson Decl. 33).

**RESPONSE: Admit, but further add that Jefferies has insufficient information or knowledge to form a belief as to whether Davidson's personal injury claim has since settled or whether proceeds were received by the bankruptcy estate.**

ACTIVE 697896374v5

151.    Another allegation made by Jefferies is that, during this bankruptcy, Davidson improperly reduced the value of a Cartier watch listed on his bankruptcy schedules from $8,000 down to $4,000. The reason for this restated reduced value between the two filings made was because during that interim period Davidson took the watch to a jeweler to see if the watch could be sold. Davidson was advised by the jeweler that the watch was damaged and was worth significantly less than he had believed it to be worth when he completed the first schedule. Davidson ultimately sold the damaged watch for less than $3,200 as he was going through financial difficulty struggling to pay his legal bills. (Davidson Dep. pp. 319:17-320:7, Davidson Decl. ¶ 34).

**RESPONSE: Deny.  Davidson has not provided any appraisal or other documentation to support the values ascribed to property listed as exempt on his Schedules, including a Cartier watch, a personal injury action against a high-net worth individual and "various artwork." Schedules, Schedules A/B and C at § 2. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.  *See also* Jefferies SOMF ¶¶ 97-101.**

152.    Another allegation made by Jefferies is that, during this bankruptcy, Davidson improperly listed the value of certain property housed in an apartment which Davidson resided at in Florida at the time of Davidson's bankruptcy filing. With respect to the apartment which Davidson maintained in Florida at the time of his bankruptcy filing, that apartment was a rental apartment which came fully furnished. Davidson did not and has never owned any of the furniture or artwork which was in that Florida apartment.  (Davidson Decl. ¶ 35, Davidson Dep. p. 277:12-277:20).

**RESPONSE: Admit only that the statements contained in this paragraph accurately reflect the statements contained in Defendant's post-deposition declaration submitted in support of his motion for summary judgment. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.**

153.    Jefferies' complaint baselessly alleges, "upon information and belief," that Davidson owns cryptocurrency that he failed to disclose on Davidson's bankruptcy schedule. Davidson does not own, and has never owned, cryptocurrency. (Davidson Decl. ¶36).

**RESPONSE: Deny as argumentative and does not constitute a material fact. Further deny that the Complaint is "baseless."  Admit only that Jefferies alleges in this adversary proceeding that Davidson owns cryptocurrency that he failed to disclose on his bankruptcy schedule, and that Defendant's post-deposition declaration submitted in support of his motion for summary judgment states that he does not own and has never owned cryptocurrency. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.**

154.    Jefferies' complaint baselessly alleges that Davidson failed to disclose his interests in businesses and bank accounts, and the value of his interest in Bellator, LLC. Bellator, LLC was a single member, passthrough entity which Davidson had set up for the purpose of receiving business income and paying business expenses. The entity Bellator, LLC never generated revenue

throughout its existence, has no assets, no value and is no longer a going concern. (Davidson Decl. ¶37, Davidson Dep. p. 388:5-23).

**RESPONSE: Deny as argumentative and does not constitute a material fact. Further deny that the Complaint is "baseless." Admit only that Jefferies alleges in this adversary proceeding that Davidson failed to disclose, among other things, his interests in business and bank accounts as well as his interest in Bellator, LLC ("Bellator").** *See* **Response to Paragraph 143(e) above, which Jefferies incorporates herein by reference.**

155.     Jefferies' complaint baselessly alleges that Davidson failed to disclose interests in DLJ First ESC LP, DLJ Funds Investment Partners II and Pershing LLC. These entities were investment vehicles Davidson had invested in at prior points in time and which at the time of his bankruptcy filing held no meaningful value and which still currently hold no meaningful value. (Davidson Decl. ¶38).

**RESPONSE: Deny as argumentative and does not constitute a material fact. Further deny that the Complaint is "baseless." Admit only that Jefferies alleges in this adversary proceeding that Davidson failed to disclose, among other things, Davison's interests in companies he owned, including DLJ First Esc LP, DLJ Funds Investment Partners II and Pershing LLC.** *See also* **Jefferies SOMF ¶¶ 124-127.**

**Further add that the Schedules did not reflect Davidson's interests in companies he owned, including DLJ First Esc LP and DLJ Fund Investment Partners II, LP despite Davidson identifying his interest in those entities in his 2016 federal tax return.** *See* **Schedules, Schedule A/B at §§ 6-7; Ex. 41. Nor did the Schedules identify that he received dividends from "Pershing LLC" despite Davidson listing the dividends received from Pershing LLC in his 2016 and 2017 federal tax returns.** *See* **Schedules, Schedule A/B at §§ 6-7; Exs. 41-24;** *see also* **Jefferies SOMF ¶¶ 124-127.**

156.     At various points in this bankruptcy case Jefferies has accused Davidson and his family of having a vast empire of overseas real estate. Davidson grew up in New Jersey and neither he nor his family has ever owned real estate overseas. (Davidson Decl. ¶39).

**RESPONSE: Deny as argumentative and does not constitute a material fact. Deny as not containing a citation to admissible evidence, as required by Local Rule 7056-1. Admit only that Defendant's post-deposition declaration submitted in support of his motion for summary judgment states that he grew up in New Jersey and neither he nor his family has owned real estate overseas. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.**

157.     At various points in this bankruptcy case Jefferies has accused Davidson of having money stashed and hidden through the use of casino markers and casino chips. Casino markers are liabilities, not assets, which are issued by casinos to permit casino players to borrow money to gamble with. Notwithstanding, Davidson has not, nor has he ever, used casino markers to "hide" money. Davidson also never hid money by or through the use of casino chips. (Davidson Decl. ¶40).

**RESPONSE**: Deny as argumentative and does not constitute a material fact. Deny as not containing a citation to admissible evidence, as required by Local Rule 7056-1. Admit only that Defendant's post-deposition declaration submitted in support of his motion for summary judgment states that Davidson has not, nor has he ever, used casino markers to "hide" money and that Davidson never hid money by or through the use of casino chips. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.

158.    Davidson never intentionally destroyed and or records related to his financial affairs and to the best of his knowledge and abilities he provided his counsel with true and accurate copies of all of the documents and records which were requested in the course of this bankruptcy. (Davidson Decl. ¶41).

**RESPONSE**: Deny. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful. Davidson knew he provided his counsel with untrue and inaccurate information for use in preparing and filing all bankruptcy schedules related to this bankruptcy proceeding as evidenced by the numerous bank accounts, wire transfers, checks, and other assets that were not identified. *See* Response to Paragraph 143 above, which Jefferies incorporates herein by reference.

159.    Davidson believes that he provided his attorneys with copies of all requested records which were accessible and available to him since the time he filed for bankruptcy. An index of all of the documents and records produced in the course of this bankruptcy is annexed to Davidson's Declaration and is incorporated herein by reference. (Davidson Decl. ¶ 42-43 and Exhibit K to the Davidson Decl.).

**RESPONSE**: Deny. Jefferies disputes that Davidson provided all requested records. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful. *See* Responses to Paragraphs 143, 158 above, which Jefferies incorporates herein by reference.

160.    Davidson has satisfactorily explained the loss of assets or deficiency of assets to meet his liabilities. Davidson has prepared and incorporates herein by reference a schedule with supporting sources records which accounts for the disposition of the approximately $5.1 million dollars of loan proceeds which Davidson received from Jefferies. (Davidson Decl. ¶¶ 21, 44 and Exhibits F and L to the Davidson Decl.).

**RESPONSE**: Deny as argumentative and does not constitute a material fact. Further add that these issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful. Further add that in addition to the Loan from Jefferies, Davidson earned gross income of over $2.2 million per year for at least the two years prior to the Petition Date. *See* SOFA. Davidson's Monthly Operating Reports (the "MORs") showed cash receipts of $977,981.36 for the five-month reporting period from the Petition Date through September 30, 2019. *See* MORs Bankruptcy Case Doc. Nos. 24, 39,

**48, 57 and 63. Davidson has not explained the wire transfers, totaling $494,000.00, sent from his People's United Wealth Advantage Checking Account (# 4489), nor has Davidson explained or accounted for the money deposited into this account by his employer between March 2018 and April 2019.** *See* **Response to Paragraphs 143(a),(b) above, which Jefferies incorporates herein by reference.** *See also* **Jefferies SOMF ¶¶ 109-118.**

161.    In addition, in his Monthly Operating Reports Davidson detailed, without objection or concern from the United States Trustee, what he earned and how he spent his earnings to meet his liabilities further explaining his deficiency of assets.  (Davidson Decl. ¶ 22 and Exhibit G to the Davidson Decl.)

**RESPONSE: Deny that the MORs are truthful and accurate.** *See* **Response to Paragraph 143(c), which Jefferies incorporates herein by reference.** *See also* **Jefferies SOMF ¶¶ 109-118.**

162.    Davidson never, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed , property of the debtor, within one year before the date of the filing of the petition; or property of the estate, after the date of the filing of the petition.  (Davidson Decl. ¶45).

**RESPONSE: Deny as argumentative.  These issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.  *See* Responses to Paragraphs 143, 158, 160 above, which Jefferies incorporates herein by reference.**

163.    Prior to and continuing during the pendency of Davidson's bankruptcy filing, Davidson had a routine and practice of transferring money from his bank account to the bank account of his domestic partner Nancy Stearns on a monthly basis so that she could setup and effectuate monthly electronic transfers of funds to pay the landlord for Davidson's New York apartment and, later, the landlord for the Miami based apartment.  Davidson engaged in this practice due to the fact that the account held in his name did not have the technical capability to conduct these electronic transfers required by the landlord.  (Davidson Decl. ¶46).

**RESPONSE: Deny. These issues go towards Davidson's credibility, and it is for the trier of fact to determine whether or not a witness is credible and truthful.  *See* Responses to Paragraphs 143 and 160 above, which Jefferies incorporates herein by reference.**

ACTIVE 697896374v5

Dated:   May 15, 2024
         Florham Park, New Jersey

**GREENBERG TRAURIG, LLP**

By: */s/ Alan J. Brody*
Alan J. Brody, Esq.
500 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 443-3543
Email: *brodya@gtlaw.com*

*-and-*

**GREENBERG TRAURIG, LLP**
Tracy L. Gerber, Esq. (admitted pro hac vice)
Elizbeth E. Moum, Esq. (admitted pro hac vice)
777 S. Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
Telephone: (561) 650-7900
Email: *gerbert@gtlaw.com*
        *moume@gtlaw.com*

*Counsel for Jefferies LLC and Jefferies Group LLC*

ACTIVE 697896374v5