**GREENBERG TRAURIG, LLP**
Alan J. Brody, Esq.
500 Campus Drive, Suite 400
Florham Park, New Jersey 07932
(973) 443-3543 (Telephone)
(973) 295-1333(Facsimile)

*-and-*

**GREENBERG TRAURIG, LLP**
Tracy L. Gerber, Esq. (admitted *pro hac vice*)
Elizbeth E. Moum, Esq. (admitted *pro hac vice*)
777 S. Flagler Drive, Suite 300 East
West Palm Beach, Florida 33401
(561) 650-7900 (Telephone)
(516) 655-6222 (Facsimile)

*Counsel to Jefferies LLC and Jefferies Group LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>RICK ALAN DAVIDSON,<br><br>         Debtor. | Chapter 11<br><br>Case No. 19–11486 (SMB) |
| JEFFERIES, LLC and<br>JEFFERIES GROUP, LLC,<br>         Plaintiffs,<br>v.<br><br>RICK ALAN DAVIDSON,<br><br>         Defendant. | Adversary Proceeding No. 19-1395 (SMB) |

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS IN
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Jefferies LLC and Jefferies Group LLC (collectively, "Jefferies"), by and

through its undersigned counsel, Greenberg Traurig, LLP, respectfully submits the following

Statement of Material Facts pursuant to Fed. R. Civ. P. 56, made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056 an, and LBR 56.1(a), in opposition to the motion for summary judgment filed by Rick Alan Davidson, the above-captioned debtor and defendant ("Davidson" or the "Defendant"):

## I.     Davidson Provides Fraudulent Information to Jefferies as an Inducement for Jefferies to Hire Him and Pay Davidson Over $5 Million Upon His Hiring

1.     Jefferies is a diversified financial services company engaged in investment banking and capital markets, asset management and wealth management.  Jefferies offers a full range of investment banking, equities, fixed income, asset and wealth management products and services.  *See generally* https://www.jefferies.com/.

2.     Jefferies LLC is a brokerage firm registered with and regulated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). *See id.; see also* FINRA Broker Check Report for Jefferies LLC, available at https://files.brokercheck.finra.org/firm/firm_2347.pdf.

3.     Jefferies Group LLC was a wholly owned subsidiary of Jefferies Financial Group. On November 1, 2022, Jefferies Group LLC merged with its parent company. Ex. 1[1] (Scoran Dep. Tr. at 5:22-6:10.

4.     Jefferies LLC is a wholly owned subsidiary of Jefferies Financial Group.  *Id.*

5.     Davidson is a securities broker and investment adviser registered with and regulated by the SEC and FINRA.  *See* FINRA Broker Check for Rick Alan Davidson, available at http://files.brokercheck.finra.org/individual/summary/1315998.

6.     In early 2016, Davidson knew he was the subject of an internal investigation by the Special Investigations Unit ("SIU") of his then employer, Morgan Stanley Smith Barney

---

[1]     Citations to "Ex. __" are to the Exhibits annexed to the Declaration of Alan Brody, submitted herewith.

LLC ("Morgan Stanley" or "MSSB").[2] *See* Exs. 2, 3 (March 15, 2016 Email from Wirhouski to Davidson; May 17, 2016 Email from Matthews; Last Chance Agreement dated February 7, 2012 ("Last Chance Agreement")).

7.      Morgan Stanley was investigating, in part, whether Davidson had improperly exercised discretion in client accounts – the same misconduct he had been under investigation for only four years earlier after Morgan Stanley received several complaints from customers who Davidson serviced at Morgan Stanley. *Id.*; *see* Paragraph 8, *supra.*

8.      Indeed, in 2012, Morgan Stanley issued Davidson a "Last Chance Agreement," which memorialized not only that Davidson had exercised discretion in client accounts, but also that there had been negative changes in Davidson's behavior and he tested positive for cocaine use in a Morgan Stanley-required drug test. Ex. 4 (Last Chance Agreement).

9.      The Last Chance Agreement (which Davidson acknowledged by counter-signing) suspended Davidson for thirty days, put him on notice that his "continued employment with MSSB is on a 'last chance' basis," and made clear that "any exercise of discretion in a client account or any violation of any provision of this Agreement or of the Firm's Drug Usage Policy or of any other Firm policy … will result in/be grounds for the immediate termination of [his] employment at MSSB for Cause." *Id.*

10.     The Last Chance Agreement memorialized only a portion of the compliance-related issues that Davidson faced during his employment at Morgan Stanley. *See id.; see also* Exs. 2-13 (June 21, 2011 Letter of Reprimand, January 24, 2012 Business Plan Requirements Memorandum, February 3, 2012 Letter of Reprimand, March 5, 2012 Email from Koutsantonis to Firestein, March 8, 2012 Letter from FINRA to Morgan Stanley, March 13, 2012 Heightened

---

[2] Davidson has acknowledged that "SIU" stands for Morgan Stanley's Specifical Investigation Unit. Ex. 24 (Davidson Tr. at 160:17-25).

Supervision Memorandum, May 9, 2012 Heightened Supervision Memorandum, May 16, 2013 FINRA Cautionary Action Letter, March 15, 2016 Wirhouski Email to Davidson, May 17, 2016 Matthews Email) (collectively along with Last Chance Agreement and March 11, 2012 Addendum to the Last Chance Agreement, "Morgan Stanley Compliance Issues Documents").

11.      Prior to becoming the subject of a second internal investigation in 2016 for exercising discretion in client accounts, and in addition to the compliance shortfalls and ramifications thereof explained in Davidson's Last Chance Agreement, Davidson's compliance history was extensive, including:

- multiple customer complaints,

- internal investigations by Morgan Stanley resulting in Morgan Stanley-imposed discipline in the form of two written Letters of Reprimand,

- a Morgan Stanley-imposed business plan requiring that Davidson adhere strictly to certain compliance policies, change his business model, obtain a Series 65 securities license, among other requirements,

- Morgan Stanley-imposed heightened supervision for a nine-month period,[3]

- findings by securities industry regulator FINRA that Davidson violated FINRA Rule 9 by causing disturbances at a FINRA testing center while taking a FINRA licensing exam, and

- a FINRA investigation into Davidson's exercising discretion in client accounts without proper written authorization, which resulted in FINRA issuing to Davidson a Cautionary Action Letter.[4]

---

[3] Heightened supervision is not a process unique to Morgan Stanley. In 1997, FINRA's predecessor, the National Association of Securities Dealers ("NASD"), issued Notice to Members 97-19 titled *NASD Regulation and New York Stock Exchange Memorandum Discusses Sweep Report and Provides Guidance on Heightened Supervision Recommendations* ("*Sweep Report*"). *See Sweep Report,* available at https://www.finra.org/sites/default/files/NoticeDocument/p004826.pdf. Among other findings included within the *Sweep Report* was that firms should consider the implementation of special supervisory procedures tailored to individual advisors with a history of customer complaints and/or disciplinary procedures. *See id.* This was the genesis of many brokerage firms' design and implementation of procedures addressing prospective heightened supervision. As the name suggests, when an advisor is placed on heightened supervision, management must implement additional supervisory procedures specific to the advisor. *Id.*

*See id.*; *see also* Ex. 14 (March 21, 2016 CRD).

12.     In 2016, no doubt recognizing that he was under investigation for again improperly exercising discretion in client accounts, and about to be terminated by Morgan Stanley under the terms of the Last Chance Agreement, Davidson sought out employment with Jefferies, approaching Frank Scheuer ("Scheuer"), the then Chief Operating Officer of Wealth Management at Jefferies, who Davidson knew years before when the two worked at Donaldson, Lufkin & Jenrette ("DLJ") and its successor firm, Credit Suisse. *See* Exs. 2-44, 15 (Last Chance Agreement; March 15, 2016 Wirhouski Email; May 17, 2016 Matthews Email; Scheuer Dep. Tr. at 14:22-15:6, 19:23-25).

13.     Scheuer, who in his role as COO, didn't "hire, recruit or fire advisors", in turn, passed along Davidson's name to Michael Armstrong, the then head of Jefferies' Wealth Management group. Ex. 15 (Scheuer Tr. at 20:18-20, 21:2-4, 22:21-23:4).

14.     Given the highly regulated nature of the securities industry and the risks of employing a financial advisor with a history of customer complaints, disciplinary actions, regulatory scrutiny and other compliance-related issues, Jefferies endeavors to learn about a financial advisor's compliance history prior to his or her hiring. Declaration of Lauri Scoran ("Scoran Dec."), ¶5.

15.     During the course of his pre-hire discussions with Jefferies, Davidson purposefully failed to disclose his extensive history of compliance issues at Morgan Stanley, including Morgan Stanley's internal investigations resulting in the issuance of two disciplinary letters by Morgan Stanley to Davidson, findings of rule violations by FINRA and a FINRA

---

[4] It is important to note that many brokers are never the subject of discipline during their careers, and it is rare indeed for an advisor to be the subject of multiple customer complaints, regulatory actions or internal reviews in such a brief time frame. *See Sweep Report*, n. 4, 5, 6).

investigation that resulted in the issuance of a Cautionary Action Letter by FINRA to Davidson, and his Morgan Stanley-imposed business plan and heightened supervision. *See* Exs. 1, 16, 17 (Scoran Tr. at 95:25-96:9; Offer Letter; Compliance Questionnaire). *See also* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Scoran Dec., ¶9.

16.     In an effort to fraudulently induce Jefferies to extend employment to him and offer him a lucrative compensation package, Davidson made it appear as though he were a compliant broker, who had faced limited scrutiny over his business practices in the past. *Ibid.; see, e.g.,* Ex. 18 (April 22, 2016 Letter from Davidson (the "April 22, 2016 Letter")); Scoran Dec., ¶¶ 8-9.

17.     On May 17, 2016, based on the gross misrepresentations and omissions made by Davidson to Jefferies (all of which are more fully set forth in the below paragraphs) and the limited information publicly available to Jefferies, Jefferies offered Davidson employment as an at-will Managing Director in its Wealth Management Division in New York City. *See* Exs. 1, 16, 17 (Scoran Tr. at 54:18-55:5, 55:10-56:15, 95:18-96:9; Offer Letter; Compliance Questionnaire); Scoran Dec., ¶10.

18.     At that time, Jefferies also offered Davidson $5,142,500.00 in loan monies as an incentive to his hiring. Davidson accepted the loan monies and executed a valid and enforceable promissory note memorializing the terms by which he would have to repay the loan. Ex. 19 (Promissory Note).

19.     Jefferies decided to part ways with Davidson a year later. Ex. 20 (Talking Points for Discussion with Rick Davidson dated May 17, 2017 ("Talking Points")).

## A.     Davidson Failed to Disclose to Jefferies His Substantial Compliance History at Morgan Stanley

20.     As part of the pre-hiring process, Jefferies obtained a copy of Davidson's publicly available CRD report.[5] Exs. 1, 14 (Scoran Dep. Tr. at 40:17-21; March 21, 2016 CRD).

21.     Jefferies reviewed the limited information contained therein, which listed three customer complaints made by customers serviced by Davidson while he was employed at Morgan Stanley:  Emily Sonnenblick who made a complaint on March 6, 2012, Stephen Levy who made a complaint on September 28, 2011, and Edwin Hunter who made a complaint on January 5, 2012 (the "Three 2012 Customer Complaints"). Ex. 14 (March 22, 2016 CRD).

22.     No other customer complaints or other compliance related issues were disclosed on Davison's CRD prior to his hiring by Jefferies. *Id.; see also* Ex. 21 (Lau Dep. Tr. at 22:9-20).[6]

23.     Moreover, Davidson expressly represented to Jefferies, in writing, that he had no other customer complaints or compliance violations.  *See* Exs. 16-18 (April 22, 2016 Letter; Compliance Questionnaire; Offer Letter); Scoran Dec., ¶¶ 8, 10.

24.     In response to Jefferies' request for an explanation of the Three 2012 Complaints set forth on his CRD, by letter dated April 22, 2016, Davidson claimed Morgan Stanley had not asked Davidson to participate in settlement discussions with Sonnenblick or Hunter, Sonnenblick

---

[5] "CRD" stands for Central Registration Depository. The CRD is the central licensing and registration system for the US securities industry and its regulators.  *See* https://www.finra.org/registration-exams-ce/classic-crd. The system contains the registration records of registered broker dealers and the qualification, employment and disclosure histories of registered individuals. Information on the CRD is in large part a reporting of the disclosures made by firms on registration forms, like the Form U4, for their registered employees.  *See* https://www.finra.org/registration-exams-ce/broker-dealers/registration-forms/form-u4.    It is important to note that not all aspects of a registered person's compliance history is reportable on the CRD.  *Id.*   Under FINRA's Rules and as demonstrated by the questions on the Form U4 itself, only certain information must be reported to regulators for inclusion in the CRD report.  *See* Form U4, *available at* https://www.finra.org/sites/default/files/form-u4.pdf; *see also* https://www.finra.org/registration-exams-ce/broker-dealers/registration-forms/form-u4.    As a few examples, only written customer complaints where the damages alleged by the customer exceed a specific value must be reported for inclusion on the CRD; written discipline by an employer does not need to be reported on the CRD, unless it meets certain conditions; and regulator discipline is not always reportable on the CRD. *Id.*
[6] In their deposition testimony, witnesses used the terms "Form U4" (or just "U4") and "CRD" interchangeably. *See, e.g.,* Lau Dep. Tr. at 19:2-10. As noted in the footnote immediately above, information reported on the Form U4 is ultimately reported on the CRD report. *See* n. 4*, supra.*

still maintained an account relationship with Davidson, and Morgan Stanley denied the Levy complaint as "frivolous." Ex. 18 (April 22, 2016 Letter).

25. Because Jefferies could not call Morgan Stanley, Davidson's current employer, to verify any of the facts or circumstances described by Davidson, or else that would tip off Morgan Stanley that Davidson was seeking employment elsewhere, Jefferies had to rely solely on Davidson's explanation. Ex. 1 (Scoran Tr. at 105:16-106:21).

26. Because the Three 2012 Complaints (the only customer complaints known to Jefferies at the time) were either settled or dismissed, Morgan Stanley continued to employ Davidson, and no other compliance issues appeared on Davidson's CRD or were disclosed by Davidson, Jefferies accepted Davidson's explanation and moved forward with his hiring. Ex. 1 (Scoran Tr. at 108:22-109:4); Scoran Dec., ¶¶ 8-10.

27. Davidson's pre-hire April 22, 2016 Letter also stated that he was "suspended for 30 days," but that "since [his] return to work in the last four years had no further complaints nor commentary regarding this or anyone else." There was no reference to a suspension on Davidson's CRD. Exs. 14, 21, 22 (Lau Tr. at 37:4-17; Arcuri Tr. at 34:3-13; March 21, 2016 CRD).

28. As a follow-up to Davidson's April 22, 2016 Letter, Jeffrey Lau ("Lau"), a compliance officer of Jefferies, spoke to Davidson, requesting an explanation for the thirty-day suspension. Ex. 21, 23 (April 22, 2016 Lau Email to Arcuri; Lau Tr. at 47:7-48:18).

29. Davidson advised Lau that he was told to take a month off while the Sonnenblick complaint was being investigated by Morgan Stanley. *Id.*; Ex. 23 (April 22, 2016 Lau Email to Arcuri).

30.     However, as explained more fully below, and completely unbeknownst to Jefferies, Davidson's suspension was actually disciplinary in nature.  *See* Ex. 9 (March 5, 2012 Email from Koutsantonis to Firestein).

31.     Moreover, contrary to Davidson's representations in his April 22, 2016 Letter, Davidson was also the subject of another customer complaint and substantive compliance-related incidents throughout his tenure at Morgan Stanley – all of which he failed to disclose to Jefferies prior to his hiring and the extension of the significant loan monies by Jefferies.  *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); *See also* Exs. 16, 17 (Offer Letter; Compliance Questionnaire); Scoran Dec., ¶13.

32.     Moreover, prior to his commencement of employment with Jefferies, Davidson also informed Jefferies that he would be leaving Morgan Stanley voluntarily – indicating that he was not then the subject of any internal investigation by Morgan Stanley or being considered for discipline or termination by Morgan Stanley.  Scoran Dec., ¶9; Ex. 1 (Scoran Dep. Tr. at 95:18-97:8).

**B.     Jefferies Hires Davidson as an At-Will Employee and Davidson Agrees to Comply with the Firm's Policies.**

33.     Relying on the information Jefferies was provided at the time (which Jefferies now knows to have been substantially false), on May 17, 2016, Jefferies offered Davidson employment as an at-will Managing Director in the Wealth Management Division in New York City.  Exs. 1, 16 (Scoran Tr. at 26:23-27:5, 56:8-15; Offer Letter).

34.     In connection with his hiring, Davidson signed a series of agreements.  Among these documents was an offer letter, which set forth the pertinent terms of Davidson's prospective employment and compensation by Jefferies and the conditions upon which he would be hired by Jefferies (the "Offer Letter").  Ex. 16 (Offer Letter).

35.     The Offer Letter required that Davidson specifically warrant that "Except as disclosed below, to the best of my current knowledge and belief, I am not, and have not been, the subject of any investigation, whether by any prior employer, any governmental or regulatory authority, or any self-regulatory organization," and it provided a space for Davidson to insert details about prior and ongoing investigations of which Defendant was the subject.  *Id.*

36.     Davidson left the space blank, indicating there was nothing to disclose.  *Id.*

37.     Davidson admits that the Offer Letter was "an important letter."   Ex. 24 (Davidson Tr. at 205:24-206:5).

38.     Following execution of the Jefferies Offer Letter on May 13, 2016, Davidson tendered his resignation from Morgan Stanley, joining Jefferies on May 17, 2016.  Exs. 3, 25 (May 17, 2016 Matthews Email ; Morgan Stanley Form U-5).

## C.     The Promissory Note

39.     In addition to signing the Offer Letter, an as a further benefit to Davidson in connection with his hiring, on or about May 17, 2016, Defendant signed a full-recourse Promissory Note with Jefferies (the "Note"), which sets forth the terms of a $5,142,500 loan he would receive from Jefferies as an incentive for leaving Morgan Stanley to join Jefferies (the "Loan").  Ex. 19 (Note).

40.     The Note provided for acceleration of repayment of the Loan in certain instances, including the termination of Davidson's employment for cause.  *Id.*

41.     Upon the occurrence of an acceleration event, the Note provides that interest would begin to accrue at the default rate of 8.00% per annum.  *Id.*

## D.     Davidson's New Hire Compliance Questionnaire

42.     Davidson continued to mislead Jefferies about his compliance history at Morgan Stanley after his hiring. *See infra.*

43.     On May 23, 2016, the Massachusetts state Securities Division sent Jefferies a letter, commencing a regulatory inquiry into Davidson. Among other information, the Massachusetts Securities Division required Davidson to disclose and provide an explanation of other compliance-related matters, regardless of whether the matter would have to be reported on Form U-4 or Form U-5, including: (a) an inquiry or investigation by any securities regulatory agency or self-regulatory organization; … (c) an internal investigation by Jefferies or any broker-dealer with which the Applicant was formerly associated; and (d) a customer complaint, arbitration proceeding, or securities related litigation. Ex. 26 (May 23, 2016 Letter from the Commonwealth of Massachusetts, Secretary of the Commonwealth, Securities Division to Arcuri).

44.     When Jefferies forwarded the Massachusetts Securities Division's inquiry to Davidson, Davidson responded, "I read what they asked for and I believe it's all fully disclosed on my U4 nothing since then at all has come up or reported by anyone." Ex. 27 (May 31, 2016 Email from Davidson to Lau).

45.     Shortly after his hiring, Davison was also required to complete a New Hire Compliance Questionnaire 2016 (the "Compliance Questionnaire"). Ex. 17 (Compliance Questionnaire).

46.     In his answers to the Compliance Questionnaire, which he certified were true and correct, Davidson made several representations which Jefferies now knows to have been false, including:

- Davidson untruthfully answered that no federal or state financial regulatory organization (which includes FINRA):

· Notified him "in writing or otherwise that it has made [him] or the organization the subject of a regulatory complaint, proceeding or investigation."

· Found Davidson to have violated laws, rules or regulations.

· Disciplined Davidson in any way.

• Davidson untruthfully answered that he was only named in the Three 2012 Customer Complaints during the period of four years prior to the Compliance Questionnaire.

• Davidson untruthfully answered that he had not resigned from Morgan Stanley after allegations were made accusing him of investment related violations.

*Id.*; Exs. 2-13 (Morgan Stanley Compliance Issues Documents).

47.     Davidson's multiple false answers on the Compliance Questionnaire were clearly designed to avoid Jefferies' discovery of the false and misleading representations and omissions Davidson had made to Jefferies during his recruitment and hiring discussions.  *Id.*

**E.      Morgan Stanley Files a Form U5 Reporting that Davidson Was Subject to a Recent Internal Investigation; Davidson Provides False Information in Response to Jefferies' Questioning on the Matter.**

48.     Contrary to Davidson's representations to Jefferies that he voluntarily resigned from Morgan Stanley with no other compliance issues beyond the three customer complaints on his CRD and the suspension (which he described as being told to take a month off while the Sonnenblick complaint was investigated), approximately one month after Davidson joined Jefferies – and after Jefferies had already extended the Loan to Davidson – Morgan Stanley filed a Form U5 with FINRA reporting that Davidson had, in fact, resigned from Morgan Stanley in the midst of an internal review that had begun on January 6, 2016 and ended on May 17, 2016, the same day that Davidson resigned from Morgan Stanley and started his employment at Jefferies.  Ex. 25 (Morgan Stanley Amended U5 dated June 15, 2016).

49.     The Form U5 disclosed that Morgan Stanley's internal review related to Davidson's exercise of discretion in clients' accounts, as well as Davidson's receipt of a loan from another Morgan Stanley employee.  *Id.*

50.     When confronted by Jefferies' management about Morgan Stanley's Form U5 disclosure, Davidson first claimed he was unaware of the internal review (Ex. 1 (Scoran Tr. at 221:15-23)), and then falsely represented to Jefferies that the Morgan Stanley internal review concerned a loan from a Morgan Stanley employee and that Morgan Stanley had already concluded the investigation with no findings of unauthorized trading.  Exs. 28, 29 (June 21, 2016 Davidson Email to Lau; June 23, 2016 Nagy Email to Scoran).

51.     Jefferies also contacted Morgan Stanley to verify Davidson's explanation. However, Morgan Stanley would not provide any further information regarding Davidson.  Exs. 1, 30 (Scoran Tr. at 154:14-155:17; June 22, 2016 Schultz Email to Flessas).

52.     Jefferies later learned that these representations by Davidson were also false.  Exs. 3-4 (May 17, 2016 Matthews Email; Last Chance Agreement); Scoran Dec., ¶ 14.

**F.      Jefferies Terminates Defendant and Commences FINRA Arbitration.**

53.     On May 17, 2017, Jefferies notified Davidson that his employment was being terminated and his last day of employment with Jefferies would be June 15, 2017. *See* Ex. 20 (Talking Points).

54.     Davidson's termination triggered a repayment obligation under the Note and caused interest to begin to accrue on the outstanding balance at the rate of 8.00% per annum.  *See* Ex. 19 (Note).

55. Davidson refused to repay the Loan, as required by the terms of the Note. Ex. 19 (Note); *see also* Schedules E/F: Creditors Who Have Unsecured Claims [Bankruptcy Case, Docket No. 1].

56. On October 26, 2017, Jefferies initiated an arbitration against Davidson by filing a Statement of Claim with FINRA Dispute Resolution (the "FINRA Arbitration"). *See* Ex. 31 (FINRA Arbitration Claim).

57. Jefferies asserted claims against Davidson for, among other things, breach of promissory note and unjust enrichment/*quantum meruit* to collect the outstanding loan amounts due under the Note. *Id.*

**G.** **Morgan Stanley Produces Documents Disclosing Davidson's Extensive Compliance Violation History**

58. As part of discovery in the FINRA Arbitration that followed Davidson's termination by Jefferies, Morgan Stanley produced several documents in response to a subpoena served by Jefferies. *See* Exs. 1, 32 (October 15, 2018 and October 26, 2018 Letters from Morgan Stanley; Scoran Tr. at 95:25-96:9); Scoran Dec., ¶13.

59. These documents disclosed, for the first time, Davidson's extensive history of compliance issues at Morgan Stanley. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Scoran Dec., ¶13.

60. The information had never been disclosed to Jefferies by Davidson during his recruitment, nor was it reflected his CRD. Exs. 1, 14 (March 21, 2016 CRD; Scoran Tr. at 95:25-96:9); Scoran Dec., ¶14.

61. Davidson otherwise never disclosed the extent of his Morgan Stanley compliance history to Jefferies before or during his employment. Exs. 1, 16-18 (Scoran Tr. at 95:25-96:9; Offer Letter; Compliance Questionnaire; April 22, 2016 Letter); Scoran Dec., ¶14.

62. Based on the documents produced by Morgan Stanley in the FINRA Arbitration, Jefferies learned, for the first time:

a. As admitted by Davidson in his Answer to the Complaint (I) to Declare Certain Debts Non-Dischargeable Under 11 U.S.C. 523, and (II) Objecting to Discharge Under 11 U.S.C. 727 ("Davidson Answer"), at ¶22, in 2011, Davidson was the subject of an internal investigation by Morgan Stanley, and in June 2011, Morgan Stanley issued a disciplinary Letter of Reprimand to Davidson (the "June 2011 Letter of Reprimand") for exercising discretion in client accounts and unauthorized trading. Ex 6. Davidson was fully aware of the Letter of Reprimand, for which he acknowledged "receipt, acceptance and understanding" by signing the Letter of Reprimand on August 31, 2011. *Id.* As part of his effort to defraud Jefferies, Davidson purposely never disclosed the 2011 Letter of Reprimand prior to or during his employment with Jefferies. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

b. As admitted by Davidson in his Answer, at ¶23, in 2012, Morgan Stanley investigated Davidson for unauthorized trading again, and in February 2012, Defendant received another Letter of Reprimand from Morgan Stanley for this conduct (the "February 2012 Letter of Reprimand"). Ex 8. Davidson was fully aware of the Letter of Reprimand, for which he acknowledged "receipt, acceptance and understanding" by signing the Letter of Reprimand on February 7, 2012. *Id.*; Ex. 24 (Davidson Tr. 101:20-102:4). As part of his effort to defraud Jefferies, Davidson purposely never disclosed the 2012 Letter of Reprimand prior to or during his employment with Jefferies. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

c. Following Morgan Stanley's 2012 internal investigation, Morgan Stanley also required Defendant to sign a document titled "Last Chance Agreement," which stated that Davidson was obligated to comply with Morgan Stanley's policies on use of discretion and unauthorized trading, as well as Morgan Stanley's substance abuse policies (the "Last Chance Agreement"). Ex. 4. Davidson was suspended, without pay, for thirty (30) days, during which he was not permitted to have contact with any clients. *Id.* Contrary to what Davidson told Jefferies during recruitment discussions, this suspension was disciplinary in nature.[7] The Last

_____

[7] Davidson has lied more than once about the reason for his thirty-day suspension by Morgan Stanley. As noted herein, Davidson told Jefferies during recruitment discussions that the reason for his suspension was he was told to take off for a month while the Sonnenblick complaint was being investigated. However, in this adversary proceeding, he fabricated another lie in an effort to continue hiding the truth. In his deposition, Davidson testified that he was not suspended—and that the thirty days were taken off to study for his Series 65 exam. Ex. 24 (Davidson Tr. 106:3-12, 127:13-128:8). As part of the FINRA arbitration, Morgan Stanley produced an internal Morgan Stanley email from Kat Koutsantonis, Executive Director of Morgan Stanley's Human Resource Department, to Ben Firestein of Morgan Stanley's Wealth Management dated March 5, 2012, stating that the suspension was disciplinary and that Morgan Stanley suspended Davidson after a review of possible instances of his

Chance Agreement gave Davidson a "last chance" at Morgan Stanley and provided that if Morgan Stanley ever found that he violated the policies cited in the Agreement or any other policy, he would be terminated. *Id.* Davidson was fully aware of the Last Chance Agreement, for which he acknowledged "receipt, acceptance and understanding" by signing the Agreement in February 2012. *Id.*; *see also* Ex. 24 (Davidson Tr. 113:15-114:8). Moreover, on March 14, 2012, Davidson signed an Addendum to Last Chance Agreement. Exs. 5, 24 (Addendum to Last Chance Agreement; Davidson Tr. at 114:9-14). In signing the Last Chance Agreement, Davidson acknowledged that exercising unauthorized discretion in a client account is a very serious matter and agreed that if Morgan Stanley were to find that he improperly exercised discretion in a client account again, his employment with Morgan Stanley could be terminated. *Id.*; Ex. 24 (Davidson Tr. at 120:6-23). As part of his effort to defraud Jefferies, Davidson purposely never disclosed the Last Chance Agreement or Addendum to Last Chance Agreement to Jefferies prior to or during his employment. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

d. Morgan Stanley received multiple reports about the possibility that Davidson had been using illegal drugs in violation of the firm's Drug, Alcohol, and Controlled Substance Using Policy, and it observed negative changes in Davidson's behavior that Morgan Stanley was concerned may have been the result of drug use. Ex. 4 (Last Chance Agreement). Davidson was required to complete a drug testing and treatment program. *Id.* As part of his effort to defraud Jefferies, Davidson purposely never disclosed his prior drug usage, Morgan Stanley's discovery thereof, or the treatment program Morgan Stanley put in place for Davidson. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

e. On March 8, 2012, FINRA issued a letter finding Davidson had violated FINRA rules by causing disturbances at a FINRA testing center while taking a FINRA licensing exam. Ex. 10 (March 8, 2012 FINRA Letter). FINRA requested Morgan Stanley outline the steps it has taken to ensure Davidson abides by FINRA rules of conduct in the future. *Id.* The letter was not reportable on Davidson's U4, nor recorded in his CRD. *See* Ex. 14 (March 21, 2016 CRD). As part of his effort to defraud Jefferies, Davidson purposely never disclosed that FINRA, his primary regulator, had found that he violated FINRA rules of conduct. Exs. 16-18, 24, 27 (Davidson Tr. at 239:21-240:3; April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

f. On March 13, 2012, Morgan Stanley's Heightened Supervision Committee determined that Davidson should be placed on heightened supervision, meaning

---

placing trades in client accounts without specific verbal approval or written discretionary authorization, which Morgan Stanley believed may have resulted from Davidson's alleged drug abuse. Ex 9. Morgan Stanley "placed Davidson on unpaid leave because [they] concluded that he has acted inappropriately." *Id.*

that additional supervisory procedures were required for Davidson for at least six months, requiring, *inter alia*, Morgan Stanley's Branch Manager to contact Davidson's clients to confirm that trades in non-discretionary accounts were authorized by the clients prior to Davidson entering such trades, and to review ten percent (10%) of Davidson's emails (the "March 2012 Memorandum"). Ex. 11. Davidson was fully aware of being placed on Heightened Supervision at Morgan Stanley; indeed, he was required to sign the March 13, 2012 Memorandum in acknowledgement of its terms. *Id.*; Ex. 24 (Davidson Tr. at 257:18-258:8).

g. On May 9, 2012, Morgan Stanley extended the duration of Davidson's heightened supervision until December 31, 2012, subject to further extensions (the "May 2012 Memorandum"). Ex 12. Davidson was fully aware of the extension of his heightened supervision which he acknowledged by signing a new Heightened Supervision Memorandum on May 22, 2012. *Id.*; Ex. 24 (Davidson Tr. at 259:17-260:7). As part of his effort to defraud Jefferies, Davidson purposely never disclosed to Jefferies that he had been on Heightened Supervision at Morgan Stanley prior to or during his employment with Jefferies. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

h. On May 16, 2013, following an investigation by FINRA into Davidson's conduct, FINRA issued a Cautionary Action Letter (a form of written discipline that is not reportable on the CRD) to Davidson for exercising discretion without written authorization in four (4) customer accounts (the "May 2013 Cautionary Action Letter"). Ex 13; Davidson Answer [Adv. Pro. Doc. No. 6] at ¶25. As part of his effort to defraud Jefferies, Davidson purposely never disclosed the FINRA Cautionary Action Letter to Jefferies prior to or during his employment with Jefferies. Exs. 16-18, 27 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; May 31, 2016 Email from Davidson to Lau).

i. Davidson had an additional complaint against him by Susi Kesterman for engaging in unauthorized trading with respect to corporate bond investments beginning in January 2015 while at Morgan Stanley, which he did not disclose to Jefferies. Ex. 33 (May 22, 2017 Email from Ayanna Bonalde to Barbara Flessas and Amended Form U-5).

j. While Jefferies would receive the Form U5 filed by Morgan Stanley reporting that Davidson was the subject of an internal investigation in 2016, Davidson expressly informed Jefferies that, but for the Three 2012 Customer Complaints and 30 Day Suspension, he "had no further complaints nor commentary regarding this or anyone else". Exs. 17, 18 (April 22, 2016 Letter; Compliance Questionnaire). However, these representations were also revealed to be lies when Jefferies received the document production from Morgan Stanley during its post-termination arbitration against Davidson. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents). Davidson was unquestionably aware of Morgan Stanley's 2016 internal investigation. On March 15, 2016, Darren Wirhouski, the

Senior Complex Risk Officer for the Midtown Manhattan Complex at Morgan Stanley Wealth Management, emailed Davidson, saying "Pursuant to **_SIU's ongoing investigation_**, please provide your personal cell phone records from January 1, 2015 to March 15, 2016. Please provide these records no later than Tuesday, March 22, 2016." Ex. 2. Notably, in response to Mr. Wirhouski's request, Davidson did not ask what ongoing investigation Mr. Wirhouski was referring to or inquire what SIU was. Rather, Defendant acknowledged the request and asked for clarification on which accounts records were being sought – clearly indicating he was already aware that an investigation was ongoing. *Id.* As part of his effort to defraud Jefferies, Davidson purposely never disclosed the ongoing internal investigation which he was the subject of during the time frame he was seeking out employment with Jefferies. Exs. 2-13, 16-18, 27 (April 22, 2016 Letter, Offer Letter, Compliance Questionnaire, Morgan Stanley Compliance Issues Documents).

k. At the time of his resignation, Morgan Stanley's Complex, Regional, Division and National Risk and Compliance divisions "were in agreement that his imminent termination was the next step." Ex. 3 (May 17, 2016 Matthews Email).

63.  In the face of Morgan Stanley's ongoing 2016 internal investigation, and the Last Chance Agreement which authorized his immediate termination in the event of any future violation of policy, and with the knowledge that Morgan Stanley could be about to terminate his employment, Davidson quickly defrauded Jefferies into hiring him. Exs. 2, 4 (Last Chance Agreement; Wirhouski Email).

64.  Davidson clearly knew about his extensive compliance violations at Morgan Stanley, as evidenced by the various disciplinary letters, agreements and other documents which he acknowledged by countersigning at the time, yet he failed to disclose them. *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents).

65.  The Offer Letter required disclosure of any internal investigations as a condition to Davidson's obtaining employment with Jefferies and the benefits thereof. *See* Ex. 16 (Offer Letter). One such benefit to employment with Jefferies was the Loan.

66.  Davidson purposely hid the severity of his compliance-related issues, the investigations conducted by Morgan Stanley and FINRA, and the employer- and regulator-

imposed discipline he received, and he lied about the internal investigation that was ongoing at Morgan Stanley when he joined Jefferies in 2016. Exs. 16-18 (April 22, 2016 Letter; Compliance Questionnaire; Offer Letter); Scoran Dec., ¶¶ 9, 13.

67. Securities industry regulatory guidance requires that firms endeavor to obtain information about a registered person's compliance history so that it can make an informed decision about whether it wants to take on the obligation of supervising the registered person and the potential risks of employing that individual. *See, e.g., Sweep Report*, available at https://www.finra.org/sites/default/files/NoticeDocument/p004826.pdf; *see also See* FINRA Rule 3110(e); Scoran Dec., ¶16.

68. FINRA (and other securities industry regulators) have noted that "[a] small number of brokers have a pattern of complaints or disclosures for sales practice abuses and could harm investors as well as the reputation of the securities industry and financial markets." FINRA 2014 Regulatory and Examination Priorities Letter, *available at* https://www.finra.org/sites/default/files/Industry/p419710.pdf; *see also* Ex. 34 (FINRA News Release, "NASD Proposes Heightened Supervision for Brokers with a History of Customer Complaints, Investigations or Regulatory Actions" (Aug. 28, 2003)).

69. In the years leading up to Davidson's hiring by Jefferies, regulators placed a focus on what they refer to as "high-risk" or "recidivist" brokers, with histories of compliance issues, and they indicated their intent for increased regulatory scrutiny of those brokers and the firms that employ them. *See* FINRA 2014 Regulatory and Examination Priorities Letter, at 3, *supra;* SEC's Office of Compliance and Examinations 2016 Examination Priorities, at 3 (Jan. 11, 2016), *available at* https://www.sec.gov/files/national-examination-program-priorities-2016.pdf;

FINRA January 2017 Annual Regulatory and Examination Priorities Letter, at 2, available at

https://www.finra.org/rules-guidance/communications-firms/2017-exam-priorities.

70.     The same month Davidson was hired by Jefferies, FINRA's Chairman and Chief

Executive Officer, Richard G. Ketchum, provided the opening remarks at FINRA's Annual

Conference, making a point to mention hiring practices for high-risk brokers with "significant

past disciplinary records or a number of settled sales practice complaints or arbitrations":

> Research from behavioral scientists also tells us that an individual person's standard of what's right or wrong is affected by the persons with whom he or she associates. At FINRA, we're also taking this into account. We are using more data and advanced analytics to identify registered representatives with potentially problematic regulatory histories. These registered representatives could be "negative culture carriers." That is, if those reps do indeed engage in problematic behavior, they could adversely influence individual colleagues and possibly become the seeds for the creation of a negative sub-culture at a firm …
>
> I'm encouraged that firms are reviewing potential employees' ethical, financial and regulatory histories before hiring … Equally troubling, however, is the fact that there remain firms that have substantial concentrations of employees with significant past disciplinary records or a number of settled sales practice complaints or arbitrations. To say it bluntly, statistical analyses done by FINRA's Office of the Chief Economist and independent studies demonstrate that these firms are meaningfully more likely to have repeat sales practice violations that harm clients. … But I think it is important to emphasize that a firm that takes these risks does it at a cost. First, that firm faces a far greater challenge in communicating that its culture will not tolerate activity that does not place the customer first. Secondly, no firm that tolerates such a concentration of "high-risk" advisers should do so without expecting searching questions from FINRA as to the special supervisory steps they have taken to ensure no further bad actions.

FINRA CEO/Chair Richard G. Ketchum, "Remarks From the 2016 FINRA Annual Conference,"

available at https://www.finra.org/media-center/speeches-testimony/remarks-2016-finra-annual-

conference.

71.     Thus, member firms like Jefferies must carefully consider whether to hire brokers

with histories of compliance related events (i.e., complaints, disciplines, terminations, internal

reviews, regulatory investigations, etc.). *Id.*

72.     The events which Davidson failed to disclose to Jefferies (i.e., multiple internal investigations by Morgan Stanley, two of which resulted in the issuance of disciplinary letters to Davidson and one of which was still ongoing at the time of Davidson's hiring by Jefferies; findings of rule violations by FINRA and a FINRA investigation that resulted in the issuance of a Cautionary Action Letter to Davidson, concerns of illegal drug use by Davidson, his Morgan Stanley-imposed business plan and heightened supervision, and a recent additional customer complaint) are serious events and issues that would have caused Jefferies great concern when considering whether to hire Davidson, because they evidence that employing Davidson could present risk of future compliance violations, customer complaints and litigations, and regulatory scrutiny.  *See* Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Scoran Dec., ¶15.

73.     Jefferies was deprived the opportunity to consider the potential regulatory and compliance implications of Davidson's prior compliance-related issues that would eventually be disclosed by Morgan Stanley, after Davidson's termination by Jefferies.  Exs. 2-13 (Morgan Stanley Compliance Issues Documents); Ex. 1 (Scoran Tr. at 95:25-96:9); Scoran Dec., ¶13.

74.     Given the regulatory environment and the nature of Davidson's compliance-related issues and disciplinary history at Morgan Stanley, Jefferies' Compliance Department would not have granted approval for the hiring of Davidson, had Jefferies known of Davidson's extensive history of compliance-related issues prior to his hire date.  Scoran Dec., ¶17.

75.     Without approval from the Compliance Department, Jefferies would not have moved forward with the hiring of Davidson. *Id.*, ¶18.

76.     If Davidson had not been hired, Jefferies would not have extended the Loan to him. *Id.*, ¶19.

77. As set forth above in detail, Defendant made material misrepresentations and omissions to Jefferies prior to and during his employment, which Jefferies relied upon in loaning him money, hiring him and continuing his employment. Exs. 1-13, 16-18 (April 22, 2016 Letter; Offer Letter; Compliance Questionnaire; Morgan Stanley Compliance Issues Documents; Scoran Dep. Tr. at 26:23-27:5); Scoran Dec., ¶9.

**l.      About to Lose the FINRA Arbitration, Davidson Files Bankruptcy.**

78. On May 7, 2019 (the "Petition Date") – 18 months into the FINRA Arbitration, having completed five full days of evidentiary hearing and only six days before the FINRA Panel was scheduled to resume the final hearing – Davidson commenced the above-captioned bankruptcy case (the "Bankruptcy Case") by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code").  *See* petition [Bankruptcy Case, Doc. No. 1].

79. As of the Petition Date, there was an outstanding principal balance of approximately $5,142,500.00, plus accrued interest of $857,900.54, attorneys' fees and costs of $626,083.30, and estimated arbitration forum fees of $20,587.50, for a total of $6,647,071.34 due from Defendant to Jefferies under the Note (the "Indebtedness").  Jefferies' Proof of Claim [Bankruptcy Case, Doc. No. 5].

80. On November 5, 2019, Defendant sought by application to convert his Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code (the "Conversion Application"). [Bankruptcy Case, Doc. No. 65].

81. By order entered on November 6, 2019, the Court denied the Conversion Application as a result of Defendant's failure to file a motion to convert in accordance with Bankruptcy Rule 1017(f)(2).  [Bankruptcy Case, Doc. No. 66].

82.     On November 8, 2019, Defendant filed a *Motion for the Entry of an Order Converting Debtor's Case to a Chapter 7 Case* (the "Conversion Motion"). [Bankruptcy Case, Doc. No. 66].

83.     On January 12, 2021, this Court entered Judgment in favor of Jefferies against Davidson in the amount of $6,147,071.34. [Adv. Pro. No. 19-1325, Doc. No. 30].

84.     The Indebtedness remains outstanding and unpaid. Schedules E/F: Creditors Who Have Unsecured Claims [Bankruptcy Case, Docket No. 1].

85.     Davidson secured the Loan from Jefferies based on false pretenses and through false representations made to Jefferies. Schedules E/F: Creditors Who Have Unsecured [Bankruptcy Case, Doc. No. 1]; Exs. 2-13, 16, 18 (Offer Letter; April 22, 2016 Letter; Morgan Stanley Compliance Issues Documents).

86.     As such, the Indebtedness owed by Davidson to Jefferies is excepted from any discharge to be granted to Davidson. 11 U.S.C. 523.

## II.     Defendant's Bankruptcy Filings Contain Material Omissions and Errors

87.     On May 7, 2019, Davidson filed his Petition, Schedules, and Statement of Financial Affairs. [Bankruptcy Case, Doc. No. 1].

88.     In connection with each of his Petition, Schedules and Statement of Financial Affair, Davidson declared under penalty of perjury that the information contained therein was true and correct. [Bankruptcy Case, Doc. Nos. 1, 60, 61].

89.    On October 11, 2019 Davidson filed amended Schedules (the "Schedules")  and an amended Statement of Financial Affairs ("SOFA").  [Bankruptcy Case Doc. Nos. 60, 62].

**A.    Davidson's Schedules Contain False Information**

**(i). *Sag Harbor***

90.    On his Schedules, Davidson identifies real property in Sag Harbor, New York (the "Sag Harbor Property") in which he claims to own a one-half interest.  *See* Schedule A/B [Bankruptcy Case, Doc. No. 60 at p. 3]; *see also* Ex. 35.

91.    The other one-half interest in the Sag Harbor Property was alleged to be owned by Davidson's girlfriend, Nancy Stearns ("Stearns"), as a joint tenant.  *Id.*; *see also* Ex. 24 (Davidson Tr. at 279:24-280:6).

92.    The Schedules reflect a current value of the Sag Harbor Property of $2,900,000 and that it is encumbered by first and second mortgages totaling approximately $ 2,256,776.72 (the "Mortgages"). *See* Schedules A/B, D [Bankruptcy Case, Doc. No. 60 at pp. 3, 12].

93.    The Sag Harbor Property was appraised for $3,032,835.00 (the "Appraised Value").  *See* Proof of Claim of Suffolk County Credit Union ("SCFCU") [POC No. 9-1].

94.    The Zillow webpage for the Sag Harbor Property, included in SCFCU's Proof of Claim, includes several exterior and interior photographs of the home, which illustrates a newly renovated large home, with several pieces of high-end modern furniture, artwork, large screen television, high-end kitchen appliances and in-ground pool accompanied by lounging and seating for guests. *Id*.

95.    As of the Petition Date, Davidson claimed to be residing in a "brand new" condominium, a luxury oceanfront building on Miami Beach, Florida, for which he was paying

$8,000 per month in rent.  *See* Petition, Schedule J at pages 2, 36 [Bankruptcy Case, Doc. No. 1];

Ex. 24 (Davidson Tr. 5:7-13; 265:15-19; 278:12-23).

96.     Accounting for those Mortgages, there is still hundreds of thousands of dollars in

equity in the Sag Harbor Property, regardless of the which valuation used:

| Davidson's Value of Sag Harbor | $2,900,000.00 | Appraisal Value of Sag Harbor | $3,032,835.00 |
|---|---|---|---|
| PUB | $1,977,577.72 | PUB | $1,977,577.72 |
| SCFCU | $ 279,199.00 | SCFCU | $ 279,199.00 |
| | $2,256,777.52 | | $2,256,777.52 |
| Total Equity | $643,222.48 | Total Equity | $776,057.48 |

*See* Schedules A/B, D [Bankruptcy Case, Doc. No. 60 at pp. 3, 12]; *see also* [POC No. 9-1].

97.     By falsely asserting he had no equity in the Sag Harbor Property, Davidson listed

several assets on his Schedules as exempt pursuant to 11 U.S.C. §(d)(5) in the aggregate amount

of $14,600.00, which exempted amount is in excess of the $1,325.00 statutory allowance.  *See*

Schedules, Schedule C, Part 1 ¶¶ 1-2.

98.     Moreover, the Schedules undervalued material assets, including "[f]urniture,

appliances and household items" – valued at $5,000 – and "[t]vs, computer" – valued at $500

(collectively, the "Household Property").  *See* Schedules, Schedule A/B, Part 3 ¶¶ 6-12.

99.     Davidson seeks to exempt all of the Household Property. *See* Schedules, Schedule

C, Part 1 ¶¶ 1-2.

100.    Davidson did not provide any appraisal or other documentation to support the

artificially low value ascribed to the Household Property. *See* Schedules, Schedule C, Part 1 ¶ 2.

101.    Davidson did not provide any appraisal or other documentation to support the

values ascribed to property listed as exempt on his Schedules, including a Cartier watch, a

personal injury action against a high-net worth individual and "various artwork." *Id.*

### (ii). *Davidson's Earnings and Financial Assets before the Petition Date*

102.    Part four of Schedule A/B requires Davidson disclose and describe his financial assets under the penalty of perjury. *See generally* SOFA, Part 4 [Bankruptcy Case, Doc. No. 60].

103.    Davidson represented, under the penalty of perjury, that he earned gross income of $2,208,000.00 in 2018 and $2,329,382.00 in 2017. *See* SOFA, Part 2 ¶ 4.

104.    According to his Schedules, Davidson earned $140,000 per month and spent in excess of $124,512.00 per month. *See* Schedules, Summary of Assets and Liabilities, Part 3 [Bankruptcy Case, Doc. 60 at p. 1].

105.    Davidson further represented, under the penalty of perjury, that he made a total gross income of $598,011.00 between the start of the year, *i.e.*, January 1, 2019, to the Petition Date, *i.e.*, May 7, 2019. *See* SOFA, Part 2 ¶ 4.

106.    However, according to Davidson's People's United Bank account ending in 4489 (which was never disclosed in his Schedules or SOFA) (hereafter "PUB Account 4489"), between January 1, 2019 and April 26, 2019,  he earned  $695,297.68 (approximately $173,824.25 per month) as evidenced by the payroll that was directly deposited  into the 4489 account:

|               |              |
|---------------|--------------|
| January 15, 2019  | $ 42,281.54  |
| January 31, 2019  | $58,944.13   |
| February 15, 2019 | $97,295.11   |
| February 28, 2019 | $ 104,765.56 |
| March 15, 2019    | $ 61,867.89  |
| March 29, 2019    | $ 91,194.00  |
| April 15, 2019    | $ 58,949.45  |

| | |
|---|---|
| April 26, 2019 | $ 180,000.00 |
| **TOTAL** | **$695,297.68** |

*(See* Ex. 36).

107.   In other words, between January and May 2019, Davidson failed to disclose <u>at least $97,286.86</u> in gross income, and <u>undervalued his monthly income by $33,000</u>. (*See* SOFA, Part 2 ¶ 4; *see also* Schedules, Summary of Assets and Liabilities, Part 3).

108.   Additionally, between January 10, 2018 and September 26, 2018 Davidson received $1,678,417.77 in payroll that was directly deposited into his PNC Bank Account ending in 4045, between January and February 2018 payrolls, and then into his PUB Account 4489 starting in March 2018 and through September 2018. (*See* Ex. 37). Of this $1,678,417 - approximately $1,344,477.56 was directly deposited into PUB Account 4489. (*See* Ex. 37).

### *(iii).* *Davidson's Concealment of Assets & Failure to Explain Dissipation of Assets*

109.   According to Davidson's Schedules, as of the date of his Petition, he had $100 in cash (*see* Schedule A/B, Part 4 ¶ 16); $8,009.00 in his Peoples United Bank account[8] (*see* Schedule A/B, Part 4 ¶ 17); and $100 in his JP Morgan Chase bank account. (*See* Schedule A/B, Part 4 ¶ 16).

110.   In effort to conceal his assets, Davidson did not even identify the existence of the PUB Account 4489 on his Schedules, despite his payroll being directly deposited into this very same account for over a year and despite transferring assets out of that account and then closing it within a year of filing the Petition. (*See* Exs. 36, 37; *see also* SOFA, Part 8 at ¶ 20).

111.   In fact, although Davidson had received $1,344,477.56 worth of direct deposits into PUB Account 4489 between March 2018 and September 2018, this account had a balance of

---

[8] Although Davidson had multiple People's United accounts, he did not identify which account contained the referenced $8,109.00, despite the Schedule's clear instructions to list each account with the same institution. *See* Schedule A/B, Part 4.

$4,737.66 as of December 18, 2018. (*See* Ex. 36). In other words, over 1.3 million dollars had completely disappeared from Davidson's bank account in less than a year.

112.     Accounting for the $695,297.68 Davidson earned between January and April 2019, and assuming Davidson's expenses amounted to $124,512.00 per month for January, February, March, and April, that still leaves approximately $199,297.68 left in PUB Account 4489, after expenses. (*See* Schedules, Summary of assets and Liabilities, Part 3; Ex. 36).

113.     It is evident from the January through May statements for PUB Account 4489 that Davidson intentionally concealed his assets by wiring out nearly half a million dollars over the course of four months:

| PERIOD | AMT. OF WIRE TRANSFERS PER PERIOD |
|---|---|
| 12/18/2018 to 01/18/2019 | $88,000.00 |
| 01/18/2019 to 02/19/2019 | $58,000.00 |
| 02/19/2019 to 03/18/2019 | $94,000.00 |
| 03/18/2019 to 04/18/2019 | $76,000.00 |
| 04/18/2019 to 05/20/2019 | $178,000.00 |
| TOTAL: | **$494,000.00** |

(*See* Ex. 36).

114.     Davidson did not disclose the $494,000.00 wired out of PUB Account 4489 and has not otherwise accounted for $494,000.00. (*See* SOFA, Part 8 ¶ 20).

115.     Nor did Davidson disclose that he wrote 26,500 worth of checks from PUB Account 4489, payable to Nancy Sterns, an insider, between November 2018 and February 2019 (*see* Ex. 39) or that he withdrew $2,400.00 in cash from PUB Account 4489 between May 1, 2019 and May 7, 2019. (*See* Ex. 36). Indeed, according to the Schedules, Davidson only had $100 in cash as of the Petition Date. (*See* Schedule A/B, Part 4 ¶ 17).

116.     In fact, no more than a few days after receiving his direct deposit, Davidson wired out large sums of money from the PUB Account 4489, for example:

| | |
|---|---|
| 01/15/2019 | $ 42,281.54 (direct deposit) |
| 01/15-16/2019 | $ -15,000.00 (wired out) |
| 01/31/ 2019 | $58,944.13 (direct deposit) |
| 02/01/2019 | $ -44,000.00 (wired out) |
| 02/28/2019 | $ 104,765.56 (direct deposit) |
| 02/28/2019 | $ -88,000.00 (wired out) |
| 03/15/2019 | $ 61,867.39 (direct deposit) |
| 03/18/2019 | $ -41,000.00 (wired out) |
| 04/26/2019 | $ 180,000.00 (direct deposit) |
| 04/26/2019 | $ -150,000.00 (wired out) |

(*See* Ex. 36).

117.    As of May 7, 2019 – i.e., the Petition Date – PUB Account 4489 had a balance of $12,789. (*See* Ex. 36).

118.    As of May 10, 2019, PUB Account 4489 had a balance of $0.00 and was closed by Davidson. *Id.*

119.    Besides PUB Account 4489, Davidson also falsely represented on his SOFA that the last balance in his "passthrough entity" Bellator, LLC ("Bellator")  Bank of America ("BoA") account was $0.00 (*see* SOFA Part 8, ¶ 20), when the last balance of the Bellator BoA account – before Davidson transferred all of the money out of said account less than a month prior to the Petition date –  was  $55,340.40. (*See* Ex. 38).

120.    Davidson also did not disclose that, between April 1, 2019 and April 9, 2019, he withdrew a total of $40,631.68 from the Bellator BoA account by way of writing a check payable to himself for $10,000.00, wiring out approximately $27,000.00 to other accounts or entities, and withdrawing over $2,000.00 from various ATM machines before closing the account altogether. (*See* Ex. 38).

121.    Davidson has yet to account for the $61,000.00 transferred out of the Bellator BoA account to an unidentified checking account ending in "0974" between January 2019 and April 2019. (*See* Ex. 38).

122. Besides the Bellator BoA account and PUB Account 4489, Davidson also concealed that he wrote over $50,000 worth of checks, payable to Nancy Sterns, an insider, between May 30, 2019 and November 2019 through another PUB account ending 8022. *See* Ex. 40.

123. Davidson did not disclose the $54,502.01 provided to Nancy Sterns, despite being required to do so on his SOFA. *See* SOFA, Part 3 ¶ 8.

### *(iv). Davidson's Failure to Disclose Business Interests*

124. Part 11 of the SOFA requires Davidson to disclose his interests in any business or company within four years of filing his Petition. *See generally* SOFA, Part 11.

125. The only business interest identified in Davidson's SOFA was his interest in Bellator. *See* SOFA, Part 11¶ 27.

126. Davidson did not identify his interest in DLJ First Esc LP and DLJ Fund Investment Partners II, LP despite Davidson identifying his interest in those entities in his 2016 federal tax return. *See* Ex. 41.

127. Nor did the Schedules identify that he received dividends from "Pershing LLC" despite Davidson listing the dividends received from Pershing LLC in his 2016 and 2017 federal tax returns. *See* Schedules, Schedule A/B at §§ 6-7; Exs. 41-42.

128. With intent to hinder, delay or defraud Jefferies, and within one year of the Petition Date, Davidson transferred or concealed, or permitted to be transferred or concealed, certain of his property. *See* Exs 36-39; *see generally* SOFA, Schedules.

129. Davidson's intentional concealment or transfer of material assets includes his concealment of significant equity in the Sag Harbor Property, bank accounts and transfers made for little or no value to or for the benefit of several third parties, including Sterns. *See* Exs 36-39.

130.    However, the information contained in the Schedules and SOFA contained materially false statements and omissions that constitute a false oath or account in connection with his Bankruptcy Case. *See* Schedule, Summary of Assets and Liabilities, Parts 1-3; Schedules A/B, C, and D; *See also* SOFA, Parts 3, 6, 8, and 11.

131.    Davidson's non-disclosure, omissions, and failure to accurately report assets and transfers have intentionally misled creditors and the Court as to the debtor's true financial condition or, at a minimum, with reckless disregard for the truth with regard to a matter material to the Bankruptcy Case. *Id.*

<table>
<tr><td>Dated:    May 15, 2024<br>           Florham Park, New Jersey</td><td>**GREENBERG TRAURIG, LLP**<br><br>By: /s/ Alan J. Brody<br>Alan J. Brody, Esq.<br>500 Campus Drive<br>Florham Park, New Jersey 07932<br>Telephone: (973) 443-3543<br>Email: brodya@gtlaw.com<br><br>-and-<br><br>**GREENBERG TRAURIG, LLP**<br>Tracy L. Gerber, Esq. (admitted pro hac vice)<br>Elizbeth E. Moum, Esq. (admitted pro hac vice)<br>777 S. Flagler Drive, Suite 300 East<br>West Palm Beach, Florida 33401<br>Telephone: (561) 650-7900<br>Email: gerbert@gtlaw.com<br>           moume@gtlaw.com<br><br>*Counsel for Jefferies LLC and Jefferies Group LLC*</td></tr>
</table>

ACTIVE 697778752v6